No. 24-7280

# In the United States Court of Appeals for the Ninth Circuit

---

DR JEFFREY ISAACS,

*Plaintiff-Appellant,*

v.

APPLE INC.

*Defendant-Appellee.*

---

On Appeal from the United States District Court
for the Northern District of California
No. 3:21-cv-05567-EMC
Hon. Edward M. Chen

---

**APPELLANT'S OPENING BRIEF**

---

JEFFREY ISAACS
11482 KEY DEER CIRCLE
Wellington, FL 33449

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................. ii

TABLE OF AUTHORITIES............................................................ iv

INTRODUCTION ....................................................................... 1

QUESTIONS PRESENTED ........................................................... 3

JURISDICTIONAL STATEMENT .................................................. 5

STATEMENT OF THE CASE ........................................................ 6

    I.    INITIAL LAWSUIT AND DISMISSAL .................................... 6

        A. Dr. Isaacs' Notary Stamp Theory ........................................ 6

        B. District Court's Dismissal ................................................ 6

    II.   POST-JUDGMENT DEVELOPMENTS: THE EU DIGITAL
        MARKETS ACT AND APPLE'S CTF ..................................... 7

        A. Introduction of the Core Technology Fee.............................. 7

        B. Plaintiff's Rule 60(b) Motion................................................ 8

STANDARD OF REVIEW............................................................ 10

ARGUMENT ........................................................................... 12

    I.    THE   DISTRICT   COURT'S   RELIANCE   ON   APPLE'S
        INVOCATION OF OPTIONAL CAPITAL V. DAS CORP. WAS
        OUTSIDE ITS PERMISSIBLE DISCRETION ......................... 12

        Isaacs' Theory of a Sherman Act "Notary Stamp" Market Was
           Prescient, Not Vexatious.................................................... 16

    II.   THE DISTRICT COURT ERRED IN REFUSING TO RECOGNIZE
        ONGOING OR NEWLY MANIFESTED VIOLATIONS ..................... 17

        Application to Apple's Notary Stamp / CTF ........................... 19

        Evidence from the Post-Judgment CTF Necessitates Reopening............. 21

    III. THE  DISTRICT  COURT  IMPROPERLY  HELD  THAT  THE
        PRIOR JUDGMENT WAS NOT PROSPECTIVE UNDER RULE
        60(B)(5) ...................................................................... 22

        Prospective Nature of the Injunction ................................. 24

IV.  THE DISTRICT COURT WRONGLY CONCLUDED THAT NO EXTRAORDINARY CIRCUMSTANCES EXISTED UNDER RULE 60(B)(6) ........................................................................... 25

　　　The Inadequacy of Final Judgment in a Dynamic Market Context ............................................................................... 26

V.   THE DISTRICT COURT MISAPPLIED "LAW OF THE CASE" BY IGNORING NEWLY EMERGENT FACTS .................................... 27

　　Apple's Noncompliance with the UCL Injunction in *Epic v. Apple* Evidences Domestic "Notary Stamp" Fees......................... 29

　　The *Epic-Google* Jury Endorsed a Factual Determination of Single-Brand App Marketplace Digital Products........................... 32

VI.  THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING AN EVIDENTIARY HEARING OR LIMITED DISCOVERY .................................................................................... 35

VII. THE DISTRICT COURT'S MISAPPLICATION OF PROCEDURAL RULES TO DISMIS SUBSTANTIVE ANTITRUST CLAIMS .......................................................................... 38

VIII.   PUBLIC POLICY AND THE NEED TO RECOGNIZE PERSONAL PROPERTY RIGHTS IN DIGITAL DEVICES ................ 40

CONCLUSION ............................................................................................... 44

# TABLE OF AUTHORITIES

## Cases

*Agostini v. Felton,* 521 U.S. 203, 215 (1997) .......................................... 23

*Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1043 (9th Cir. 2018) ...... 28

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006) .................... 40

*Epic Games v. Apple, Inc*., No. 4:20-cv-05640-YGR (N.D. Cal.) .................. 15, 26

*FTC v. Actavis, Inc.,* 570 U.S. 136, 152 (2013) ...................................... 41

*Hall v. Haws*, 861 F.3d 977, 987 (9th Cir. 2017) .................................... 25

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968) ................ 18

*Horne v. Flores*, 557 U.S. 433, 447 (2009) ........................................... 22

*In re Google Play Store Antitrust Litig.*, 21 md 02981 (N.D. Cal.) ...................... 32

*Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) ......................................... 8, 18

*Latshaw v. Trainer Wortham & Co.,* 452 F.3d 1097, 1103 (9th Cir. 2006) ........... 37

*Lawlor v. National Screen Serv. Corp.,* 349 U.S. 322, 328 (1955) .............. 3, 11, 17

*Northern Pacific Ry. Co. v. United States,* 356 U.S. 1, 5–6 (1958) ...................... 42

*Optional Capital, Inc. v. DAS Corp*., 66 F.4th 1188 (9th Cir. 2023) .................... 12

*Richardson v. United States,* 841 F.2d 993, 1000 (9th Cir. 1988) .................. 36, 37

*Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 380–81 (1992) .................. 37

*United States v. Alexander,* 106 F.3d 874, 876 (9th Cir. 1997) ............................ 27

*United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc) ............ 11

*United States v. State of Washington*, 98 F.3d 1159, 1163–64 (9th Cir. 1996). 10,25

*Zenith Radio Corp. v. Hazeltine Research, Inc*., 401 U.S. 321, 338 (1971) .... 11, 17

**INTRODUCTION**

This appeal addresses a deceptively simple question: If you buy an iPhone, do you really own it, or does Apple still control its essential functions? Imagine purchasing a VCR or personal computer: once you get it home, you can insert any tape or install any software you wish—no questions asked. By contrast, an Apple iPhone blocks you from installing software unless Apple bestows its digital "Notary Stamp." This single approval mechanism (the "stamp") is effectively a digital signature check that forbids any unsigned software from even running on iOS. Apple claims it's just a security measure—but many in the tech and legal community see it differently: a monetizable gatekeeper function that Apple uses to maintain absolute control over which apps appear on iPhones. Europe tried to do away with it, but Apple doubled-down, exposing its true cost (the Core Technology Fee, or "CTF"). That resulted in the filing of a Rule 60 motion that is the subject of this appeal.

Dr. Jeffrey Isaacs and his co-Plaintiffs have spent five years challenging Apple's Notary Stamp practice as an illegal monopolistic scheme that improperly ties a separate, intangible "notarization service" to the purchase of iPhone hardware—contrary to the Sherman Act. They argue that Apple's stamp is not a trivial software design choice. Instead, it's a full-blown product Apple uses to extract fees and bar competition. Under this notarization model, Apple can (and does) censor COVID-19 apps, hamper cross-platform video solutions, and impose Core

Technology Fees on developers. In the US, that fee is built-in to developer commissions and consumer purchase prices, which lead the Honorable Edward Chen to dismiss its "economic reality" in 2021. Whether it exists as a distinct CTF, or a hidden bundled fee, the net effect is the same stranglehold on iOS software distribution—a "stamp tax" that punishes free app developers and stifles user freedom.

Time has shown that the lower court erroneously dismissed these claims, determining the Notary Stamp concept implausible without any peak into evidence, let alone, *Brown Shoe* jury determination. The lower court concluded that iOS notarization was inseparable from the phone's hardware or operating system—thus not a standalone "product" subject to antitrust scrutiny. That conclusion seemed final—until Apple recently introduced the Core Technology Fee in the European Union, effectively charging developers for that very stamping/approval process. If Apple truly had no separate "notary stamp" here in the United States, it wouldn't be able to unbundle and monetize it in Europe. The new CTF vindicates the entire premise of the initial lawsuit. The District Court, however, refused to reopen the judgment under Rule 60(b), ignoring the new evidence. It invoked "law of the case," local page-count rules, and finality concerns—thus barring any chance to litigate the freshly revealed anticompetitive practice.

*Lawlor v. National Screen Serv. Corp.,* 349 U.S. 322, 328 (1955) and related precedents hold that continuing antitrust violations can't be permanently shielded by a single adverse judgment—especially when the alleged violator modifies or extends its unlawful conduct. Apple's newly evidenced stamp tax is precisely that kind of modification: it shows Apple is selling iOS app approval as a service. And more importantly, it shows Apple could thwart domestic antitrust enforcement, for example, the *Epic* UCL injunction, by doing the same exact stamp tax in America. Denying Plaintiffs-Appellants a chance to prove these ongoing violations not only contradicts Supreme Court precedent but also hampers the public's right to an open, competitive marketplace. This brief, therefore, seeks reversal of the District Court's denial of the Rule 60(b) motion. The record must be reopened for a proper evidentiary hearing and to preserve the Sherman Act's fundamental policy against continuing monopolistic conduct.

## QUESTIONS PRESENTED

1. **Improper Reliance upon *Optional Capital***: Whether the District Court exceeded its discretion by endorsing Apple's improper invocation of *Optional Capital, Inc. v. DAS Corp.*, 66 F.4th 1188 (9th Cir. 2023)—a factually unrelated contractual payment dispute—to categorically bar reconsideration under Rule 60(b) and Ninth Circuit precedent allowing reopening of judgments when newly emerged facts materially alter the basis for dismissal.

3

2. **Continuing or Newly Manifested Violations:** Whether the District Court erred by treating Apple's post-judgment conduct—including the "Core Technology Fee" (CTF)—as barred by the original dismissal, contrary to *Lawlor v. National Screen Serv. Corp.*, 349 U.S. 322 (1955), *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968), and related precedents that forbid using an old judgment to shield new or evolving anticompetitive practices.

3. **Rule 60(b)(5) – Prospective Injunctive Relief:** Whether the District Court abused its discretion by not recognizing that the prior judgment (denying a class action injunction) was prospective under Rule 60(b)(5), with Apple's changed practices directly necessitating the prospective injunctive relief the Plaintiffs and putative class members originally sought.

4. **Rule 60(b)(6) – Extraordinary Circumstances:** Whether Apple's introduction of a separate line-item "stamp tax" for iOS app approval (the CTF)—and its potential to circumvent domestic antitrust enforcement—constitutes a fundamental alteration in controlling facts that justifies reopening under Rule 60(b)(6).

5. **Law of the Case and Newly Emergent Facts:** Whether the District Court misapplied "law of the case" in refusing to revisit Plaintiffs' tying allegations, despite "substantially different evidence" emerging post-judgment (Apple's separate CTF and alleged notary fees in the *Epic* litigation), thereby preventing meaningful judicial scrutiny of Apple's updated conduct.

6. **Evidentiary Hearing or Limited Discovery:** Whether the District Court erred by denying an evidentiary hearing or minimal discovery into Apple's new fee structure—particularly in light of *Latshaw v. Trainer Wortham & Co.*, 452 F.3d 1097 (9th Cir. 2006), and *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992)— to determine if Apple's "stamp" has become a monetized, stand-alone product.

7. **Procedural Irregularities and Public Policy:** Whether the court's reliance on page-limit rules, finality concerns, and alleged "law of the case" overshadowed due process and broader antitrust-policy interests—thereby allowing a major smartphone gatekeeper to evade scrutiny of its new fee scheme that impacts consumer choice, app innovation, and the public interest.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction over this case under 28 U.S.C. § 1331 because Plaintiffs alleged federal antitrust violations of the Sherman Act. On October 28, 2024, the District Court entered an order denying Appellant's motion under Fed. R. Civ. P. 60(b). Appellant timely filed a notice of appeal. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

5

# STATEMENT OF THE CASE

## I.     INITIAL LAWSUIT AND DISMISSAL

### A. Dr. Isaacs' Notary Stamp Theory

Plaintiffs, led by Dr. Jeffrey Isaacs, challenged Apple's absolute control over iOS software distribution. They argued that Apple's "Notary Stamp" is more than a security measure: it's a distinct product that developers must buy (or otherwise comply with) to run apps on iPhones. Plaintiffs alleged Apple's "stamp tax" effectively ties the iPhone device market to the iOS notary stamp market—an illegal tie under Sherman Act jurisprudence. They also alleged Apple discriminated by blocking or censoring certain apps, including Coronavirus Reporter.

### B. District Court's Dismissal

The District Court dismissed the complaint under Fed. R. Civ. P. 12(b)(6), finding that (1) no plausible "notary stamp" market existed, (2) Plaintiffs failed to define a valid product market, and (3) there was insufficient showing of antitrust injury. The Ninth Circuit affirmed in a published opinion.

## II.     POST-JUDGMENT DEVELOPMENTS: THE EU DIGITAL MARKETS ACT AND APPLE'S CTF

### A. Introduction of the Core Technology Fee

In response to the European Union's Digital Markets Act (DMA)—which mandates more open distribution on smartphones—Apple announced a plan to allow limited "sideloading" (i.e. direct install of apps outside the App Store) but only with a Core Technology Fee (CTF). This fee, charged to developers for the right to distribute iOS apps outside the official App Store, effectively monetizes Apple's notary stamp. By Apple's own statements, the CTF helps defray the "ongoing cost" of Apple's "core technologies" that allow an app to run. That is precisely the tying scenario Plaintiffs described in their complaint: Apple has a second product—an iOS approval stamp—separable from the initial phone purchase. It is noteworthy to this appeal that neither the District Court's order – nor the subsequent *de novo* review by this Circuit – ever analyzed the tying claim, which precludes deference to law of the case. For that reason alone, Rule 60 reopening is appropriate given the circumstances.

Apple's Core Technology Fee is not merely a European creation but part of its global strategy to monetize the notary stamp. Appellants' filings document Apple's repeated efforts to collect "services income" from iOS app approval— showing Apple has a long-term aim to replicate or expand this strategy across all

7

markets, including the United States. Courts have recognized that a defendant's cross-market patterns of commercial behavior can demonstrate a broader plan to restrain trade. *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997). Apple's consistent approach to notary fees suggests it is a discrete revenue source rather than a mere technical OS function.

To be sure, Apple has argued in their filings that the new EU-based fee structure "has no bearing" on iOS distribution in the United States. But even if the CTF were limited to Europe initially, it remains a highly probative new piece of evidence that Apple's app-approval function (i.e. notarization) is truly a separate, salable service. Apple has vigorously defended this notarization system globally, including by threatening surcharges on developers who circumvent the App Store. The company's own "Core Technology Fee" effectively proves the allegedly integrated OS function exists as a separately monetized line item—contradicting Apple's prior claims that no "notary" product ever existed.

### B. Plaintiff's Rule 60(b) Motion

Possessing new evidence vindicating his five year old 'common sense' theory, Dr. Isaacs moved under Rule 60(b)(5)–(6) to reopen. (ER 47). The motion advances that Apple's newly revealed fee structure represents "altered business practices in response to the new regulatory environment," thereby serving as a continuing or renewed antitrust violation. (ER 50). Plaintiff stressed that Apple's "steadily

growing services income" derived from iPhone's anticompetitive notarization conduct. (ER 58). New evidence shows subversive, and global, attempts to thwart antitrust regulation, funnel developer usage into Apple's gatekeeping model and protect Apple's notary stamp revenue at all costs. He contended these developments confirm that Apple's notary-stamp-based gating was not a "fictional creation" but an active, continuing scheme—consistent with *Hanover Shoe's* recognition that an old adverse judgment cannot insulate newly manifested or reconfigured monopolistic conduct. (ER 52).

Plaintiff also cited parallel litigation and investigations (DOJ, *Epic* Games, etc.) that highlight Apple's antitrust regulation conduct, pointing to Apple's "tooth and nail fight" to preserve notary-stamp-based control across iOS devices. (ER 21). The EU CTF, he argued, serves as "irrefutable proof" that Apple views the stamp as a critically valuable, distinct product. (Ibid.)

The District Court refused to reopen. It stated that "law of the case" barred further arguments under Rule 60(b)(5). It held that a foreign jurisdiction's legislation[1] and a verdict in another district court are not grounds to contravene the

---

[1] The Rule 60 motion, to clarify, cited Apple's recent *response* to the EU legislation, i.e. the CTF, as evidence revealed from a change in controlling circumstances. This is distinct from the foreign legislation itself, and hence was confounded by the lower court.

Ninth Circuit's published opinion affirming the dismissal of Plaintiffs' claims. This clearly conflated evidence stemming from *Apple's response* to EU regulation as *legislation* that would contravene the law of the case. The court also invoked local page-count rules, also erroneously, dismissing the case on purported grounds the that Plaintiff exceeded the 25-page limit. It declined to hold an evidentiary hearing or allow any discovery, effectively shielding Apple's new scheme from judicial scrutiny. Dr. Isaacs appeals.

The District Court analysis is about a page in length, and does not mention Apple's introduction of the CTF (rather than the pre-existing legislation), nor does it acknowledge Apple's 27% anti-steering "commission." Without touching upon these two fundamental shifts in Apple's marketing practices, it largely failed in its obligation to adjudicate this motion. The bulk of the one-page discussion explains that the District Court follows the Ninth Circuit law of the case, and how the Rule 60 paper purportedly "ignored significant portions" of this Circuit's Opinion. In light of that narrowly defined path to Rule 60 intervention, the court below denied the motion. (ER 6).

## STANDARD OF REVIEW

A District Court's denial of a Rule 60(b) motion is generally reviewed for abuse of discretion. *United States v. Washington*, 98 F.3d 1159, 1163 (9th Cir. 1996).

10

A court abuses its discretion if it applies the wrong legal standard or if its findings are illogical, implausible, or unsupported by the record. *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc).

Even if the original lawsuit was properly dismissed, courts have long recognized that a prior judgment does not forever shield a defendant who continues or extends the same anticompetitive practice. *Lawlor v. National Screen Serv. Corp.*, 349 U.S. 322, 328 (1955) (rejecting the notion that one adverse judgment "immunize[s]" the defendant from subsequent suits where new acts "could properly be the basis for [new] relief"); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971) (each "overt act" can give rise to a fresh violation and new damages).

Federal Rule of Civil Procedure 60 provides in section (b) "Grounds for Relief from a Final Judgment, Order, or Proceeding. On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: … (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief."

## ARGUMENT

### I.    THE DISTRICT COURT'S RELIANCE ON APPLE'S INVOCATION OF OPTIONAL CAPITAL V. DAS CORP. WAS OUTSIDE ITS PERMISSIBLE DISCRETION

Apple's invocation of *Optional Capital, Inc. v. DAS Corp*., 66 F.4th 1188 (9th Cir. 2023), to frame Isaacs' Rule 60(b) motion as frivolous or vexatious was both disingenuous and factually misplaced. Contrary to Apple's portrayal, the procedural and factual context of *Optional Capital* bears no meaningful resemblance to the issues before this Court. Apple's argument inverts reality: the company is openly engaged in malicious compliance with both the Epic UCL injunction and the EU Digital Markets Act—by overtly monetizing digital notarization of apps—yet simultaneously labels Plaintiff as vexatious for correctly alleging that such notarization constitutes a distinct, economically real market. Apple's argument epitomizes the concept of DARVO; the company is actively engaged in improper antitrust regulatory conduct, yet somehow blames Plaintiff as vexatious merely for accurately alleging that notarization, in fact, bolsters Apple's profits.

Most troubling is, like the baseless page number allegation (see below), the District Court appears to have adopted Apple's misleading framing wholesale, reflexively accepting that the law-of-the-case doctrine as articulated in *Optional* bars Isaacs' Rule 60 motion without engaging substantively with the fundamentally

12

different factual and procedural circumstances at issue. By doing so, the lower court effectively allowed Apple's misrepresentation of *Optional* to obscure the legitimate factual basis for reopening Isaacs's case. This oversight constitutes reversible error, as it improperly applied procedural rules in a manner contrary to Supreme Court precedent emphasizing judicial flexibility when faced with substantial new evidence. See *Agostini v. Felton*, 521 U.S. 203, 215 (1997); *Horne v. Flores*, 557 U.S. 433, 447 (2009).

First, Apple omitted crucial details about the *Optional Capital* case, in which the plaintiff persistently sought relief for what was essentially a payment dispute involving assets allegedly owed from a South Korean corporation. The Ninth Circuit characterized *Optional's* motion as a transparent effort to re-argue the identical legal questions already conclusively resolved by prior appellate rulings. Id. at 1192. No new factual revelations, market changes, or intervening developments were presented—only rehashed arguments that had already failed. This repetitive, purely legal maneuvering eventually prompted sanctions for frivolous and vexatious litigation. Id. at 1193.

In stark contrast, Isaacs's Rule 60(b) motion is based upon newsworthy, major international antitrust developments surrounding Apple's monetization of notary stamps. The legal journal and news articles that have been stunned by Apple's non-compliance with the *Epic* UCL injunction and the EU DMA are too numerous to list.

13

These substantive developments – that Apple "fights tooth and nail" to protect its notarization revenue – are absolute proof that Dr. Isaacs' now five-year old notary stamp theory had merit, and moreover, was tethered to "economic reality" of a Sherman relevant market. Appellant's motion is based upon significant and widely-publicized factual developments occurring *after* the original dismissal of his antitrust claims—most prominently, Apple's explicit and public monetization of notarization services via the "Core Technology Fee" (CTF) in Europe. These new facts confirm Isaacs' original theory: that Apple's "notary stamp" function, initially dismissed by the district court as "untethered from economic reality," is, in fact, economically distinct and separately monetized. Far from frivolous, Appellant's allegations were demonstrably prescient: the economic reality he pleaded in advance has now become front-page business news globally, validating the plausibility and necessity of reexamining his claims.

Moreover, unlike the plaintiff in *Optional Capital*, this Rule 60 motion relies directly upon specific new factual occurrences, such as Apple's post-judgment implementation of external-payment fees following the *Epic Games* injunction, the jury finding in the closely analogous *Epic v. Google* case confirming the plausibility of single-brand market definitions, and Apple's internal testimony detailing the implementation and rationale behind these fees. None of these crucial, newly revealed facts existed or could have been addressed at the pleading stage, and

14

certainly not during the Ninth Circuit's earlier review. The lower court's order doesn't even mention these developments, and for that reason alone, must be reversed.

Adding to the troubling nature of Apple's argument is the company's demonstrable strategic hypocrisy in its own litigation conduct. Apple itself has liberally invoked Rule 60(b) motions in multiple cases—including, notably, in the parallel *Epic Games v. Apple* litigation—to seek relief or modification of court orders based on new factual circumstances and subsequent developments in the law. For instance, in *Epic Games v. Apple, Inc.*, No. 4:20-cv-05640-YGR (N.D. Cal.), Apple filed a Rule 60(b) motion explicitly requesting modification or vacation of an injunction based on highly questionable new evidence and changed circumstances post-judgment. Thus, Apple clearly recognizes and employs Rule 60(b) as an essential procedural tool when any semblance of new factual circumstances warrant relief from judgment.

Yet, when Dr. Isaacs properly invokes the identical procedural mechanism based on genuinely new and significant evidence, Apple resorts to citing *Optional Capital*—a completely unrelated case involving repetitive litigation of previously settled legal questions—to falsely depict him as vexatious. Apple's selective and self-serving invocation of *Optional* represents a strategic misuse of precedent intended not only to unfairly discredit Isaacs personally, but to obscure the

15

substantial merit and timeliness of his motion. This practice of *ad hominem* attacks on legitimate petitioners of *the largest monopoly in history* must stop. As part of this Opening Brief, Apple is specifically requested to identify, in tabular format in the Answering Brief, a list of all discrediting personal remarks carried out by their counsel and/or lobbying firms on the character of antitrust petitioners, including but not limited to Epic Games' CEO, PhantomAlert's "disgruntled" CEO, and Senator Klobuchar (bipartisan lead of the Open App bill).

### Isaacs' Theory of a Sherman Act "Notary Stamp" Market Was Prescient, Not Vexatious

When Dr. Isaacs initially alleged a relevant antitrust market for Apple's notary stamp mechanism, the district court dismissed this theory as existing in the 'hinterlands,' and "detached from economic reality." Yet subsequent global developments have confirmed Isaacs' theory was not only economically plausible, but prescient. The European Union's Digital Markets Act explicitly forced Apple's hand, prompting the company to publicly monetize notarization via the Core Technology Fee. Apple's internal strife and subsequent decision to similarly monetize external payment notarization under the Epic UCL injunction domestically further validate Isaacs' initial allegations.

Thus, the underlying Rule 60 motion does not reflect vexatious litigation tactics, but rather legitimate and well-founded attempts to have the courts recognize

an evolving antitrust violation grounded in newly emerged facts. Labeling such attempts as vexatious through misapplication of inapplicable precedents like *Optional Capital* is improper and unjust.

In sum, Apple's attempt to equate a substantively supported Rule 60(b) motion with the filings of the plaintiff in *Optional Capital* is wholly unjustified, strategically hypocritical, and clearly distinguishable on both factual and procedural grounds. The district court's near-automatic acceptance of Apple's faulty logic amounts to clear reversible error, warranting correction on appeal.

## II.    THE DISTRICT COURT ERRED IN REFUSING TO RECOGNIZE ONGOING OR NEWLY MANIFESTED VIOLATIONS

Under *Lawlor v. National Screen Serv. Corp.*, 349 U.S. 322, 328 (1955), and *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338 (1971), a prior adverse judgment does not immunize a defendant from liability when its conduct evolves to inflict new harm. Apple's decision to unbundle and monetize its notary stamp—evidenced by the introduction of the Core Technology Fee—is a clear instance of such renewed misconduct. Consequently, the District Court's dismissal must yield to the fresh, actionable harm now before this Court. Under *Lawlor* and *Zenith Radio*, the fact that Apple persists in the same tying or monopolistic behavior—indeed, has codified it into a separate revenue stream—means the District Court's prior dismissal cannot foreclose Plaintiffs from challenging the continued or

17

newly manifested harm. Accordingly, the case should be reopened to account for Apple's ongoing and expanded notary-stamp practices.

In the underlying case, Plaintiffs' class action injunction sought to enjoin Apple's notarization control over iPhone software distribution; yet Apple has not only kept the anticompetitve requirement in place but expanded it globally (via the "Core Technology Fee" abroad and parallel fees domestically). Hence the escalated conduct defeats the proposed injunction with new, more overt acts.

Likewise, in *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968), the Supreme Court declared that a defendant's ongoing antitrust misconduct may generate fresh or continuing claims—even if earlier litigation of similar issues resulted in dismissal. *Hanover Shoe, Lawlor*, and *Zenith* collectively stand for the proposition that a prior adverse judgment cannot shield reconfigured or newly revealed monopolistic behavior. Therefore a "continuing violation" flows from repeated misconduct—thus each new or altered manifestation of the challenged activity is independently actionable. Absent such a principle, a single lawsuit might immunize a monopolist perpetually, at odds with the central aim of antitrust laws to prevent and remedy ongoing restraint of trade.

Subsequent decisions have reinforced this. For example, in *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997), the Supreme Court explained that each "overt act" in a continuing violation triggers a fresh right of action. The policy

rationale is manifest: antitrust law cannot condone indefinite exploitation of a monopoly under the rubric "We already litigated that."

In this vein, the above cases emphasize that any new or different misconduct—or any continuation of prior misconduct that yields fresh harm—remains subject to challenge. Thus, courts cannot raise an impenetrable barrier around a defendant's post-judgment modifications simply because an earlier iteration of the claims was dismissed.

### Application to Apple's Notary Stamp / CTF

Before final judgment, Apple represented that iOS notarization was an inseparable technical function—not a distinct good or service. That representation directly formed the District Court's conclusion that no plausible "notary stamp" product existed. (See Order Granting MTD, ER 94, describing the stamp as mere "integrated features" and rejecting Plaintiffs' "contrived" product definition of "component parts.")

But Apple's subsequent introduction of a Core Technology Fee—particularly in response to the DMA—plainly contradicts the notion that notarization is wholly integrated and inseparable. By instituting a line-item charge to developers for iOS approval (outside the App Store), Apple is effectively monetizing the notary function, validating Plaintiffs' original theory that the "stamp" is not a trivial OS

19

component but a separate "thing" Apple can sell. See ER 57 (arguing that Apple's new fees confirm the iOS notary tax was always there, just "obscured as part of the Apple Ecosystem.")

Under *Hanover Shoe*, the question is not whether Plaintiffs lost round one, but whether Apple has now engaged in further or renewed anticompetitive conduct. 392 U.S. at 502–03. A defendant cannot invoke an earlier dismissal to immunize subsequent continuing antitrust injury. Each new injury remains actionable, and likewise, if evidence comes to light of an injury uncovered by a material change in Defendant's conduct, that injury is ripe for adjudication. The entire point of continuing-violation doctrine is to prevent a defendant from insulating subsequent or adapted practices behind an old judgment. Here, the District Court's refusal to consider the CTF effectively grants Apple a free pass to adopt the same notary scheme in a newly formalized way.

This is precisely what *Lawlor* and *Hanover Shoe* sought to prevent. Apple's "stamp tax" was arguably nascent before; now it's explicit. Ignoring that shift invites indefinite exploitation of Apple's iOS monopoly. *Klehr*, 521 U.S. at 189. As Appellant explained in the Rule 60(b) motion, Apple always had real, tangible notary revenue; it proved that when it implemented the CTF and UCL anti-steering fees. The District Court's disregard of that transformation is legal error, particularly

20

manifested in its characterization of the entire manner as "overseas legislation," which fundamentally missed the point.

### Evidence from the Post-Judgment CTF Necessitates Reopening

In Appellant's Rule 60(b) motion and reply, Dr. Isaacs highlighted how Apple's new Core Technology Fee is not a mere European anomaly but direct proof "notarization fees are indeed what Apple is fighting for tooth and nail." (ER 63.) Emphasizing Apple's "steadily growing services income," id. at 9, Appellant stressed that the CTF reveals Apple's capacity to unbundle the iOS "stamp" and charge fees—effectively "the largest Stamp Tax in history." (ER 51) He warned :

> *Embedding the notarization stamp requirement within a computing system showcases one of the most pernicious tying arrangements presently conceivable—a mechanism monopolizing approval and access within a field where openness and competition birth innovation and consumer value. This is not an obscure argument buried within the complexities of computational theory; it is the recognition of a monopolist seizing control over the very arteries that feed the software industry. (ER 52)*

These arguments invoke the aforementioned principle that renewed or evolving monopolistic practices remain actionable notwithstanding a prior adverse judgment. Yet the District Court never engaged with this continuing-violation analysis; instead, it reasoned without substantiation that "the latest relief sought is directly contrary to the Ninth Circuit rulings in this case," blocking further inquiry.

21

(ER 5).  That ruling failed to account for *Lawlor's* recognition that an old dismissal cannot immunize new or reconfigured anticompetitive schemes. But more importantly, it overlooked the basic premise of the motion: that recent events demonstrate the single-brand Notary Stamp market *was* tied to economic reality (the lower court's original reason for rejecting it), and therefore, the FAC *did* state a claim for relief.

### III. THE DISTRICT COURT IMPROPERLY HELD THAT THE PRIOR JUDGMENT WAS NOT PROSPECTIVE UNDER RULE 60(B)(5)

Federal Rule of Civil Procedure 60(b)(5)[2] permits reopening a final judgment if "applying it prospectively is no longer equitable." The District Court's order never directly ruled on the prospective nature of the initial preliminary injunction and subsequent judgment. Apple's opposition claimed that the matter was not of a prospective nature, therefore for purposes of the appeal, and because the ruling overlooks the broader context of the class action antitrust case, Appellant submits that the order effectively held the initial judgment to be non-prospective.

The Supreme Court in *Horne v. Flores*, 557 U.S. 433, 447 (2009), clarified that a decree's "prospective" effect hinges not on whether it is labeled an

---

[2] The District Court analysis did not explain why FRCP 60(b)(6), the catch-all provision, shouldn't apply here, given the substantially improper conduct taking place and public policy arguments.

"injunction," but on whether the ruling restrains or compels future conduct in a way that may become inequitable if circumstances change.

Here, the prior dismissal (and the Ninth Circuit's affirmance) effectively bars Plaintiffs from seeking injunctive relief against Apple's "stamp" scheme, in perpetuity. That is grounds for relief. By treating the final judgment as an absolute barrier to re-litigation, the District Court's approach confers a prospective shield upon Apple—precisely the scenario Rule 60(b)(5) addresses. *Agostini v. Felton*, 521 U.S. 203, 215 (1997) (allowing reconsideration of final decisions if controlling facts or legal principles have changed). It is notable the District Court did not attempt to re-affirm that notary stamps are not tethered to economic reality – it doesn't even mention them[3]. Instead, it is saying nothing changes the fact the pleading was deficient (due to lack of evidence of a single-brand market). Concrete new evidence of the single-brand notary stamps market *does* change the sufficiency of the pleadings.

---

[3] The Order does not mention notary stamps, Core Technology Fee, or Epic UCL non-compliance by way of 27% commission. These were the matters that justified the Rule 60 motion, and the proposed subject of the requested evidentiary hearing. Absent acknowledgement of these key issues, the Order reads as a boilerplate (and erroneous) deference to rule of the case that failed to substantively grapple with the issues in any meaningful fashion.

## Prospective Nature of the Injunction

The injunction at issue is inherently prospective—it is designed not only to address past conduct but also to govern Apple's future behavior. In the present case, the District Court's final judgment precludes any injunctive remedy against Apple's evolving notary stamp practices. Yet, with the emergence of Apple's Core Technology Fee (CTF)—which explicitly monetizes the stamp function—there is a clear indication that Apple intends to continue its anticompetitive conduct prospectively.

Because the injunction was originally based on the premise that the notary function was inseparable from iOS, the subsequent development—Apple's unilateral introduction of a fee structure in the US and abroad—alters the very basis for the original injunctive relief. Indeed, nearly five years ago the injunction argued that a likelihood of success existed because the *per se* tying of notarized apps store was pernicious. That didn't resonate with the lower court back then, but it should now. The new evidence demonstrates that the "stamp" exists as a distinct, profit-generating service. This change has a direct prospective impact, as Apple continues to enforce its fee-based model for app approval. By treating the judgment as final, the District Court has effectively insulated Apple from future review, thereby undermining the equitable purpose of Rule 60(b)(5). Here, the new facts clearly indicate that the injunction's prospective application is no longer equitable.

## IV. THE DISTRICT COURT WRONGLY CONCLUDED THAT NO EXTRAORDINARY CIRCUMSTANCES EXISTED UNDER RULE 60(B)(6)

Rule 60(b)(6) offers a "grand reservoir of equitable power" to relieve judgments for "any other reason that justifies relief." *Hall v. Haws*, 861 F.3d 977, 987 (9th Cir. 2017). Courts have consistently held that major changes in controlling facts or newly discovered misconduct can justify relief even in the face of an otherwise final judgment. See *United States v. State of Washington*, 98 F.3d 1159, 1163–64 (9th Cir. 1996).

The District Court's order dismissed the possibility of new circumstances (declining a hearing), concluding that the new developments do not affect the sufficiency of the original complaint. (ER 5). But in doing so it ignored the essence of Rule 60(b)(6). If fresh factual circumstances fundamentally alter the premise upon which a dismissal was based—Apple's prior stance that 'no separate notary stamp exists'—the ends of justice allow a court to revisit that conclusion. Apple's decision to roll out the CTF—a line-item charge for something it previously claimed was "integrated and not sold"—supplies precisely that fundamental alteration. Refusing to account for it contravenes the equitable heart of Rule 60(b)(6).

When the controlling facts change—as they have with Apple's unilateral implementation of the Core Technology Fee—the injunctive relief originally granted is no longer equitable. The Supreme Court in *Horne v. Flores* and *Agostini v. Felton*

makes clear that when a final judgment's prospective effect is undermined by newly emergent, extraordinary circumstances, the judgment must yield to ensure justice. Here, Apple's reconfiguration of its notary function into a revenue stream meets this high threshold.

Notably, Apple itself has filed a Rule 60(b) motion in *Epic Games v. Apple, Inc.,* No. 4:20-cv-05640-YGR (N.D. Cal.), Dkt. 1018, seeking to modify or vacate an injunction based on changed factual and legal circumstances. Apple's willingness to invoke 60(b) for its own benefit in a parallel antitrust dispute—while opposing any 60(b) relief here—reveals a stark inconsistency: the same Rule is valid for Apple but allegedly foreclosed for Plaintiffs. This highlights that 60(b) is meant to accommodate newly emerged evidence or altered conditions. The District Court should have recognized Plaintiffs' new evidence of Apple's notary stamp monetization under the same flexible approach that Apple endorses elsewhere. Instead, the court below seemed to rebuke Plaintiff on page-count, suggesting the *pro se* Rule 60 motion against Apple was not well received.

### The Inadequacy of Final Judgment in a Dynamic Market Context

The speed of innovation in digital platforms counsels against rigid finality. *Agostini v. Felton* permits reexamination when altered facts or law reveal that prior assumptions no longer hold. Apple's CTF exemplifies how iOS notarization has

evolved from a purportedly inseparable OS element into a newly monetized, line-item service.

Digital markets are inherently dynamic, and judicial finality must not be allowed to freeze an evolving economic reality. As evidenced by Apple's transformation of its notary function into a fee-based service, the assumptions underlying the original judgment have been fundamentally undermined.

## V.    THE DISTRICT COURT MISAPPLIED "LAW OF THE CASE" BY IGNORING NEWLY EMERGENT FACTS

Law of the case is a discretionary doctrine designed to promote finality, not an iron rule that forbids acknowledging factual changes. *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997). This Court has repeatedly held that "substantially different evidence" appearing after a prior ruling is an exception that can reopen the matter. Id. at 877.

In denying Plaintiff's motion, the District Court invoked "law of the case" as if it were absolute, stating that the Ninth Circuit's affirmance left no room to re-argue these claims. (ER 5.) The entirety of the ruling, about a page altogether, explains how the District Court is bound to the law of the case, i.e. the Ninth Circuit published opinion that followed a de novo review of the 12(b)(6) dismissal. It is not entirely clear whether the District Court simply erred too conservatively in effort to respect this Circuit's prior opinion, or somehow fell into a circular logic trap that the FAC's factual allegations couldn't in fact be meritorious after substantial appellate

27

review. By deferring to "rule of the case" from the get-go, the court below avoided any discussion of notary stamps, CTF fees, or *Epic* non-compliance. But had it done so, it should have been clear that the new controlling facts, revealed by changes in regulatory enforcement both overseas and domestically, render the FAC's markets plausible and viable.

*Agostini*, 521 U.S. at 236, demonstrates that when "the controlling facts have changed," prior rulings must yield to present circumstances. The controlling fact at the time of dismissal was Apple's representation that iOS notarization was inseparable from the phone's OS. Today's controlling fact is that Apple has begun charging a separate fee, effectively unbundling that function, and proving it was never a necessary component from its inception. Law of the case cannot override newly revealed or newly matured claims. *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1043 (9th Cir. 2018).

The doctrine of law of the case is not a straitjacket but a principle of judicial efficiency that must yield when new, substantially different evidence emerges. In this instance, the District Court's blanket application of the doctrine—despite the introduction of the Core Technology Fee—has effectively insulated Apple from accountability. This misapplication, as highlighted by *United States v. Alexander*, demands a reexamination of the case.

By disregarding Apple's own post-judgment actions, the District Court turned "law of the case" from a principle of efficiency into a protective barrier for Apple's alleged continuing violations. See ER 52 (warning that Apple's new fees represent "authoritarian technology" if left unchecked). That refusal to integrate new facts is precisely the error *Alexander* and *Agostini* caution against. Additionally, Apple's posture in other disputes—such as the *Epic* litigation—illustrates that Apple's gating or anti-steering tactics remain hotly contested, reinforcing that post-judgment developments in notary-based fees cannot be sealed off by an earlier final decision.

### Apple's Noncompliance with the UCL Injunction in *Epic v. Apple* Evidences Domestic "Notary Stamp" Fees

The "law of the case" certainly doesn't preclude new facts determined by a competent jury verdict forming a basis for reopening. But that is precisely what the district judge found, representing a substantial abuse of discretion. It would suffice – or should have, at least – that newly revealed facts demonstrate Apple charged for notarization over in Europe. But just down the hallway from the lower court, Apple is currently accused of being in contempt of the Honorable Yvonne Gonzales-Rogers for none other than notary stamps violations, albeit under a different moniker. Defeating the intent of her UCL injunction in *Epic-Apple*, last year Apple implemented a 27% commission to developers who use non-App Store payment methods. There, the relevant terminology is "anti-steering" injunction related developer commissions. But make no mistake, Apple's new (and apparently

29

contemptuous) commission is only made possible through the notary stamp mechanism. Without it, Apple would have no way to implement the charges – a central issue to current testimony, which this Court may take judicial notice.

---

*In a new development reported by The Washington Post and others, Apple executive Phil Schiller testified at a recent hearing on Apple's external-purchase policies—admitting that he had "concerns" about turning Apple into "some kind of a collection agency" for charges outside the App Store. Schiller opposed imposing new fees on these external transactions, fearing it could "deteriorate Apple's relationship with developers."*

---

Phil Schiller recently testified in *Epic* that a 27% royalty would present difficulties by effectively turning Apple into a collection agency[4]; it is clear that the fee as levied represent the price for notarization. In essence, Schiller's remarks allude to the implicit fact that if developers do not pay the fee, they will be 'switched off' from receiving notarization—a clear admission that the fee is not an ancillary charge but the monetized cost of Apple's notary stamp. This testimony, which this Court may take judicial notice thereof, highlights that Apple's notary stamp is deliberately designed as a revenue-generating mechanism.

---

[4] Mr. Schiller was not suggesting Apple would take on a credit bureau role of dinging credit scores. Apple would revoke an app's notarization to enforce collection, conduct Schiller was apparently not comfortable with, because it would deteriorate Apple's developer relations.

Nonetheless, Apple did proceed, setting up a 27% commission for alternative purchases, decided upon by Apple's "pricing committee" (including CEO Tim Cook). Mr. Schiller's concerns that strongly imply, if not concede, that Apple's fee-collection power is intrinsically linked to its control over the notarization process. In this context, the term "collection agency" suggests that Apple's authority to enforce payment depends on its exclusive ability to provide notarization; without such control, it could not compel compliance. This inference is significant because it indicates that the fee is not an incidental charge but a deliberate mechanism for monetizing the notarization service, just like the EU notary fee conduct. The implication is that Apple's control over notarization—by denying it to nonpaying developers—serves as the enforcement tool for its fee, thereby reinforcing the argument that the notary stamp is a central and monetized aspect of Apple's anticompetitive conduct.

The Rule 60 assertion that Apple's injunction noncompliance amounted to notarization fees was conceded by Apple's own Phil Schiller. The 27% fee represents the cost of a notary stamp, just like the CTF does. And that is because, if a developer didn't pay it, they would be informed of a DPLA violation, leading to removal from the App Store notary process, to collect the fee. Hence the notary stamp is monetized. Mr. Schiller didn't like these implications, but Mr. Cook apparently did, and the policy went forward.

### The *Epic-Google* Jury Endorsed a Factual Determination of Single-Brand App Marketplace Digital Products

Recent developments in another *Epic* antitrust litigation—*In re Google Play Store Antitrust Litig.*, 21 md 02981 (N.D. Cal.)—highlight that even when an app distribution platform is dominated by a single brand, its foreclosure practices may still constitute anticompetitive conduct. This case, decided after the lower court's original dismissal, demonstrates that "single-brand" app-distribution markets are indeed cognizable under antitrust law—contrary to the District Court's suggestion that such theories are "disfavored" or lacking "economic reality."

The *In re Google* jury found that Google's restrictive policies on the Google Play Store supported an antitrust claim, when the court recognized the platform as a single brand. In stating *In re Google* does not bind the lower court, it misses the point: there is new evidence of a single-brand app distribution market, tightly linked to the market for notary stamps.  *In re Google* confirms an app distribution platform—standing alone—can constitute a relevant market if the platform's foreclosure or pricing structure is plausibly anticompetitive.

Here, the District Court dismissed the "Notary Stamp" as an impermissible single-brand market, but the *In re Google* outcome highlights how that very distinction—between competing app stores or approval mechanisms—can, in fact, give rise to a valid antitrust market**. The verdict there highlights that the District Court's prior rationale—that single-brand app stores or approval processes are

generally too speculative to be a "real" market—no longer holds in light of subsequent case law and factual confirmations. Hence, the District Court should have at least reconsidered the notary-stamp-based market definition under Rule 60(b) instead of summarily concluding that nothing changed.

The Rule 60 order references "essential elements" of market definition that it purports remain unchanged despite a "non-binding" *Epic-Google* verdict. The court abuses its discretion by trying to cast *Epic-Google* as a variation of law by "another court." It is, rather, a factual determination by a competent authority – that single-brand market exists in a closely related digital marketplace. To the extent the order suggested (it is not entirely clear) price elasticity and substitutability were never defined for notary stamps, it errs.  Interchangeability of a single-brand notary stamp *is* defined by the FAC – it is, by Apple's construction, not replaceable or interchangeable. And the antitrust injury is also readily apparent – it is the price of the demand-manufactured (i.e. useless) notary stamp, which in the US, is the supra-competitive portion of charges levied upon consumers and developers, collectively. In short, the Rule 60 order re-declares the *complete impossibility and implausibility* of a single-brand notary stamps market. That is for a *Brown Shoe* jury to decide, not a district judge on a 12(b)(6) motion. And it should be emphasized, just down the hallway from the lower court, a *Brown Shoe* jury *did* find a single-brand app distribution in violation of Sherman Act.

33

Therefore, Apple's post-judgment actions inside the United States corroborate with its new stamp policies abroad, thereby challenging the District Court's assumption that the CTF has "no bearing" on American iOS distribution. In *Epic Games v. Apple*, Inc. No. 4:20-cv-05640-YGR (N.D. Cal.), the court issued an anti-steering injunction under California's UCL, intended to permit developers to direct users to alternate payment systems. Rather than comply, Apple has effectively imposed or threatened "platform fees" on these external transactions—mirroring the EU's Core Technology Fee. Multiple news articles and hearing transcripts referencing Mr. Schiller's objections plainly reveal that Apple's executives continue policies charging or auditing developers for payments for notarization. These facts further negate the District Court's premise that Apple only charges notary fees in the EU or that domestic evidence is lacking.

Apple's apparent refusal to comply fully with the anti-steering injunction suggests that Apple has effectively extended the notary stamp's control domestically—charging or preparing to charge "commissions" on so-called external (off-App Store) transactions. This conduct directly parallels the stamp fees unmasked in Europe, showing that Apple's worldwide "monetize every software launch" approach is not limited to one jurisdiction. As with the CTF, this new information that Apple still collects or intends to collect fees for "non-App Store"

purchases confirms Apple's notary-stamp scheme is not "purely hypothetical" but is a de facto U.S. implementation of the same gating function the EU recognized.

Thus, the "stamp tax" no longer appears as a speculative or "fictional" theory. The actual transcripts and testimony indicate a real, ongoing effort by Apple to impose or enforce fees for externally notarized or non-App Store purchases. Schiller's statements also illustrate Apple's "malicious compliance," where Apple nominally grants external purchasing options but still charges stamp or platform fees, effectively neutralizing the UCL injunction. This testimony, disclosed well after the District Court denied Rule 60(b), corroborates Dr. Isaacs' assertion that Apple's gating system is an actionable, continuing violation.

## VI. THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING AN EVIDENTIARY HEARING OR LIMITED DISCOVERY

Given the significance of the *In re Google* decision in validating single-brand app-store markets, as well as Apple's ongoing noncompliance issues and internal debates under the *Epic v. Apple* UCL injunction, the District Court had a duty to inquire whether "single-brand" or "stamp-based" market definitions had become viable. In ignoring these post-judgment developments and failing to entertain a limited hearing or discovery, the District Court effectively foreclosed legitimate avenues of factual and legal exploration—contrary to broader policy that continuing violations must remain subject to judicial scrutiny. Instead of summarily denying the

motion, the District Court could have indicated it would revisit these issues once the appeal or ongoing disputes in *Epic v. Apple* and *In re Google* progressed further, thereby preventing inconsistent or prematurely final rulings on a single-brand theory that is now recognized by major litigation in this District.

In short, these two critical considerations—(1) the validation of single-brand markets in *In re Google*, and (2) Apple's ongoing "malicious compliance" with the *Epic* UCL injunction, featuring domestic notary or platform fees—further strengthen Dr. Isaacs' basis for Rule 60(b) relief. The facts and law have evolved since the initial dismissal, and the District Court's failure to account for these shifts (or even stay proceedings to investigate them) undermines the finality rationale it invoked to deny Dr. Isaacs' motion.

The District Court's reliance on the "law of the case" doctrine also ignores basic preclusion principles, including collateral estoppel, which do not bar relitigation of issues emergent from genuinely new factual circumstances. *Richardson v. United States*, 841 F.2d 993, 1000 (9th Cir. 1988). Because Apple's fee-based approach to stamping did not exist in the same form at the time of the original dismissal, the question of whether iOS notarization constitutes a distinct product cannot be deemed conclusively decided.

The doctrine of collateral estoppel cannot bar relief when a defendant's conduct evolves in a manner that introduces new, material facts. Here, the

36

introduction of the Core Technology Fee represents a fundamental shift in Apple's business model—a shift that was not evident (at least, to the court below) at the time of the original dismissal. As established in *Richardson v. United States*, 841 F.2d 993, 1000 (9th Cir. 1988), newly manifested facts warrant a fresh examination of issues previously dismissed.

As the Supreme Court has repeatedly observed, newly uncovered or newly manifested facts can defeat otherwise-final judgments. Here, the Core Technology Fee and domestic UCL subversion is precisely the kind of changed circumstance that calls for reexamination under Rule 60(b).

Ninth Circuit precedent allows at least narrow discovery or an evidentiary hearing to investigate these allegations. *Latshaw v. Trainer Wortham & Co.,* 452 F.3d 1097, 1103 (9th Cir. 2006). A District Court abuses its discretion when it rests its decision on a clearly erroneous finding of fact and when it forecloses fact-finding that is essential to determine whether new harm has been incurred. Permitting an evidentiary hearing would illuminate these critical issues and prevent judicial finality from shielding ongoing antitrust violations. Without a hearing, the District Court mistakenly concluded, largely upon Apple's word, that 'nothing has changed.'

Yet Apple's introduction of a fee for the same activity that Plaintiffs alleged was a separate product certainly is a change—one that should have triggered factual development. *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 380–81 (1992)

(District Courts must remain flexible if factual conditions diverge from the assumptions originally supporting the judgment). Minimal discovery might reveal internal admissions that Apple is vigorously protecting revenue from the notary process, clarifying whether the notary mechanism is a standalone economic service.

Likewise, Apple's 60(b) motion in *Epic Games v. Apple, Inc.* confirms that a post-judgment hearing can be necessary to determine the effect of changed circumstances. Apple should not be permitted to disclaim new fact-finding here while arguing in *Epic* that even lesser developments justify re-opening or modifying the earlier judgment. The disparity further highlights the District Court's error in refusing any evidentiary exploration of Apple's CTF.

## VII. THE DISTRICT COURT'S MISAPPLICATION OF PROCEDURAL RULES TO DISMIS SUBSTANTIVE ANTITRUST CLAIMS

The District Court's focus on a trivial page-length issue to dismiss substantive claims is not only disproportionate but also undermines the pursuit of fair competition. Such procedural dismissals effectively shield Apple from accountability, allowing it to perpetuate practices that have been challenged by regulators and competitors alike. The District Court's dismissal of the Rule 60(b) motion on the basis of exceeding local page limits by half a page—despite the final adjudicated motion being fully compliant—represents a broader pattern where procedural technicalities overshadow substantial antitrust concerns. This approach

is particularly troubling given the historical context of Apple's efforts to maintain its market dominance.

While procedural compliance is essential, the District Court's dismissal of Plaintiff's motion solely for exceeding page limits (which it did not) flagrantly disregards the fundamental objectives of antitrust law—to safeguard competitive markets and protect consumer welfare. Apple's counsel suggested that the court could dismiss the motion for exceeding page count. In fact, a formatting error was cured and the document was page-count client. But nevertheless, the court's order seemed to signal to Apple that it accepts any argument they present – even a verifiably wrong page count. This is troublesome, to say the least.

Historical precedents show that courts have set aside petty technical deficiencies when doing so would allow monopolistic practices to continue unchecked. Given the enormous market implications of Apple's notary stamp scheme, the balance of equities overwhelmingly favors reopening this case for a full and fair adjudication.

This pattern of judicial underenforcement of Big Tech regulation is evident in cases like *PhantomALERT v. Apple*, where seasoned antitrust attorneys faced similar skepticism and dismissal of their claims (which are quite identical to this case, despite the respective parties being competitors), even comparison to Dr. Isaacs, astounding given the fact that they never knew each other. Apple's *ad hominem*

characterization of *PhantomAlert's* good Samaritan as "disgruntled," to disabled Dr. Isaacs' being "in the hinterlands" or authoring "Frankenstein" complaints dismisses legitimate concerns about Apple's monopolistic practices.

The District Court's dismissal of Dr. Isaacs' motion on procedural grounds, despite full compliance with formatting rules, reflects a broader issue of judicial reluctance to engage with substantive antitrust allegations against Apple. This approach not only undermines procedural fairness but also perpetuates a legal environment where monopolistic practices go unchecked, to the detriment of competition and consumer choice.

When a developer raises a plausible claim of ongoing restraint of trade—especially one validated by Apple's subsequent fee structure—courts should not allow personal, irrelevant matters to derail critical analysis of the economic facts. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006). Local rules often discourage *ad hominem* or irrelevant personal references, particularly those implicating disability. The District Court's silence permitted Apple's approach to go unchecked, overshadowing the structural antitrust claims at stake.

## VIII.  PUBLIC POLICY AND THE NEED TO RECOGNIZE PERSONAL PROPERTY RIGHTS IN DIGITAL DEVICES

In 2010, the U.S. Copyright Office, under the authority of the Library of Congress, recognized the legality of jailbreaking smartphones, allowing users to

install software beyond the manufacturer's ecosystem. Despite this, Apple employed technical countermeasures to prevent jailbreaking, effectively restricting user autonomy and stifling competition. Hence, the notary stamp, as it exists today, wouldn't exist, had Apple respected the spirit of the 2010 U.S. Copyright decision.

Beyond technical barriers, Apple has engaged in extensive political maneuvering to evade antitrust enforcement. The company successfully lobbied against bipartisan legislative efforts like the Open App Markets Act, which sought to promote competition in app distribution by prohibiting practices such as mandatory use of proprietary payment systems and self-preferencing. Apple's opposition to such measures proves its intent to preserve its monopolistic control over the app ecosystem.

Internationally, Apple has resisted regulatory actions aimed at curbing its market power. From the EU Digital Markets Act, to similar laws in China, Brazil, South Korea, Japan, and India, Apple counters political regulatory enforcement measures of a magnitude never before seen by a private entity. The same can be said for Apple's constant efforts to sway whichever domestical political party is in power. By all definitions, Apple has evolved into the powerful multi-national cartel that the Sherman Act only envisioned in theory in 1890.

Antitrust laws exist to protect the public interest by preserving competition. *FTC v. Actavis, Inc.*, 570 U.S. 136, 152 (2013). In an age where smartphones

function as personal computers, cameras, and more, the question of whether the device owner can freely install software is no trifling matter. If Apple's Notary Stamp is indeed a separate, locked-down funnel for gating app distribution, then Apple's "Core Technology Fee" and domestic equivalents are essentially a stamp tax. Historically, the Supreme Court has condemned tying or bundling that prevents alternative distribution or exacts a forced payment— *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5–6 (1958).

Moreover, allowing Apple to proceed with a newly minted stamp fee while the courts say, "We won't reexamine the case—Single brand markets are still disfavored," sets a perilous precedent. It effectively teaches would-be monopolists that if they can survive one round of litigation, they may extend or morph the same anticompetitive practices with impunity. That is diametrically opposed to *Lawlor* and its progeny, which aim to keep judicial doors open to continuing or revived antitrust violations.

Beyond the direct consumer impact, there is also the intangible harm of stifling innovation. Developers—particularly smaller or free-app creators—face unyielding gatekeeping. If Apple taxes the notary process, free apps become less viable. This is precisely why the original complaint singled out the notary stamp (five years ago) as a problem: it can be used to censor or to impose supra-competitive fees that hamper upstarts. The District Court's refusal to weigh these new, post-

42

judgment developments leaves the public interest unprotected and the Sherman Act's deterrence function unfulfilled.

Taken as a whole, the policy arguments for revisiting Apple's new fee structure are overwhelming. Dr. Isaacs' medical status, local rule page-limit constraints, and Apple's repeated disclaimers should not obscure the fundamental question: Does Apple's notary process constitute a separate product that Apple is now monetizing, thereby perpetuating or renewing the same anticompetitive conduct alleged from the start? If so, the District Court's refusal to reopen the judgment contradicts established Supreme Court case law on continuing antitrust violations and the broad remedial scope of Rule 60(b).

Finally, the ramifications of Apple's "stamp tax" extend beyond private-party disputes and into matters of democratic accountability. *FTC v. Actavis* teaches that antitrust enforcement protects not only consumer prices but also the innovation ecosystem. Letting Apple impose a notary fee, unnoticed and unexamined, would silence meaningful judicial oversight over a gatekeeper of millions of iPhone users. In an era when smartphones serve as essential portals for commerce, education, and self-expression, the courts have a special duty to reexamine prior decisions if new evidence indicates a monopoly is tightening its grip. Closing the courthouse doors in the face of Apple's newly minted fees runs counter to the democratic principle

43

that all business practices must be subject to judicial scrutiny when they threaten competition.

## CONCLUSION

Appellant respectfully asks this Court to reverse the District Court's denial of Rule 60(b) relief and remand for further proceedings. On remand, the lower court should hold an evidentiary hearing or permit limited discovery into Apple's newly revealed "Core Technology Fee," thereby determining whether this fee demonstrates that Apple's "notary stamp" is an unlawfully tied, stand-alone service rather than an inseparable iOS feature. As *Lawlor, Zenith,* and *Hanover Shoe* make abundantly clear, a prior dismissal cannot shield continuing or reconfigured monopoly conduct from scrutiny—particularly when the defendant has since monetized the very practice that was earlier deemed "integrated."

By declining to revisit the expanding notary stamp conduct under Rule 60(b), the District Court effectively insulated a possible tying scheme that not only impacts the parties here, but also could harm countless developers and consumers who rely on open access to smartphone software. Apple's introduction of a separate line-item fee, especially after claiming iOS notarization was inseparable, raises significant concerns under the Sherman Act's prohibition on tying and continuing antitrust

44

violations. Allowing a dominant gatekeeper to profit from an unreviewed modern-day stamp mechanism compromises both user autonomy and market innovation.

Reopening the record will protect the public interest, ensuring that evolving gatekeeping tactics remain subject to the antitrust laws. When a defendant modifies a business practice post-judgment—particularly in ways that may confirm the very anticompetitive conduct alleged—courts must not let finality lock the courthouse doors. Appellant therefore urges this Court to remand with instructions that the lower court reexamine Apple's notary-stamp practices in light of newly discovered facts.

Date: March 12, 2025

/s/ Jeffrey Isaacs
JEFFREY ISAACS, MD
11482 KEY DEER CIRCLE
Wellington, FL 33449

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** <u>24-7280</u>

I am the attorney or self-represented party.

**This brief contains <u>9580</u> words,** including <u>0</u> words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** <u>/s/ Jeffrey Isaacs</u>      **Date** <u>3/12/2025</u>