No. 24-7280

# In the United States Court of Appeals for the Ninth Circuit

DR JEFFREY ISAACS,

*Plaintiff-Appellant,*

v.

APPLE INC.

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of California
No. 3:21-cv-05567-EMC
Hon. Edward M. Chen

## EXCERPTS OF RECORD

### Volume 1 of 1

JEFFREY ISAACS
11482 KEY DEER CIRCLE
Wellington, FL 33449

## <u>INDEX</u>

**District Court Order Denying Rule 60 Motion** (Dkt.129, 10/28/2024)     3

**Plaintiff's Rule 60 Reply** (Dkt,121, 5/03/2024)     7

**Apple's Rule 60 Objection** (Dkt.119, 4/26/2024)     25

**Plaintiff's Rule 60 Motion** (Dkt.118, 4/12/2024)     46

**District Court Order Granting MTD** (Dkt.85, 11/30/2021)     76

**Ninth Circuit De Novo Appeal Order** (Dkt.113, 11/03/2023)     110

**Supreme Court Certiorari Denied** (Dkt.122, 5/13/2024)     126

**Notice of Appeal** (Dkt.130, 11/27/2024)     127

**Docket History**     129

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORONAVIRUS REPORTER, et al., | Case No. 21-cv-05567-EMC |
| Plaintiffs, | |
| v. | **ORDER DENYING PLAINTIFF'S MOTION TO REOPEN CASE** |
| APPLE INC., | |
| Defendants. | Docket No. 118 |

## I.       **INTRODUCTION**

Plaintiffs Coronavirus Reporter, CALID, Inc., Primary Productions LLC, and Dr. Jeffrey D. Isaacs ("Plaintiffs") sued Defendant Apple ("Defendant") for allegedly maintaining a monopoly of the Apple App Store, among other claims.  The Court dismissed Plaintiffs' claims because Plaintiffs failed to adequately plead several essential elements of their claims.  *See* Docket Nos. 85 and 103.  The Ninth Circuit affirmed, and the Supreme Court denied certiorari.  *See Coronavirus Rep. v. Apple Inc.,* 85 F.4th 948, 953 (9th Cir. 2023); *see Coronavirus Rep. v. Apple, Inc.*, No. 23A718, 2024 WL 421280, at *1 (U.S. Feb. 5, 2024).  Now pending before the Court is Dr. Jeffrey D. Isaac's motion to reopen the case.  The Court finds the matter suitable for disposition on the papers under Civil Local Rule 7-1(b).  For the reasons explained herein, the Court **DENIES** the motion.

## II.       **BACKGROUND**

On November 30, 2021, the Court granted Apple's motion to dismiss all of Plaintiffs' claims against Apple.  Docket No. 85.  There, the Court also denied as moot Plaintiffs' motions for preliminary injunction, to strike and to append claim, as well as Apple's motion to quash.  *Id.*

1    On February 2, 2022, the Court denied Plaintiffs' motions for reconsideration and relief

2    from judgment.  Docket No. 103.

3    On November 3, 2023, the Ninth Circuit affirmed.  *Coronavirus*, 85 F.4th at 953.  There,

4    the Ninth Circuit held:

5    > While the district court dismissed the Plaintiffs-Appellants' first
     > amended complaint in this case, Plaintiffs-Appellants were given a
6    > total of seven opportunities to amend similar complaints across
     > jurisdictions and between various permutations of plaintiffs, but still
7    > failed to state their claims here adequately. It is within the district
     > court's discretion to determine that an eighth opportunity would
8    > produce a similar result.

9    *Id.* at 958.

     On February 5, 2024, the Supreme Court denied certiorari.  *Coronavirus*, 23A718, 2024
10
     WL 421280, at *1 (U.S. Feb. 5, 2024).
11
     Dr. Jeffrey D. Isaacs ("Plaintiff") now moves to reopen the case.  Docket No. 118.
12
                              III.    **LEGAL STANDARD**
13
     Under Federal Rule of Civil Procedure 60(b), a party may seek relief from a final judgment
14
     or order under specific circumstances.  A court may grant relief if "the judgment has been
15
     satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or
16
     vacated; or applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5).  However,
17
     "Rule 60(b)(5) may not be used to challenge the legal conclusions on which a prior judgment or
18
     order rests." *Horne v. Flores*, 557 U.S. 433, 447 (2009).  A court may also grant relief for "any
19
     other reason that justifies relief."  Fed. R. Civ. P. 60(b)(6).  However, Rule 60(b)(6) applies in the
20
     "rare case in which extraordinary circumstances" justify relief.  *United States v. Buenrostro*, 638
21
     F.3d 720, 722 (9th Cir. 2011).
22
                              IV.    **DISCUSSION**
23
     The Court denies Plaintiff's Rule 60 motion.
24
     First, the Court may deny Plaintiff's motion because it disregards Local Rule 7-2(b), which
25
     states that motions must not exceed 25 pages in length.  N.D. Cal. Civ. R. 7-2(b).
26
     Second, the law of the case bars Plaintiff's motion to reopen the case.  Under the doctrine
27
     concerning the law of the case, the Ninth Circuit's rulings bind the trial court as to any "issues
28

United States District Court
Northern District of California

1  actually addressed and explicitly or implicitly decided upon in the court's previous disposition."

2  *United States v. Garcia-Beltran*, 443 F.3d 1126, 1130 (9th Cir. 2006); *see Optional Cap., Inc. v.*

3  *DAS Corp.*, 66 F.4th 1188, 1192 (9th Cir. 2023) (holding that the relevant Ninth Circuit "rulings

4  are the law of the case, and the district court [is]… bound to follow them").  More specifically,

5  where "the latest relief sought [is]…directly contrary to [the Ninth Circuit's] rulings in this case,"

6  relief under Rule 60 is not warranted.  *Optional*, 66 F.4th at 1189.

7        The Ninth Circuit's decision is the law of this case.  In its decision, the Ninth Circuit

8  affirmed this Court's dismissal of Plaintiffs' complaint because Plaintiffs failed to adequately

9  plead several essential elements of their claims.  *Coronavirus*, 85 F.4th 948.  Specifically, the

10  Ninth Circuit held that Plaintiffs failed to: 1) adequately define the relevant market, as needed to

11  state a restraint of trade or monopolization claim under the Sherman Act, 2) sufficiently allege a

12  single-brand market, sufficient to satisfy the 'relevant market' element under the relevant claims

13  of the Sherman Act; 3) demonstrate a breach of a license agreement; and 4) allege an enterprise

14  other than the manufacturer as a corporation, as required to state a Racketeer Influenced and

15  Corrupt Organizations Act (RICO) claim.  *Id.*

16        Now, Plaintiff Dr. Jeffrey D. Isaacs seeks relief from a final judgment dismissing the case

17  under Rule 12(b)(6) because of the European Union's implementation of the Digital Markets Act

18  ("DMA") and the verdict in *In re Google Play Store Antitrust Litigation* (MDL Cases No. 21-md-

19  02981-JD, Member Case No. 20-cv-05671-JD).  *See* Docket No. 118 (Plaintiff's motion to

20  reopen).  However, a foreign jurisdiction's legislation and a verdict in another district court are not

21  grounds to contravene the Ninth Circuit's published opinion affirming this Court's dismissal of

22  Plaintiffs' claims.

23        As the court held in *In re Zermeno-Gomez*, "[u]nder our 'law of the circuit doctrine,' a

24  published decision of this court constitutes binding authority 'which must be followed unless and

25  until overruled by a body competent to do so.'"  *In re Zermeno-Gomez*, 868 F.3d 1048, 1052 (9th

26  Cir. 2017) (quoting *Gonzalez v. Arizona*, 677 F.3d 383, 389 n.4 (9th Cir. 2012)). The Ninth

27  Circuit's opinion, affirming this Court's finding that Plaintiffs failed to state a claim as a matter of

28  law, binds this Court.  *Coronavirus*, 85 F.4th at 953.

*United States District Court*
*Northern District of California*

3

1    Further, as the Ninth Circuit held in *Optional*, denial of a party's Rule 60 motion is valid

2    where "the arguments on which [the Rule 60 motion] was based 'ignore[d] significant portions' of

3    [the Ninth Circuit's] opinion and…granting the relief requested would 'contravene[ ] the law of

4    the case and the rule of mandate.'"  *Optional*, 66 F.4th at 1189 (quoting *United States v. 475*

5    *Martin Lane, Beverly Hills, California*, 2022 WL 4117109, at *1 (C.D. Cal. Aug. 5, 2022)).

6    While the specific motion in *Optional* was a Rule 60(a) motion, rather than a Rule 60(b) motion as

7    is here, the Ninth Circuit's reasoning behind affirming the district court's denial of the party's

8    Rule 60 motion applies here.

9    As stated, Plaintiffs' failure to adequately plead several essential elements of their claims

10   informed the Ninth Circuit's decision to affirm this Court's dismissal of their claims.

11   *Coronavirus*, 85 F.4th at 953.  Plaintiff Dr. Jeffrey D. Isaacs's arguments regarding external

12   developments do not cure deficiencies in Plaintiffs' own allegations, which this Court and the

13   Ninth Circuit found insufficient under Rule 12(b)(6).

14   Therefore, the Court **DENIES** Plaintiff's motion to reopen the case.   Correspondingly,

15   neither an evidentiary hearing nor further discovery is warranted.

16                              **V.      CONCLUSION**

17   For the foregoing reasons, the Court **DENIES** Plaintiff's motion to reopen the case.

18

19

20   **IT IS SO ORDERED**.

21

22   Dated: October 28, 2024

23

24   _____

25   EDWARD M. CHEN
     United States District Judge

26

27

28

United States District Court
Northern District of California

4

**ER_6**

Dr. Jeffrey D. Isaacs
11482 Key Deer Circle
Wellington, FL 33449

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORONAVIRUS REPORTER,<br>CALID INC,<br>PRIMARY PRODUCTIONS LLC,<br>DR. JEFFREY D. ISAACS,<br>on behalf of themselves and all others similarly situated<br><br>                Plaintiffs,<br><br>vs.<br><br>APPLE INC.<br>                Defendant. | Case No. 3:21-cv-5567-EMC<br><br><br>**REPLY IN SUPPORT OF<br>MOTION TO REOPEN CASE**<br><br><br>**<u>Hearing</u>**<br><br>Date:    July 11, 2024<br>Time:    1:30PM<br>Place:   Courtroom 5, 17th Floor<br><br><br>The Honorable Edward M. Chen |

PLAINTIFF JEFFREY ISAACS REPLY TO RULE 60 MOTION
CASE NO. 3:21-CV-5567-EMC

ER 7

1

2

3

**REPLY IN SUPPORT OF MOTION TO REOPEN CASE UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(B)(6) DUE TO NEWLY REVEALED ECONOMIC LANDSCAPE BY THE IMPLEMENTATION OF THE EU DIGITAL MARKETS ACT. 1**

I.      INTRODUCTION ........................................................................................... 1

II.     MISAPPLICATION OF "LAW OF THE CASE" ........................................... 4

III.    MISAPPLICATION OF RULE 60(B)(5) AND 60(B)(6)................................... 5

IV.     APPLE FORFEITS MOTION PURSUANT TO *RETLAW* ............................ 7

V.      OBJECTIONS FAIL TO JUSTIFY DISPARAGEMENT OF PLAINTIFF'S DISABILITY ............................................................................................... 10

VI.     APPLE's REQUEST TO DISMISS MOTION ON BASIS OF PAGE COUNT AGAIN AVOIDS MERITS .......................................................................... 12

**CONCLUSION .................................................................................................. 12**

**CERTIFICATE OF SERVICE ........................................................................ 16**

1

CASES

*Foman v. Davis*, 371 U.S. 178 (1962) ------------------------------------------------------- 3, 9

*Retlaw Enterprises, Inc. v. Marketron Broadcasting System, Inc.*,

    945 F.2d 245 (9th Cir. 1991) ----------------------------------------------------------7, 10

*United States v. Alexander*, 106 F.3d 874----------------------------------------------------- 4

RULES

Federal Rule of Civil Procedure 60(b)------------------------------------------------------- 4

REGULATIONS

European Union's Digital Markets Act (DMA) ------------------------------------------- 1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

PLAINTIFF JEFFREY ISAAC'S REPLY TO RULE 60 MOTION
CASE NO. 3:21-CV-5567-EMC

**REPLY IN SUPPORT OF MOTION TO REOPEN CASE UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b)(6) DUE TO NEWLY REVEALED ECONOMIC LANDSCAPE BY THE IMPLEMENTATION OF THE EU DIGITAL MARKETS ACT**

## I. INTRODUCTION

Following years of investigation, the European Union competition authorities enacted rules requiring Apple open up App Store distribution to third parties ("sideloading"). Apple responded by issuing a Core Technology Fee, intended to defeat the new EU regulation.[1] Plaintiff Dr. Jeffrey Isaacs brought a Motion to Reopen the underlying case, in part to prevent the same outcome from happening in the United States. Apple objected last week on the basis that this motion, about the freedoms of nearly every human on this planet to use the smartphone they own, is "abusive" and "vexatious." Worse yet, Apple doubled-down that the "neuropsychiatric disability" of Plaintiff is somehow relevant to their Sherman Act misconduct. Apple now asserts that the link between CTF and their historic notarization services profits is "invented interpretation," which apparently means the fictitious belief of a disabled person. (*Apple Objection*, p.10) This Court is witnessing real-time ADA violations intended to discredit antitrust litigation.

This motion to reopen the case emerges from significant new developments that sharply challenge the premises of the prior dismissal, highlighting an evolving competitive and regulatory environment surrounding Apple Inc. The motion specifically draws attention to the enactment of the European Union's Digital Markets Act (DMA) and subsequent response that illuminated the existence of a market for iOS notary stamps—a market that this Court previously found unsubstantiated. It further references a recent verdict in the *Epic Games* litigation, where new legal interpretations, significantly, a guilty jury verdict applied single-brand antitrust market theory to app distribution digital marketplace behaviors similar to or identical to that contested in this case.

---

[1] EU DMA regulations are nearly identical to proposed bipartisan 2023 US senate bills with 73% popular support, never brought to vote after Apple's unprecedented lobbying efforts.

PLAINTIFF JEFFREY ISAACS REPLY TO RULE 60 MOTION
CASE NO. 3:21-CV-5567-EMC

As outlined in the motion, "the introduction of Apple's Core Technology Fee (CTF), ostensibly a compliance measure with the DMA, effectively institutes a de facto 'Notary Stamp Fee' for Apple's notarization process" (*Motion to Reopen,* p. 12). This fee mirrors the monopolistic practices previously alleged and dismissed as implausible, now substantiated by Apple's own adjustments in response to regulatory pressures. Moreover, the *Epic Games* verdict against Google for anticompetitive practices in app distribution "directly contradicts the foundational premises relied upon by this Court in its dismissal" (*Motion to Reopen*, p. 8), offering a new legal precedent that reinforces the applicability of the single-brand market theories described by the Plaintiff. These pivotal elements underscore the necessity for a thorough reevaluation of the case in light of compelling new evidence and legal developments.

Further underscoring the compelling need for reconsideration is the recent antitrust action lodged by the Department of Justice against Apple, which alleges conduct strikingly similar to that contended by the Plaintiff concerning cross-platform video communications apps, amongst others. The DOJ's complaint details how Apple has impaired third-party, cross-platform video communications apps while favoring its own app, FaceTime, echoing the antitrust injuries and market manipulations described in this case (*DOJ Complaint Exhibit*, p. 120-129). This parallel litigation by a federal authority not only underscores a strong public policy interest in addressing such monopolistic behaviors rather than dismissing claims brought by small developers with less resources than DOJ. Significantly, the DOJ's detailed market definitions and delineations of antitrust injury directly counter previous assertions of the futility of amending the complaint in this case; there exists no reasonable basis to refute that this developer may now clearly "state a claim" based on exhaustive research and documentation by DOJ. The alignment of the DOJ's allegations with those of the Plaintiff transforms the landscape of litigation pubic interest, demonstrating that an amendment to reassert claims related to cross-platform video conduct would not only be viable but necessary to

PLAINTIFF JEFFREY ISAACS' REPLY TO RULE 60 MOTION
CASE NO. 3:21-CV-5567-EMC

align with the current judicial understanding of competitive harms in the digital economy. Moreover, Multi-District Litigation is now underway based on private lawsuits following DOJ's guidance. This case should be adjudicated accordingly.

In their extensive objection to reopening this case, Apple Inc. has deployed a litany of characterizations against the "frivolous" motion. They assert with unwavering confidence that "nothing in the world can change the dismissal," and celebrate their victories at various judicial levels, proclaiming that "no amount of testimony can change the insufficiency of Plaintiffs' complaints" (*Apple Objection*, p. 14).

Absent from Apple's objection is any substantive denial of the newly disclosed market realities for iOS notary stamps, revealed through the implementation of the EU Digital Markets Act (DMA). They sidestep the undeniable implications of these regulatory changes which now tether what was once claimed to be an "untethered" market to a stark economic reality. Nor does Apple meaningfully confront the U.S. Department of Justice's recent allegations, which mirror the Plaintiff's claims regarding Apple's exclusionary conduct towards third-party, cross-platform video communication apps—an omission that speaks volumes about the merits of reopening this case under the principles established in *Foman v. Davis*, 371 U.S. 178 (1962), where the futility of amendment no longer holds water given the parallel legal narratives now officially recognized by federal authorities.

Moreover, Apple's response glaringly omits any acknowledgement of their strategic compliance maneuvers in response to both the *Epic Games* litigation and EU regulatory directives— actions that many respectable witnesses characterize as "malicious compliance." Their document lacks any engagement with the notion that public policy, particularly the enforcement of antitrust standards in light of such conduct, demands a heightened scrutiny and a revisit of previously dismissed claims.

PLAINTIFF JEFFREY ISAACS REPLY TO RULE 60 MOTION
CASE NO. 3:21-CV-5567-EMC

1    In essence, while Apple's objection is replete with declarations of procedural victories and

2    dismissals of the Plaintiff's capabilities and intentions, it conspicuously avoids engaging with the

3    substantive shifts in the legal and regulatory landscape that directly bear on the dismissed claims.

4    This oversight, whether strategic or otherwise, underscores a continued pattern of behavior that this

5    Court must consider. The following sections will address these gaps and argue why this Court should

6    not only reconsider its prior rulings but also recognize the changed circumstances that justify the

7    reopening of this case.

## II.    MISAPPLICATION OF "LAW OF THE CASE"

9    In their response, Apple Inc. relies heavily on the "law of the case" doctrine to oppose the

10    motion for relief under Federal Rule of Civil Procedure 60(b). They argue that since the merits of

11    case have been previously adjudicated and dismissed, and affirmed on appeal, this finality precludes

12    any subsequent reconsideration or reopening of the case.

13    Apple's argument presents a paradox wherein any motion under Rule 60(b) could be

14    categorically dismissed using the "law of the case" doctrine. This rigid interpretation fails to

15    recognize the purpose and explicit provisions of Rule 60(b), which exists precisely to address

16    situations where exceptional circumstances or manifest injustices require deviation from the usual

17    finality of judgments. The doctrine is not a tool to perpetually shield previous judgments from

18    correction, especially when new evidence, changes in law, or other pivotal factors come into play

19    after a decision has been rendered.

20    The "law of the case" doctrine is designed to maintain consistency and prevent the re-litigation

21    of issues that have been decisively settled in earlier stages of the same case. However, it is not

22    absolute. Courts retain the discretion to reconsider earlier rulings if it is clear that the initial decision

23    was materially flawed, if new evidence has surfaced, or if there has been a significant change in the

24    law that undermines the decision's foundations (*United States v. Alexander*, 106 F.3d 874). Rule

PLAINTIFF JEFFREY ISAACS REPLY TO RULE 60 MOTION
CASE NO. 3:21-CV-5567-EMC

60(b) serves as a critical safeguard within this framework, providing a mechanism to correct or reopen a case if maintaining the original judgment would be "inconsistent with substantial justice" (Federal Rules of Civil Procedure, Rule 60(b)(6)).

Apple's reliance on the "law of the case" as an absolute barrier to Rule 60(b) motions employs circular logic: if every adverse ruling establishes unchallengeable law of the case, then Rule 60(b) would never apply.

The "law of the case" doctrine simply does not apply to the Core Technology Fee (CTF). This new development, which did not form part of the original case record and was not available during previous hearings, is crucial. The CTF substantively supports the previously contested notion of an "iOS notary stamps" market, effectively validating the market's existence and Apple's monopolistic control over it. Since this fee was introduced subsequent to the appellate review, it was understandably not considered by the Ninth Circuit, and does not fall within the realm of the "law of the case."

Given that the CTF directly relates to the economic realities of the notary stamps market—a core issue in the original dispute—its emergence is a pivotal development that the Ninth Circuit had no opportunity to consider.

## III.    MISAPPLICATION OF RULE 60(B)(5) AND 60(B)(6)

Apple's assertion that Rule 60(b)(5) is inapplicable because the judgment is not "prospective" fails to acknowledge the broader implications of this Court's original dismissal. The Court's dismissal order simultaneously denied an injunction as moot. Prospective judgment is typically associated with ongoing judgments like injunctions, but "prospective" here encompasses a ruling with lasting effects that extend beyond the immediate case. A dismissal under Rule 12(b)(6) allows an antitrust injury to prospectively continue; this is not a normal case about one party's damages or lack thereof. Any further attempt to enjoin notary stamp conduct will be prospectively affected by the judgment here,

because notary stamps were deemed untethered to reality. That would mean that if Apple implemented a CTF in America, this case would prospectively preempt any challenge to the CTF.

Moreover, the recent verdict in the *Epic Games* case against Google presents a change in the legal understanding of market definitions within technology and antitrust law. This contradicts some of the fundamental legal bases relied upon in dismissing this case. Rule 60(b)(5) states relief is warranted if it is "based on an earlier judgment that has been reversed or vacated," and while not directly reversed or vacated, the principles underpinning the *Epic Games* ruling significantly deviate and conflict from those this Court relied upon, warranting a reevaluation under the second prong of 60(b)(5).

Apple's interpretation of Rule 60(b)(6) is excessively narrow, ignoring its designation as a catch-all provision intended to ensure justice is done. The emergence of the Core Technology Fee (CTF) introduced by Apple as a response to the Digital Markets Act (DMA) constitutes a significant new fact that was not and could not have been presented earlier as it did not then exist. This new fee structure mirrors the notary stamp system challenged in our original complaint and directly impacts the core issues of this case. The assertion that the developments cited in the motion do not affect the governing law overlooks the essence of Rule 60(b)(6), which allows for relief in cases of extraordinary circumstances where adherence to a final judgment is no longer equitable. The introduction of the CTF, covered extensively in the media, casts new light on Apple's practices and their competitive implications, fulfilling the extraordinary circumstances clause. Hence, even if 60(b)(5) prong 3 applied for prospective relief, the catch-all 60(b)(6) still is in force, because we (American developers) should be able to contest a CTF notary fee, whether hidden or revealed by EU policy.

The Court's prior decisions—both the dismissal of the case and the denial of the preliminary injunction—therefore meet the criteria for reconsideration under Rule 60(b)(5), as they have

established a lasting barrier to the pursuit of claims that are now supported by new evidence and developments, particularly those related to Apple's implementation of the Core Technology Fee in response to the Digital Markets Act.

## IV.    APPLE FORFEITS MOTION PURSUANT TO *RETLAW*

In its objection, Apple summarily dismisses the pivotal allegation regarding the Core Technology Fee (CTF) with a single sentence, asserting the "invented interpretation of Apple's Core Technology Fee is unsupported and untrue" (Dkt. 119, p. 15). This cursory dismissal fails to engage substantively with the allegation, effectively forfeiting the issue under the principles established in *Retlaw Enterprises, Inc. v. Marketron Broadcasting System, Inc*., 945 F.2d 245 (9th Cir. 1991), which holds that a party forfeits the right to argue an issue not properly raised or developed in its initial pleadings.

Apple's failure to provide a detailed rebuttal or evidentiary counter to the specific claims about the CTF suggests a waiver of any detailed defense against it. This perfunctory response does not satisfy the requirement to "specifically and distinctly" contest issues presented in an opposing motion, as mandated by Ninth Circuit precedent. Therefore, the court should treat the issue of the CTF and its implications as conceded for the purposes of this motion.

Moreover, Apple again carefully chose its language to disparage plaintiff. That CTF relates to notary stamps is just an "invented interpretation" is just another thinly veiled attempt to win an antitrust argument at the expense of Plaintiff's neuropsychiatric disability. Local rules permitted Apple to spend 25 pages on a rebuttal to the CTF controversy – a matter of significant importance covered by international press (See Press Coverage Exhibit.) Apple chose to ignore the *entire* issue, but for one sentence declaring the motion an "invented interpretation" of Plaintiff. This invokes *Retlaw* and forfeits the motion. In the alternative, an evidentiary hearing is warranted to determine whether or not the CTF relation to notary stamps is an "invented interpretation." Apple has not

PLAINTIFF JEFFREY ISAACS REPLY TO RULE 60 MOTION
CASE NO. 3:21-CV-5567-EMC

provided substantial proof of their position to warrant a dismissal of this concept without judicial investigation.

### Additionally, Apple Forfeited by Advancing Objections that Failed to Materially Analyze Relation of DOJ Litigation to the Underlying Case

Despite Apple's cursory dismissal of the Department of Justice's lawsuit as irrelevant, the substantive nature of the DOJ's allegations directly supports the claims previously made in this case, particularly regarding anticompetitive practices in cross-platform video communication apps. Apple's brief fails to address the crux of the matter: the DOJ's allegations provide independent governmental corroboration of the anticompetitive conduct Plaintiff has long accused Apple of perpetrating.

Apple's response to the introduction of the DOJ's lawsuit in our motion does not engage with the public policy implications presented by the Plaintiff. By failing to substantively refute or even acknowledge DOJ's parallel claims, Apple effectively bypasses new evidence presented. The involvement of the DOJ underscores the public interest and legal significance of the issues at hand. When a federal agency alleges conduct similar to that which a plaintiff has claimed in a civil suit, such allegations are inherently relevant to the reconsideration of related legal arguments in civil proceedings. This is not merely coincidental or tangential information; it is a powerful, corroborative development that strengthens the case for revisiting an original court decision to dismiss under 12(b)(6).

The Court should be wary of allowing Apple's minimalistic treatment of the DOJ's involvement to stand without scrutiny. Dismissing the DOJ's allegations as irrelevant allegations fails to consider the broader implications of systemic anticompetitive behavior alleged against Apple. In sum, Apple's insufficient response to the DOJ's allegations should be viewed as an implicit acknowledgment of the challenges these new facts pose to their defense. The Court is encouraged to

8

PLAINTIFF JEFFREY ISAACS' REPLY TO RULE 60 MOTION
CASE NO. 3:21-CV-5567-EMC

critically assess the significance of the DOJ's allegations and their impact on the overall context of this case.

In light of the recent Department of Justice allegations against Apple, the principle outlined in *Foman v. Davis*, 371 U.S. 178 (1962), is particularly relevant to the current motion to reopen the case. *Foman* asserts that a dismissal with prejudice pursuant to a Rule 12(b)(6) motion should only occur when there is clear evidence of futility in amending the complaint. This case has now reached a juncture where such a conclusion of futility can no longer be justifiably maintained, given the substantive parallels between the DOJ's detailed market definitions, its articulation of antitrust injuries, and the claims initially posited by the Plaintiff.

This alignment is critical as it demonstrates that the conduct alleged by the Plaintiff is not only plausible but is also of concern to the federal government. Even if Plaintiff got the relevant markets wrong – which in light of DMA, it appears at least one was reasonably close – the DOJ action inherently negates the previous assertions of futility in amending the Plaintiff's complaint. This situation represents a scenario where the "futility of amendment" doctrine no longer holds, as the new facts from a high-level governmental body introduce a viable path forward for amending the complaint.

In addition to *Foman*, *Retlaw* similarly applies to the new facts derived from the DOJ, EU, and *Epic* cases. Apple's opposition does not address compelling evidence sourced from the DOJ Complaint: CEO Tim Cook's blatant mockery of antitrust injury from cross-platform video apps. Apple's opposition also does not meaningfully address the fact Apple is in malicious compliance with this District's YGR Epic Court, and of course, the EU Competition Authorities. The Motion asserts that all three facts independently invoke Rule 60's catch-all, in the interest of public policy against leniency for felony antitrust conduct when the actor – Apple – is in defiance of enforcement efforts. They also didn't respond to the fact that PhantomALERT, Coring, and a host of other

PLAINTIFF JEFFREY ISAACS REPLY TO RULE 60 MOTION
CASE NO. 3:21-CV-5567-EMC

1     developer cases will now proceed under the guidance of the DOJ complaint, hence it would be unfair

2     to preclude Plaintiff, simply because he was the first to advocate against free app censorship. Because

3     Apple didn't touch upon these issues in its objections, they are forfeited under *Retlaw Enterprises,*

4     *Inc. v. Marketron Broadcasting System, Inc*., 945 F.2d 245 (9th Cir. 1991).

5

6     ### V.    OBJECTIONS FAIL TO JUSTIFY DISPARAGEMENT OF PLAINTIFF'S DISABILITY

7     Apple and Gibson Dunn's focus on disability, rather than the merits of the legal arguments, was

8     both irrelevant and inappropriate as a tactic to win an antitrust claim. Apple's pretextual objections

9     are implausible and based on demonstrably false information. First, Apple asserts that the "chief

10    complaint" (a medical term, seemingly mocking the entire issue) of the motion is their use of the

11    descriptor "neuropsychiatric disability," which stems from a Third Circuit order. That is not the

12    alleged problem – it is that Isaacs' medical disability is irrelevant and shouldn't have been introduced

13    into pleadings to win an antitrust lawsuit, where the conduct has nothing to do with Isaacs' disability.

14    Attempting to prove relevance, Apple proffers:

15

16                    Nor was this "irrelevant," as Isaacs suggests.
                      Plaintiffs put Isaacs' "interdisciplinary expertise" at
17                    issue, Dkt. 41 ¶ 30, sought a preliminary injunction
                      challenging the denial of their app as "pretextual at
18                    best," Dkt. 20 ¶ 46, and thereby put Apple to its proof
                      of explaining that a former physician…
19                    (Objection p. 11)

20    Apple's explanation is caught as untrue by their own evidence. A document containing all

21    correspondence of Coronavirus Reporter's App Store submission was filed by Apple as evidence

22    opposing a Preliminary Injunction. *Docket Entry #34-1, Exhibit A*. It proves Apple considered the

23    following in the app rejection:

24

*"[Coronavirus Reporter was] developed under Dr Robert Robert's leadership."*
*"Dr Robert Roberts is Chief Medical Officer of CALID, Inc. Dr Robert Roberts oversees this app,"*
*"Please see attached letter from Dr. Robert Roberts and CV. Calid is operating as a bioinformatics and telemedicine focused corporation, under his leadership. As his letter states, he also serves as liaison between Calid and University of Arizona."*
*"While we understand that you are working with healthcare professionals, we continue to find that your app contains information related to the COVID-19 pandemic, but the seller and company names associated with your app are not from a recognized institution, such as a governmental entity, hospital, insurance company, non-governmental organization, or university."*

The evidence is clear. Apple rejected the App because Dr. Roberts, purportedly, didn't satisfy their "institutional" requirement, despite him being an executive at University of Arizona. Apple's unequivocal rejection documentation has *nothing to do* with Dr. Isaacs medical credentials or disability. Moreover, the FAC describes Dr. Roberts' interview with CNBC about managing this app. Dr. Roberts had full medical authority over the app and there is absolutely zero evidence to suggest otherwise, despite Gibson Dunn's best efforts, which now constitute multiple false filings meant to inject Isaacs' disability into this proceeding, and which have resulted in multiple international news articles improperly discussing Isaacs' disability.

Isaacs' assertion in the FAC that he had multidisciplinary education does not explain why Apple, in an opposition to preliminary injunction filed a month before Isaacs' educational disclosure, falsely stated that Coronavirus Reporter's "only connection" to medicine was "Jeffrey Isaacs," who suffers from "neuropsychiatric disability." Not only was that false – Apple's documentation clearly evidences Dr. Robert's primary, lead medical role – but it improperly introduced medical disability information meant to tarnish the proceedings. And it did. A Ninth Circuit Justice asked "this may be a silly question, but what is a notary stamp?" Gibson Dunn's sleight of hand – manipulating description of underlying evidence to suggest Apple rejected the App on Isaacs' medical credentials – when it did not – played a role in undermining Plaintiff's market definitions and winning an antitrust case, at Isaacs' expense. This is now repeat ADA violation and unethical litigating.

11

PLAINTIFF JEFFREY ISAACS REPLY TO RULE 60 MOTION
CASE NO. 3:21-CV-5567-EMC

## VI.    APPLE'S REQUEST TO DISMISS MOTION ON BASIS OF PAGE COUNT AGAIN AVOIDS MERITS

Apple asserts that the Motion should be denied because it exceeds the Local Rules page length limitation. The twenty-sixth page Apple refers to, which Plaintiff concedes exists, contains one sentence from the conclusion, and a section requesting oral argument, which is redundant with the previous section requesting Evidentiary Hearing. Therefore, at its discretion, the Court may truncate the last page, or Plaintiff may re-file the truncated version, whichever is preferred. Neither will affect the briefing process underway, and will permit this matter to be adjudicated on the merits.

## CONCLUSION

Put simply, Apple had twenty-five pages to rebut their alleged "tooth and nail fight" to keep notarization charges alive globally. Evidently, they couldn't do this under Rule 11, and therefore this motion should be granted. Apple Inc.'s opposition rests heavily on prior procedural outcomes and mischaracterizes both the intent and the substance of Isaacs' motion to reopen the case under Federal Rule of Civil Procedure 60(b). The response highlights a fundamental misunderstanding or intentional misrepresentation of the evolving legal landscape that impacts this case.

The disproportionate focus on past victories and the character of the plaintiff rather than the substantive new evidence presented by Isaacs suggests that Apple may perceive the CTF allegation as a significant threat to their position. This is evident in their extensive efforts, ever present in their objection, to discredit Isaacs and minimize the legal implications of the new market realities introduced by the DMA and reflected in the CTF. Apple's reluctance to engage with the CTF issue in depth may be indicative of the potential validity of the claims associated with it, which could fundamentally alter the competitive landscape in a manner previously dismissed by the court.

The court must critically assess why Apple has chosen to sideline the discussion of the CTF— a potentially transformative factor in the antitrust landscape surrounding iOS app distribution. The

PLAINTIFF JEFFREY ISAACS' REPLY TO RULE 60 MOTION
CASE NO. 3:21-CV-5567-EMC

selective focus of Apple's response not only undermines the spirit of comprehensive judicial review but also potentially deprives the court of a balanced understanding of how new market conditions might influence the antitrust analysis central to this case. This oversight on Apple's part necessitates a more thorough examination by the Court to ensure that all relevant factors are considered in adjudicating the motion for relief under Rule 60(b).

Apple's strategic decision to virtually ignore the CTF allegation while concentrating on procedural history and attacking a disabled developer's character should raise concerns about the adequacy of their response to the substantive legal issues presented in the motion. The Court should recognize the potential for these tactics to divert attention from significant changes in market dynamics that could validate Plaintiff's claims. A focused judicial inquiry into the implications of the CTF and the broader competitive environment is essential to ensure that the motion for relief is evaluated on its full merits, taking into account all relevant and recent developments.

Apple's use of pejorative terms to describe this motion—words carefully chosen for their stigmatizing connotations—mirrors their past strategy to shift focus to Plaintiff as rather than address the merits of his claims. This approach is not only prejudicial but also distracts from the factual and legal bases of the motion. The repeated use of such language in legal filings can have a severe impact on the perception of the litigant's character and motivations, which is especially damaging when the Plaintiff has faced challenges related to his medical condition.

Imagine if this new development were to go unchecked, and like the EU, the US authorities required Apple open up app distribution to allow third-party sideloading. Apple would then implement a CTF in the United States, just as they did in Europe. And they would be protected by the law of this case – that notary stamps are not a market. The law of this case, as it presently stands, risks further enabling the Apple monopoly. Rule 60 is the appropriate mechanism to do correct this matter.

PLAINTIFF JEFFREY ISAACS' REPLY TO RULE 60 MOTION
CASE NO. 3:21-CV-5567-EMC

1    Apple dismisses the relevance of the DMA and other global market changes by claiming they

2    are unrelated to U.S. law and the specifics of this case. This overlooks the global nature of digital

3    markets and the influence of international regulatory frameworks on U.S. businesses and antitrust

4    jurisprudence, and the obvious stated above – that Apple can and will implement a CTF in the USA,

5    if permitted. The DMA's impact on Apple's business practices offers a direct analogy to potential

6    monopolistic practices within the U.S., thus providing new evidence that supports the plausibility of

7    Plaintiff's market theories, particularly concerning iOS notary stamps.

8    Apple's focus on Isaacs' medical condition was both irrelevant and prejudicial, which tainted

9    the proceedings. Contrary to Apple's assertion, the references to Isaacs' neuropsychiatric condition,

10   which were never submitted to Apple nor relevant to the antitrust issues at hand, were used to

11   undermine his credibility and win an antitrust lawsuit by mocking "notary stamps" and other writings

12   of Isaacs. That is improper. This misuse of personal health information in court proceedings warrants

13   correction to prevent manifest injustice, an aim squarely within the ambit of Rule 60(b)(6).

14   The motion for an evidentiary hearing and further discovery is justified by the need to examine

15   the implications of new facts arising from regulatory changes and market evolution that were

16   previously unavailable. This is a legitimate issue to say the least, and is certainly not "abusive" but

17   rather ensures that the court's decision is informed by the most current and relevant information.

18   Apple's attempt to close off any reconsideration of this case fails to recognize the significant changes

19   in the digital market landscape and the potential implications of these changes on the original

20   judgment. It is neither vexatious nor frivolous to request that the court consider new evidence that

21   could fundamentally alter the legal and factual framework of the case. Therefore, Plaintiff respectfully

22   requests that the court grant the motion to reopen the case, allow the introduction of new evidence,

23   and reconsider its prior rulings in light of these developments.

24

PLAINTIFF JEFFREY ISAACS' REPLY TO RULE 60 MOTION
CASE NO. 3:21-CV-5567-EMC

1    Given the significance of the new information regarding Apple's adaptation to the DMA, an

2 evidentiary hearing and further discovery are not only justified but necessary. These processes are

3 essential to explore fully the implications of Apple's adjustments in their business model, which

4 support claims about monopolistic practices associated with notary services. Dismissing the need for

5 further inquiry as "prolonging litigation" fundamentally misunderstands the purpose of judicial

6 oversight in ensuring fair competition in digital markets.

7    Apple's response to the motion for relief under Rule 60(b) attempts to deflect from the

8 substantive issues by undermining the Plaintiff's character and motivations. This approach is not only

9 inappropriate but also indicative of a broader strategy to use personal attacks in place of engaging

10 with significant legal and factual developments that warrant reopening the case. The Court should

11 recognize these tactics for what they are—an attempt to avoid scrutiny of potentially anticompetitive

12 practices that have now been substantiated by international regulatory actions and documented

13 changes in Apple's business conduct. Therefore, Plaintiff Isaacs respectfully requests that the Court

14 look beyond the derogatory framing by Apple and allow the motion to proceed on its merits, ensuring

15 that justice is served in light of new and compelling evidence.

16        Submitted on this 3rd day of May, 2024.

17        /s/ Dr. Jeffrey D. Isaacs

18        Dr. Jeffrey D. Isaacs
         11482 Key Deer Circle

19        Wellington, FL 33449

20

21

22

23

24

PLAINTIFF JEFFREY ISAACS REPLY TO RULE 60 MOTION
CASE NO. 3:21-CV-5567-EMC

RACHEL S. BRASS, SBN 219301
    RBrass@gibsondunn.com
JULIAN W. KLEINBRODT, SBN 302085
    JKleinbrodt@gibsondunn.com
One Embarcadero Center, Suite 2600
San Francisco, CA  94111-3715
Telephone:    415.393.8200
Facsimile:    415.393.8306

*Attorneys for Defendant*
*APPLE INC.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| CORONAVIRUS REPORTER, CALID INC., PRIMARY PRODUCTIONS LLC, DR. JEFFREY D. ISAACS, on behalf of themselves and all others similarly situated<br><br>Plaintiffs,<br><br>v.<br><br>APPLE INC., FEDERAL TRADE COMMISSION<br><br>Defendants. | CASE NO. 3:21-CV-05567-EMC<br><br>**DEFENDANT APPLE INC.'S OPPOSITION TO PLAINTIFF JEFFREY ISAACS' MOTION FOR RELIEF FROM JUDGMENT**<br><br>Date:        May 23, 2024<br>Time:        1:30 p.m.<br>Location:    San Francisco Courthouse,<br>                 Courtroom 5 – 17th Fl.<br>Judge:       Hon. Edward M. Chen |

Gibson, Dunn &
Crutcher LLP

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................. 1

BACKGROUND .................................................................................................................... 2

LEGAL STANDARD ............................................................................................................ 4

ARGUMENT ......................................................................................................................... 4

   I. Isaacs' Rule 60 Motion Is Barred By Law Of The Case ................................................ 4

   II. Isaacs Has Not Met His Burden Under Rule 60 ........................................................... 6

     A. There Is No Right to Relief Under Rule 60(b)(5). ..................................................... 6

     B. There Is No Right to Relief Under Rule 60(b)(6). ..................................................... 8

   III. There Is No Basis For An Evidentiary Hearing Or Discovery ................................... 13

CONCLUSION .................................................................................................................... 14

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Aquino v. Cnty. of Monterey Sheriff's Dep't,*
2018 WL 3845718 (N.D. Cal. Aug. 12, 2018) ............................................................... 5

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ................................................................................................. 14

*Biancur v. Hickey,*
221 F. App'x 546 (9th Cir. 2007) .............................................................................. 5

*Cascade Health Sols. v. PeaceHealth,*
515 F.3d 883 (9th Cir. 2008) .................................................................................. 13

*Coltec Indus., Inc. v. Hobgood,*
280 F.3d 262 (3rd Cir. 2002) .................................................................................... 7

*Comfort v. Lynn Sch. Comm.,*
560 F.3d 22 (1st Cir. 2009) ...................................................................................... 7

*Coronavirus Rep. v. Apple Inc.,*
85 F.4th 948 (9th Cir. 2023) ................................................................ 1, 3, 4, 8, 11, 12, 13

*Edmondson v. RCI Hosp. Holdings, Inc.,*
2021 WL 4499031 (S.D.N.Y. Oct. 1, 2021) .......................................................... 10, 11

*Eichman v. Fotomat Corp.,*
880 F.2d 149 (9th Cir. 1989) .................................................................................... 5

*Epic Games, Inc. v. Apple Inc.,*
559 F. Supp. 3d 898 (N.D. Cal. 2021) ...................................................................... 2

*Epic Games, Inc. v. Apple, Inc.,*
67 F.4th 946 (9th Cir. 2023) ..................................................................................... 8

*Fantasyland Video, Inc. v. Cty. of San Diego,*
505 F.3d 996 (9th Cir. 2007) .................................................................................... 7

*Fed. Trade Comm'n v. Hewitt,*
68 F.4th 461 (9th Cir. 2023) ................................................................................... 11

*Gen. Ins. Co. of Am. v. Corp. Control, Inc.,*
2005 WL 1592918 (E.D. Cal. June 27, 2005) ............................................................ 8

*Gibbs v. Maxwell House,*
738 F.2d 1153 (11th Cir. 1984) ................................................................................ 7

*Godecke v. Kinetic Concepts, Inc.,*
2016 WL 11673222 (C.D. Cal. Nov. 16, 2016) .......................................................... 5

*Harris v. Vector Mktg. Corp.,*
2010 WL 11484769 (N.D. Cal. Aug. 17, 2010) ........................................................ 11

Gibson, Dunn &
Crutcher LLP

iii

*Harvest v. Castro*,
 531 F.3d 737 (9th Cir. 2008) ........................................................................................4

*Hiramanek v. Clark*,
 2016 WL 11033962 (N.D. Cal. Mar. 29, 2016)............................................................4

*Horne v. Flores*,
 557 U.S. 433 (2009)................................................................................................ 8, 13

*Illinois Tool Works Inc. v. Independent Ink, Inc.*,
 547 U.S. 28 (2006)........................................................................................................13

*In re International Fibercom, Inc.*,
 503 F.3d 933 (9th Cir. 2007) ........................................................................................8

*Isaacs v. Arizona Bd. of Regents*,
 608 F. App'x 70 (3d Cir. 2015) ............................................................................ 11, 12

*Johnston v. Cigna Corp.*,
 14 F.3d 486 (10th Cir. 1993) ......................................................................................10

*Karam v. Corinthian Colleges, Inc.*,
 2015 WL 13593539 (C.D. Cal. Mar. 4, 2015) ..............................................................6

*Knopp v. Life Ins. Co. of N. Am.*,
 2009 WL 5215395 (N.D. Cal. Dec. 28, 2009) ............................................................11

*Kreidler v. Pixler*,
 2010 WL 1536842 (W.D. Wash. Apr. 15, 2010) ..........................................................9

*LaShawn A. v. Barry*,
 87 F.3d 1389 (D.C. Cir. 1996) (en banc) ......................................................................5

*Latshaw v. Trainer Wortham & Co.*,
 452 F.3d 1097 (9th Cir. 2006) .................................................................................. 4, 8

*Maraziti v. Thorpe*,
 52 F.3d 252 (9th Cir. 1995) ..................................................................................... 6, 7

*Martinez v. Allstate Ins. Co.*,
 2001 WL 37124841 (D.N.M. Aug. 5, 2001) .................................................................9

*Martinez v. Shinn*,
 33 F.4th 1254, 1263 (9th Cir. 2022)..............................................................................9

*McKinney v. Boyle*,
 404 F.2d 632 (9th Cir. 1968) ........................................................................................8

*Miller v. Norton*,
 2008 WL 1902233 (E.D.N.Y. Apr. 28, 2008) ..............................................................8

*Money Store, Inc. v. Harriscorp Fin., Inc.*,
 885 F.2d 369 (7th Cir. 1989) ........................................................................................8

*Morse-Starrett Prod. Co. v. Steccone,*
    205 F.2d 244 (9th Cir. 1953) ............................................................................. 4, 13

*Newcal Industries Inc. v. Ikon Office Solution,*
    513 F.3d 1039 (9th Cir. 2008) ................................................................................. 8

*In re Optionable Sec. Litig.,*
    2009 WL 1653552 (S.D.N.Y. June 15, 2009) ......................................................... 6

*Optional Capital, Inc. v. DAS Corp.,*
    66 F.4th 1188 (9th Cir. 2023) .................................................................................. 5

*Polites v. United States,*
    364 U.S. 426 (1960) ........................................................................................ 1, 8, 9

*Reese v. McGraw-Hill Companies, Inc.,*
    293 F.R.D. 617 (S.D.N.Y. 2013) ............................................................................. 6

*Rivas Rosales v. Barr,*
    2020 WL 1505682 (N.D. Cal. Mar. 30, 2020) ...................................................... 11

*Rufo v. Inmates of Suffolk County Jail,*
    502 U.S. 367 (1992) ................................................................................................. 7

*Selkridge v. United of Omaha Life Ins. Co.,*
    360 F.3d 155 (3d Cir. 2004) .................................................................................. 13

*Shoom, Inc. v. Eletronic Imaging Systems of America, Inc.,*
    2006 WL 1529983 (N.D. Cal. May 31, 2006) ....................................................... 14

*Tapper v. Hearn,*
    833 F.3d 166 (2d Cir. 2016) .................................................................................... 7

*Twelve John Does v. D.C.,*
    841 F.2d 1133 (D.C. Cir. 1988) ............................................................................... 7

*United Airlines, Inc. v. Brien,*
    588 F.3d 158 (2d Cir. 2009) .................................................................................... 9

*United States v. Bermudez,*
    2014 WL 2111496 (N.D. Cal. May 20, 2014) ...................................................... 13

*United States v. Buenrostro,*
    638 F.3d 720 (9th Cir. 2011) .................................................................................. 4

*United States v. Garcia-Beltran,*
    443 F.3d 1126 (9th Cir. 2006) ................................................................................ 5

*United States v. Jallali,*
    587 F. App'x 583 (11th Cir. 2014) .......................................................................... 5

*United States v. Montalvo,*
    2009 WL 2591356 (E.D. Cal. Aug. 21, 2009) ........................................................ 9

v

*United States v. Pacific Gas and Electric Co.*,
  2016 WL 3255069 (N.D. Cal. June 14, 2016) ........................................................................... 13

*In re Zermeno-Gomez*,
  868 F.3d 1048 (9th Cir. 2017) ..................................................................................................... 6

**Rules**

Fed. R. Civ. P. 60 ...................................................................................1, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13

N.D. Cal. L.R. Civ. 7-2(b) .................................................................................................................. 4

Gibson, Dunn &
Crutcher LLP

vi

## INTRODUCTION

The Court dismissed this case with prejudice, denied two requests for preliminary injunctions, and refused reconsideration. Dkts. 85 & 103. The Ninth Circuit affirmed. *Coronavirus Rep. v. Apple Inc.*, 85 F.4th 948, 953 (9th Cir. 2023). That Plaintiffs did "not adequately define[] the relevant market"—"[a] threshold step in any antitrust case"—and also "did not demonstrate that [Apple] undertook anticompetitive conduct" is law of the case. *Id.* at 955–57. So is Plaintiffs' failure to state a claim under any of the myriad other theories in their Complaint. *Id.* at 957–58. Yet Plaintiff Jeffrey Isaacs ("Isaacs") returns to this Court under the misimpression that the merits of his allegations remain an open question. They are not: Federal Rule of Civil Procedure 60 does not allow Isaacs to relitigate his failed arguments yet again. Isaacs' extraordinary request—to vacate an already-affirmed judgment—should be rejected.

First, Isaacs' arguments are foreclosed by law of the case. The Ninth Circuit held that the Complaint did not "state *any* claim." *Coronavirus Rep.*, 85 F.4th at 959 (emphasis added). That decision was based on the allegations in Plaintiffs' Complaint, none of which can be changed by developments in the world at large. All of Isaacs' arguments—which reduce to an attempt to reargue that he articulated a valid antitrust claim—run afoul of the Ninth Circuit's mandate. The Court should deny Isaacs' motion for this reason alone.

Second, Isaacs does not meet the requirements for relief under Federal Rules of Civil Procedure 60(b)(5) or 60(b)(6). As to Rule 60(b)(5), the Court's judgment was not, as required, prospective; there has been no change in controlling law; and Isaacs identifies no inequity in maintaining a judgment that has already been affirmed. So too under Rule 60(b)(6). None of the "developments" to which Isaacs points, Mot. 1—from European legislation to ongoing district-court proceedings in different antitrust cases—affect (or even could affect) the "governing law" in this case. *Polites v. United States*, 364 U.S. 426, 433 (1960). And Isaacs' false accusations of discrimination as well as his other attempts to relitigate the merits of his tying claim fall far short of demonstrating the extraordinary circumstances needed to disturb a final judgment. *Id.*

Nor is there any basis to indulge Isaacs' requests for discovery and an evidentiary hearing. This case failed on the pleadings, and no amount of testimony can change that. Plaintiffs had their days in

1

1   court and lost.  The Court should summarily deny Isaacs' motion.

2                                **BACKGROUND**

3           On September 6, 2021, Plaintiffs filed the operative complaint (Dkt. 41)—the seventh iteration

4   of their suit against Apple.  Dkt. 85 at 8.  Plaintiffs alleged that they were the developers of five apps.

5   Dkt. 41 ¶ 8.  They complained that Apple had rejected two of their apps pursuant to its App Review

6   Guidelines, which address "issues of safety, privacy, performance, and reliability" and are "used in

7   appropriate ways for appropriate purposes."  *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 949

8   (N.D. Cal. 2021); *see also* Dkt. 85 at 2–4 (summarizing Plaintiffs' allegations).  Plaintiffs claimed their

9   other apps had been "suppressed" on the App Store because Isaacs had a patent infringed by Apple's

10  supposed "crony"—even though Plaintiffs conceded the patent had been invalidated (and, moreover,

11  that Plaintiffs had abandoned at least one of their "suppressed" apps).  Dkt. 85 at 3–4.  Plaintiffs asserted

12  eleven causes of action against Apple.  *Id.* at 6–7; *accord* Dkt. 41 ¶¶ 160–323.  Their seven antitrust

13  claims turned on a counterfactual theory that Apple somehow restrained or monopolized "at least

14  fifteen different relevant markets" by "'purchas[ing]' apps from developers—by approving them

15  through the App Review process—and then resell[ing] them to consumers on its own terms."  Dkt. 85

16  at 4–5.  Plaintiffs also advanced two contract claims, a RICO claim, and a fraud claim.  *Id.* at 6–7;

17  *accord* Dkt. 41 ¶¶ 160–323.

18          Although the case never progressed past the pleadings, Plaintiffs polluted the docket with

19  meritless requests.  Plaintiffs filed two motions for preliminary injunctions without a shred of evidence.

20  Dkts. 20 & 55.  Plaintiffs responded to Apple's motion to dismiss with a motion to strike, Dkt. 51, even

21  though "[t]here is no basis for a party to strike a motion," Dkt. 85 at 31.  Plaintiffs filed a "procedurally

22  improper attempt to amend their complaint" that was "a nullity because Plaintiffs did not notice a

23  motion for such relief, much less compl[y] with the Court's procedures for doing so."  *Id.*  Plaintiffs

24  also propounded baseless discovery requests, including serving improper state-court subpoenas and

25  "notices to appear" upon Apple employees for a hearing at which the Court had not authorized live

26  testimony.  *See* Dkt. 74.  Although all of these efforts were meritless and properly rejected, they

27  consumed significant resources.  *See, e.g.*, Dkts. 32, 62, 72, 76 (extensive briefing required to address

28  some of Plaintiffs' baseless requests).

On November 30, 2021, the Court dismissed Plaintiffs' Complaint with prejudice in a detailed, 34-page order. Dkt. 85. The Court dismissed Plaintiffs' antitrust claims on two threshold grounds. First, there were at least three independent problems with Plaintiffs' attempt to define the relevant markets: The "fifteen different markets" were confused, overlapping, and ill-defined, *id.* at 10–13; Plaintiffs also "fail[ed] to plead facts . . . under the standard rules for *any* market," including, as to their five alleged single-brand markets, failing to "allege[] facts required to justify defining these markets as *single-brand* markets," *id.* at 14–20; and "the markets Plaintiffs allege[d] fail[ed] to grapple with their own admission and economic reality that the 'iOS App market is two-sided,'" *id.* at 20–22. Second, Plaintiffs failed to allege antitrust injury—advancing a "theory of injury … that *their* apps were rejected from the App Store or subjected to alleged ranking suppression," without "harm[ing] competition *in the market* beyond Plaintiffs' conclusory allegations." *Id.* at 22. The Court found that Plaintiffs' contract, RICO, and fraud claims also failed on multiple grounds. *Id.* at 27–30. The Court then denied Plaintiffs' motion for reconsideration and Isaacs' motion for sanctions. *See* Dkts. 100 & 103.

The Ninth Circuit affirmed this Court's analysis and disposition on all counts. *Coronavirus Rep.*, 85 F.4th at 954–959. In a unanimous published opinion, the court held that Plaintiffs' antitrust claims faltered at the "threshold step" of market definition for the same three reasons this Court found: The "scattergun" markets were inadequately defined, the Complaint failed to support the alleged markets with sufficient factual allegations, and Plaintiffs "fail[ed] to properly allege a relevant [two-sided] market . . . to the extent that [they] attempt[ed]" to do so. *Id.* at 956–57. The Ninth Circuit further affirmed the Court's alternative holding that Plaintiffs "did not demonstrate that [Apple] undertook anticompetitive conduct in that market sufficient to harm the competitive process as a whole." *Id.* at 957. The court also agreed that Plaintiffs' other claims were meritless, *id.* at 957–58, and affirmed the denial of leave to amend since Plaintiffs had been "given a total of seven opportunities to amend similar complaints across jurisdictions and between various permutations of plaintiffs, but still failed to state their claims here adequately," *id.* at 958. The panel then denied Plaintiffs' petition for rehearing. *Coronavirus Rep. et al. v. Apple Inc.*, 22-15166 (9th Cir.) Dkt. 80.

Plaintiffs next petitioned the Supreme Court. They first applied for a writ of injunction, asking

the Supreme Court to issue the preliminary injunction this Court rejected. *See* Decl. of Julian Kleinbrodt Ex. 1. Justice Kagan and then the full Court rejected that application. *Id.* Plaintiffs have now sought a writ of certiorari. *See* Dkt. 117. Although that petition remains pending, Isaacs filed this 26-page motion—seeking to vacate the already-affirmed judgment under Federal Rule of Civil Procedure 60(b)(5) and 60(b)(6)—on April 12, 2024. *See* Mot. 4–5.[1]

## LEGAL STANDARD

"The procedure provided by Rule 60(b) is not a substitute for an appeal." *Morse-Starrett Prod. Co. v. Steccone*, 205 F.2d 244, 249 (9th Cir. 1953). Because it disturbs "the interest of preserving the finality of judgments," "[l]iberal application [of Rule 60] is not encouraged." *Latshaw v. Trainer Wortham & Co.*, 452 F.3d 1097, 1104 (9th Cir. 2006). The rule is instead "used sparingly." *Harvest v. Castro*, 531 F.3d 737, 749 (9th Cir. 2008). Under Rule 60(b)(5), a court may vacate a judgment only if it "has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). Rule 60(b)(6) applies only in the "rare case in which extraordinary circumstances" justify relief. *United States v. Buenrostro*, 638 F.3d 720, 722 (9th Cir. 2011) (citing Fed. R. Civ. P. 60(b)(6)).

## ARGUMENT

Isaacs' overlength motion violates Local Rule 7-2(b) and should be denied on that basis alone. *See Hiramanek v. Clark*, 2016 WL 11033962, at *2 (N.D. Cal. Mar. 29, 2016). His arguments also fail on the merits. First, Isaacs' request is barred by the law of the case. Second, Isaacs does not approach the extraordinary proof required for relief under Rules 60(b)(5) or 60(b)(6). Nor is there any basis for further discovery or an evidentiary hearing, both of which would only be used to prolong these proceedings further.

## I. ISAACS' RULE 60 MOTION IS BARRED BY LAW OF THE CASE

The Court found that Plaintiffs' Complaint failed to state a claim as a matter of law. Dkt. 85 at 1. The Ninth Circuit affirmed that conclusion, agreeing with this Court that each of Plaintiffs' claims failed on the pleadings and amendment would be futile. *Coronavirus Rep.*, 85 F.4th at 954–959. The Ninth Circuit's decision is final, its mandate issued. Dkt. 116. Accordingly, Plaintiffs' inability to

---

[1] Plaintiffs Coronavirus Reporter, CALID, and Primary Productions did not join Isaacs' motion.

DEFENDANT APPLE INC.'S OPPOSITION TO ISAACS' MOTION FOR RELIEF FROM JUDGMENT
CASE NO. 3:24-CV-00476-RS

Gibson, Dunn &
Crutcher LLP

allege a viable claim is law of the case that this Court "on remand . . . is bound to follow." *United States v. Garcia-Beltran*, 443 F.3d 1126, 1129 (9th Cir. 2006); *see also Eichman v. Fotomat Corp.*, 880 F.2d 149, 157 (9th Cir. 1989) (a court of appeal's "explicit decisions as well as those issues decided by necessary implications" are law of the case and "must be followed in all subsequent proceedings in the same case").

Isaacs' motion runs afoul of this "time-honored doctrine[]." *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc).  Here, he seeks to vacate a judgment entered because his *allegations* failed to state a claim as a matter of law.  *See* Dkt. 85 at 1.  The sufficiency of those allegations has already been considered and resolved by both this Court and the Ninth Circuit, and the Complaint has not changed in any way since that time.  Any argument that the Complaint states a plausible antitrust claim, *see* Mot. 10–21, thus challenges "explicit decisions" or "issues decided by necessary implication[]." *Eichman*, 880 F.2d at 157; *see also LaShawn*, 87 F.3d at 1393 ("[T]he *same* issue presented a second time in the *same case* in the *same court* should lead to the *same result*.").

Indeed, Isaacs' motion is foreclosed by *Optional Capital, Inc. v. DAS Corp.*, 66 F.4th 1188 (9th Cir. 2023).  There, like here, the movant sought relief under Rule 60 by making arguments "that [were] directly contrary to, and squarely foreclosed by, the rulings in [the Ninth Circuit's] prior opinion." *Id.* at 1192.  The Ninth Circuit summarily affirmed the denial of that motion, holding that Rule 60 "obviously" cannot be used to circumvent law of the case doctrine. *Id.* at 1191–93.  Isaacs' motion— which also is "utterly meritless," "frivolous," and serves only to "vexatiously multiply[] these proceedings"—should be dispatched in similarly short order. *Id.* at 1193; *see also*, *e.g.*, *United States v. Jallali*, 587 F. App'x 583, 586 (11th Cir. 2014) (Rule 60 motion denied under the law of the case); *Biancur v. Hickey*, 221 F. App'x 546, 547 (9th Cir. 2007) (same); *Aquino v. Cnty. of Monterey Sheriff's Dep't*, 2018 WL 3845718, at *1 (N.D. Cal. Aug. 12, 2018) (same).

Isaacs appears to argue that the Court should disregard the Ninth Circuit's mandate because the Digital Markets Act went into effect in the European Union and a jury found against Google in a different antitrust case.  *See* Mot. at 9, 16–17.  Neither meets the high standard to depart from law of the case.  *See Godecke v. Kinetic Concepts, Inc.*, 2016 WL 11673222, at *5 (C.D. Cal. Nov. 16, 2016).  It goes without saying that European Union legislation and a verdict in a different district court cannot

countermand the Ninth Circuit's published affirmance of the dismissal in this case. *See In re Zermeno-Gomez*, 868 F.3d 1048, 1052 (9th Cir. 2017) ("[A] published decision of this court constitutes binding authority which must be followed unless and until overruled by a body competent to do so."). Nor do the Digital Markets Act ("DMA") or verdict against Google unsettle the result here: Plaintiffs lost this case at the pleading stage because *their allegations* failed on multiple grounds. No number of developments in the world at large can change the insufficiency of Plaintiffs' Complaint. *See In re Optionable Sec. Litig.*, 2009 WL 1653552, at *4 (S.D.N.Y. June 15, 2009) (refusing to vacate dismissal order despite emergence of new evidence from government investigation because "Plaintiffs chose to file on insufficient allegations"); *Karam v. Corinthian Colleges, Inc.*, 2015 WL 13593539, at *5–7 (C.D. Cal. Mar. 4, 2015) (similar); *Reese v. McGraw-Hill Companies, Inc.*, 293 F.R.D. 617, 622 (S.D.N.Y. 2013) (similar). Isaacs' motion should be denied.

## II. ISAACS HAS NOT MET HIS BURDEN UNDER RULE 60

Isaacs' motion also should be denied because he does not establish any entitlement to relief under Federal Rule of Civil Procedure 60 itself. First, Rule 60(b)(5) does not apply because the judgment is not prospective, nor does Isaacs demonstrate any inequity in leaving that judgment undisturbed. Second, Isaacs' resort to irrelevant developments across the globe, false claims of discrimination, and a bare assertion that every court to have considered his claims got it all wrong does not justify relief under Rule 60(b)(6).

### A. There Is No Right to Relief Under Rule 60(b)(5).

Federal Rule of Civil Procedure 60(b)(5) allows relief from a final judgment where "the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). Isaacs does not seek relief under either of the first two prongs. Rather, he argues that "applying the previous dismissal prospectively is no longer equitable due to a significant shift in the legal landscape." Mot. 8. This argument fails for three reasons.

First, the Court's judgment does not have prospective application—as required for a judgment to be "unfair under Fed. R. of Civ. P. 60(b)(5)." *Maraziti v. Thorpe*, 52 F.3d 252, 254 (9th Cir. 1995). Prospective judgments are those that are not merely "executory" and instead involve "the supervision

6

ER 36

1    of changing conduct or conditions." *Id.* So while dismissing a case has "reverberations into the future

2    insofar as it precludes relitigation, such judgments are executory and have no 'prospective application'

3    for the purposes of Rule 60(b)(5)." *Id.* (order dismissing party from lawsuit was not prospective); *see*

4    *also Fantasyland Video, Inc. v. Cty. of San Diego*, 505 F.3d 996, 1005 (9th Cir. 2007) (summary

5    judgment not prospective even though it precluded plaintiff from challenging constitutionality of

6    ordinance). As a result, courts routinely find that orders dismissing cases with prejudice are not

7    prospective under Rule 60(b)(5). *See, e.g.*, *Tapper v. Hearn*, 833 F.3d 166, 171 (2d Cir. 2016); *Comfort

8    v. Lynn Sch. Comm.*, 560 F.3d 22, 27–28 (1st Cir. 2009); *Coltec Indus., Inc. v. Hobgood*, 280 F.3d 262,

9    271–72 (3rd Cir. 2002); *Gibbs v. Maxwell House*, 738 F.2d 1153, 1155–56 (11th Cir. 1984); *Twelve

10   John Does v. D.C.*, 841 F.2d 1133, 1139–40 (D.C. Cir. 1988). Isaacs offers no contrary authority or

11   argument.[2]

12          Second, "controlling legal principles" have not "shift[ed]." Mot. 4. Isaacs focuses on the

13   verdict returned for Epic in its recent antitrust case against Google. *See id.* Setting aside that a jury

14   verdict cannot supersede the considered opinion of the Ninth Circuit (*see supra* 5), Isaacs far overstates

15   the overlap between Epic's case and his. In that case, the jury found that Google had engaged in

16   anticompetitive conduct—including through agreements with potential rival app stores and original

17   smartphone equipment manufacturers—in worldwide markets (excluding China) for Android app

18   distribution and Android in-app billing services. *See In re Google Play Store Antitrust Litigation*, 21-

19   md-02981, Dkt. 866 at 3–7. That is very different than the challenges here to Apple's Guidelines,

20   review process, and search algorithms across numerous, ill-defined, domestic markets. *See, e.g.*, Dkt.

21   85 at 4–5 (summarizing the "claim theory" and 15 markets alleged by Plaintiffs, most explicitly limited

22   to iOS). The *Google* verdict does not and cannot control the outcome of this litigation.

23          That the jury in *Google* found a single-brand market does not mean there was a change in

24   "controlling legal principles." Mot. 4. The viability of single-brand markets remains governed by

25   *Newcal Industries Inc. v. Ikon Office Solution*, 513 F.3d 1039, 1049–50 (9th Cir. 2008), *Epic Games,*

---

26   [2] *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992), cited by Isaacs (Mot. 9), does not suggest

27   otherwise. The movant there sought to modify "an institutional reform consent decree" with extensive,
     ongoing obligations—a classic prospective judgment subject to Rule 60(b)(5). 502 U.S. at 383. Nor

28   do the improvements in prison conditions at issue in *Rufo* resemble the supposedly changed
     circumstances to which Isaacs points here. *See id.* at 375–77.

*Inc. v. Apple, Inc.*, 67 F.4th 946, 977 (9th Cir. 2023), and their progeny.  That was the standard applied in this case, *Coronavirus Rep.*, 85 F.4th at 956–57; to the extent Isaacs argues a different standard was applied in *Google*, that would point to error in that case, not this one.  Nor would a change in the law on this issue warrant relief: Plaintiffs' failure to plead a single-brand market was only one of many independent shortcomings with the alleged markets, and Plaintiffs pled no antitrust injury to boot.  *Id.* at 954–959; *see also* Dkt. 85 at 22–27.

Third, "Rule 60(b)(5) may not be used to challenge the legal conclusions on which a prior judgment or order rests."  *Horne v. Flores*, 557 U.S. 433, 447 (2009).  But Isaacs seeks to do just that. He gestures to a series of external developments, none bearing on the insufficiencies of the Complaint, and asks for a do-over.  *See* Mot. 16–17.  That is improper.  *See Money Store, Inc. v. Harriscorp Fin., Inc.*, 885 F.2d 369, 372 (7th Cir. 1989) ("Rule 60(b)(5) 'does not allow relitigation of issues which have been resolved by the judgment.'").  Far from furthering "justice and equity," Mot. 29, "both would be offended by rewarding [Isaacs'] needless relitigation" of arguments that have been made and rejected—particularly since Isaacs does not even attempt to dispute many of the grounds supporting the judgment.  *Gen. Ins. Co. of Am. v. Corp. Control, Inc.*, 2005 WL 1592918, at *4 (E.D. Cal. June 27, 2005).  Because none of Isaacs' arguments approach the high bar for relief, his request to vacate the judgment under Rule 60(b)(5) should be rejected.

## B.  There Is No Right to Relief Under Rule 60(b)(6).

"While drafted broadly," Federal Rule of Civil Procedure 60(b)(6) is "very narrow."  *Miller v. Norton*, 2008 WL 1902233, at *2 (E.D.N.Y. Apr. 28, 2008).  It provides an "'equitable remedy to prevent manifest injustice' and 'is to be utilized only where extraordinary circumstances prevented a party from taking timely action to prevent or correct an erroneous judgment.'"  *In re International Fibercom, Inc.*, 503 F.3d 933, 941 (9th Cir. 2007) (quoting *Latshaw v. Trainer Wortham & Co.*, 452 F.3d 1097, 1103 (9th Cir. 2006)).  This requires especially egregious circumstances, such as gross fraud, *McKinney v. Boyle*, 404 F.2d 632 (9th Cir. 1968), or a "clear and authoritative change in governing law," *Polites*, 364 U.S. at 433.  Although Isaacs' arguments are anything but clear, he appears to advance three points: (1) that developments since the Court's dismissal justify relief, Mot. 9–11, 15–17, 19–21; (2) that the Court's decision was tainted by alleged discrimination, Mot. 11–13;

DEFENDANT APPLE INC.'S OPPOSITION TO ISAACS' MOTION FOR RELIEF FROM JUDGMENT
CASE NO. 3:24-CV-00476-RS

and (3) that he stated a plausible *per se* tying claim, Mot. 2–3, 10. Each of these arguments fails.

### 1. There Are No Extraordinary Developments Warranting Relief

For a change in governing law to constitute extraordinary circumstances under Rule 60(b)(6), it must, at a minimum, be one that affects *the outcome of the judgment*. *Martinez v. Shinn*, 33 F.4th 1254, 1263 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 584 (2023) (holding that "only legal rulings that may have affected the outcome of the judgment the petitioner seeks to review should weigh toward a finding of extraordinary circumstances") (cleaned up). None of the four "developments" Isaacs cites— the Department of Justice's March 21, 2024 complaint against Apple, Mot. 19–20, Apple's compliance with the DMA in the European Union, Mot. 11–13, 21, the verdict in *In re Google Play Store*, 21-md-02981, Mot. 1, 4, 7, 16–17, and Apple's compliance with the injunction in *Epic Games, Inc. v. Apple Inc.*, 20-cv-05640, Mot. 9–11—meet this bar.

To start, none of these developments even affect the "governing" law in this case. *Polites*, 364 U.S. at 433. The Department of Justice's complaint is just that—an initial pleading—with no precedential force. *See Kreidler v. Pixler*, 2010 WL 1536842, at *1 (W.D. Wash. Apr. 15, 2010) ("The [government's] allegations against [a party], are, at this point, just allegations."). The DMA has no bearing on U.S. antitrust law. *See* DMA, Regulation (EU) 2022/1925, Ch. 1, Art. 1, ¶ 2. And no proceedings in *In re Google Play Store*, No. 21-md-02981 (N.D. Cal.) or *Epic Games, Inc. v. Apple Inc.*, No. 20-cv-05640 (N.D. Cal.), could suffice as even disparate decisions in district courts are not "by [themselves], sufficiently 'extraordinary' to justify reopening [a] judgment." *United Airlines, Inc. v. Brien*, 588 F.3d 158, 176 (2d Cir. 2009); *see also Martinez v. Allstate Ins. Co.*, 2001 WL 37124841, at *2 (D.N.M. Aug. 5, 2001) ("The fact that another judge has issued a decision that may contain a different conclusion from that of this Court does not mean that enforcement of this judgment is inequitable."). The Ninth Circuit held on multiple grounds that Plaintiffs' claims failed—a decision that is now the law of this Circuit—and pleadings by a litigant, statutes by a foreign sovereign, and ongoing district-court proceedings in different cases cannot supersede that. *See United States v. Montalvo*, 2009 WL 2591356, at *3 (E.D. Cal. Aug. 21, 2009) (rejecting Rule 60(b)(6) motion where "intervening authority . . . does not change the governing law").

Isaacs also fails to identify anything "beyond any question inconsistent" with the Court's

1   rulings here.  *Edmondson v. RCI Hosp. Holdings, Inc.*, 2021 WL 4499031, at *2 (S.D.N.Y. Oct. 1,

2   2021).  For example, Isaacs claims that the DMA "ha[s] brought to light the actuality and significance

3   of 'iOS notary stamps' as a distinct market."  Mot. 8.  That is so, he says, because the "Core Technology

4   Fee" that forms part of Apple's new business terms available for developers' apps in the European

5   Union is "a de facto 'Notary Stamp Fee' for Apple's notarization process."  *Id.* at 8.  That invented

6   interpretation of Apple's Core Technology Fee is unsupported and untrue.  More to the point, it is

7   completely irrelevant to the issues in this case: New business terms that Apple has made available in

8   the European Union have no bearing on whether Plaintiffs adequately alleged a relevant market in this

9   case—all of which, Plaintiffs argued, were limited to the United States.  *Coronavirus Rep. et al. v.*

10  *Apple Inc.*, 22-15166 (9th Cir.) Dkt. 17 at 50*; see also, e.g.*, *Johnston v. Cigna Corp.*, 14 F.3d 486, 497

11  (10th Cir. 1993) ("Absent a post-judgment change in the law in a factually-related case, however, we

12  have held that 'a change in the law or in the judicial view of an established rule of law' does not justify

13  relief under Rule 60(b)(6).").[3]

14          So too for the other litigation Isaacs cites.  The motion pending before Judge Gonzalez Rogers

15  challenges Apple's compliance with an injunction issued under the California Unfair Competition Law

16  concerning so-called "anti-steering provisions" that were once in Apple's Guidelines.  *See Epic Games,*

17  *Inc. v. Apple Inc.*, No. 20-cv-05640, Dkts. 897 & 915 (N.D. Cal.).  But Plaintiffs never challenged

18  Apple's anti-steering provisions here, much less under the Unfair Competition Law.  Dkt. 41 ¶¶ 160–

19  323.  Indeed, Isaacs has repeatedly argued that *Epic* stands "in contrast" to this case.  *Coronavirus Rep.*

20  *et al. v. Apple Inc.*, 22-15166 (9th Cir) Dkt. 17 at 11.  As explained above, Epic's lawsuit against

21  Google also was fundamentally different from this case.  *Supra* 7.  And the Department of Justice's

22  allegations, unlike those in this case, focus on messaging apps, cloud streaming apps, smartwatches,

23

24  _____

    [3] Isaacs asserts without citation that "Apple also conceded during appeal that Notarization stamps are
25  a tangible thing . . . refuting their MTD submission to this Court that the Notarization Stamps aren't a
    product"—an argument he also pressed to the Ninth Circuit.  Mot. 6; *see also Coronavirus Rep. et al.*
26  *v. Apple Inc.*, 22-15166 (9th Cir.) Dkt. 69-1 at 5.  But as Apple has explained previously, it "in fact
    argued the opposite: Notary stamps are 'not a standalone product that can form the basis for a market,
27  much less a single brand one as is alleged here . . . because they are 'not a product' that 'Apple is . . .
    buying and selling,' but rather a mere 'technical process' that can 'identify a particular piece of software
28  as having been approved.'"  *Coronavirus Rep. et al. v. Apple Inc.*, 22-15166 (9th Cir.) Dkt. 71 at 10
    (quoting video of oral argument at 22:50–23:32).

10

"super apps," and digital wallets, *United States, et al. v. Apple Inc.*, No. 24-cv-04055, Dkt. 1 ¶¶ 61–117 (D.N.J. Mar. 21, 2024). At bottom, all of Isaacs' supposed "developments" have no bearing on this Court's evaluation of Plaintiffs' *allegations in this case*. *See Edmondson*, 2021 WL 4499031 at *2–4 (denying Rule 60(b)(6) motion where decision was not clearly irreconcilable with "new law").

What is more, Isaacs fails to grapple with the multiple, independent grounds on which his antitrust claims faltered. His arguments focus on single-brand markets. *See* Mot. 1, 4, 5, 6, 15–17 & n.1. But his failure to adequately allege the prerequisites to a single-brand market was only one of many failures with the Complaint: Isaacs does not even attempt to argue that the law has changed with regard to any of the other dispositive defects identified by this Court and the Ninth Circuit. *See* Dkt. 85 at 10–22; *Coronavirus Rep.*, 85 F.4th at 954–959. Without addressing these other grounds for dismissal, the supposed changes in law cannot affect "the outcome of the judgment the petitioner seeks to review." *Shinn*, 33 F.4th at 1263. For this reason too, Isaacs' motion should be denied.[4]

## 2. Isaacs' allegation of "discrimination" is false.

Isaacs also claims that this case was "marred" because Apple and its counsel "target[ed] [his] medical condition" and thereby "poisoned the Court's perception of the case." Mot. 16. That is not true. Isaacs' chief complaint is the description of his disability as a "neuropsychiatric illness." Mot. 17. Setting aside that he has acknowledged as much in his own filings (*see*, *e.g.*, Mot. 12; Dkt. 118-10 ¶ 17), the description that Isaacs condemns is neither Apple's nor its counsel's. It is from the United States Court of Appeals for the Third Circuit: In affirming the dismissal of another lawsuit brought by Isaacs, that court observed that he "suffers from a neuropsychiatric illness." *Isaacs v. Arizona Bd. of Regents*, 608 F. App'x 70, 72 (3d Cir. 2015). Nor was this "irrelevant," as Isaacs suggests. Mot. 17. Plaintiffs put Isaacs' "interdisciplinary expertise" at issue, Dkt. 41 ¶ 30, sought a preliminary injunction challenging the denial of their app as "pretextual at best," Dkt. 20 ¶ 46, and thereby put Apple to its

---

[4] Although courts sometimes also consider other factors such as the movant's diligence, the effect of vacatur on past, executed effects of the judgment, and the delay between the final judgment and seeking relief, *Fed. Trade Comm'n v. Hewitt*, 68 F.4th 461, 469 (9th Cir. 2023), Isaacs makes no arguments that any of these factors support his motion. Having failed to make these arguments in his motion, he cannot do so for the first time in reply. *See Rivas Rosales v. Barr*, 2020 WL 1505682, at *9 (N.D. Cal. Mar. 30, 2020) (Chen, J.) (finding that issues not raised until reply are waived); *Harris v. Vector Mktg. Corp.*, 2010 WL 11484769, at *3 (N.D. Cal. Aug. 17, 2010) (Chen, J.) (same); *Knopp v. Life Ins. Co. of N. Am.*, 2009 WL 5215395, at *2 (N.D. Cal. Dec. 28, 2009) (Chen, J.) (same).

DEFENDANT APPLE INC.'S OPPOSITION TO ISAACS' MOTION FOR RELIEF FROM JUDGMENT
CASE NO. 3:24-CV-00476-RS

Gibson, Dunn &
Crutcher LLP

proof of explaining that a former physician who lost his license and then unsuccessfully sued the medical school at which he lost his residency for disability discrimination over his "neuropsychiatric illness," *Isaacs*, 608 F. App'x at 72–73, did not meet the Guidelines' requirement that a COVID-19 app developer be a "legal entity that provides [healthcare] services." Dkt. 32 at 6. Relying in part on a federal court's description of the plaintiff to make that showing was not discriminatory or improper, much less grounds for extraordinary relief under Rule 60(b)(6).[5]

Isaacs' argument is only the latest of his many complaints about phantom slights and imaginary persecution at the hands of Apple or Gibson Dunn. *See, e.g.*, Dkt. 62 at 20 & n.4; Dkt. 96 at 3; Dkt. 97 at 11–12; *Jeffrey Isaacs et al. v. Apple Inc.*, 22-15167 (9th Cir.) Dkt. 8 at 24; *Coronavirus Rep. et al. v. Apple Inc.*, 22-15167 (9th Cir.) Dkt. 8 at 24; Kleinbrodt Decl. Ex. 4. In each instance, Isaacs' allegations have been untrue, unsupported by even a shred of evidence, and rejected as such. *See, e.g.*, Dkt. 85 at 33 (rejecting unsupported assertions that Apple's counsel has a conflict of interest). The same is true here: The notion that Apple sought to attack Isaacs to "evade substantive legal debate," Mot. 13, is disabused by even a cursory review of Apple's submissions in this case. Only Plaintiffs have been chastised for their pejorative references in place of sound legal argument in this litigation. *See Primary Prods. LLC v. Apple Inc.*, No. 2:21-cv-00137-JDL, Dkt. 19 (D. Me. July 20, 2021) (admonishing plaintiffs about "the use of ad hominem references to opposing counsel").

In any event, Isaacs cites no authority that supposed "discrimination" in legal filings is grounds for relief under Rule 60, and nothing suggests that the Court's judgment was tainted by any improper considerations. The Court heard argument from Isaacs and, by his own admission, "underst[ood]" his arguments "quite well." *Coronavirus Rep. v. Apple Inc.*, 22-15166 (9th Cir.) Dkt. 17 at 32. The Court then issued a detailed opinion that (correctly) resolved this case on its merits—without any reference to the assertions Isaacs now finds offensive. Dkt. 85 at 9–31; *see also Coronavirus Rep.*, 85 F.4th at 954–959. Although Isaacs ascribed many faults to this Court in his appeal (*see, e.g., Coronavirus Rep. et al. v. Apple Inc.*, 22-15166 (9th Cir.) Dkt. 17 at 11, 21, 20, 32), ruling on the basis of disability

---

[5] Isaacs also takes issue with the assertion that he is "steering the ship" of this litigation. Mot. 14. Isaacs is not only a named plaintiff, Dkt. 41, but also the self-described "client" of counsel for the entities in this litigation. Dkt. 63 Ex. 1 (explaining how Isaacs is "the driving force behind the *Coronavirus Reporter* lawsuit"). Regardless, none of this is a basis for relief under Rule 60.

DEFENDANT APPLE INC.'S OPPOSITION TO ISAACS' MOTION FOR RELIEF FROM JUDGMENT
CASE NO. 3:24-CV-00476-RS

1  discrimination was not one of them.  His manufactured theory should be rejected.

2  ### 3.  There is no plausible *per se* tying claim.

3  Finally, Isaacs appears to claim that he has alleged a plausible *per se* tying claim.  *See* Mot. 2–

4  3, 11.  But the time for this argument has passed.  Even if there had been "legal error" (and there was

5  not), that "does not by itself warrant the application of Rule 60(b)."  *Selkridge v. United of Omaha Life*

6  *Ins. Co*., 360 F.3d 155, 173 (3d Cir. 2004).  Rather, the "correction of legal errors" generally  "is the

7  function of the Courts of Appeals."  *Id.*  Isaacs pressed his arguments to the Ninth Circuit and lost.  He

8  cannot continue to relitigate the same disputes under the guise of Rule 60.  *See, e.g.*, *Horne*, 557 U.S.

9  at 447; *Morse-Starrett Prod.*, 205 F.2d at 249.

10  Moreover, Isaacs' arguments are wrong as a matter of antitrust law.  While he says his "*per se*

11  tying claim" describes "pernicious conduct," Mot. 6, such a claim still requires the plaintiff to define

12  the relevant markets.  *See, e.g.*, *Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 35–37,

13  46 (2006); *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 913 (9th Cir. 2008).  Both this Court

14  and the Ninth Circuit found that Plaintiffs failed to do so.  *See supra* 3; Dkt. 85 at 9–31; *Coronavirus*

15  *Rep.*, 85 F.4th at 954–959.  Nor was that the only problem with Plaintiffs' claim: Any tying claim also

16  failed for lack of antitrust injury—an independent basis for the Court's judgment that Isaacs does not

17  even try to call into question, *see* Dkt. 85 at 22–27—as well as on various other grounds too.  *See* Dkt.

18  45 at 16–17 (explaining Plaintiffs' failure to allege two separate products as well as their lack of

19  standing to bring a tying claim).  Isaacs' third bite at this argument is no more meritorious than his first

20  two, and it provides no basis for relief under Rule 60.

21  ## III.    THERE IS NO BASIS FOR AN EVIDENTIARY HEARING OR DISCOVERY

22  Isaacs' request for an evidentiary hearing should be denied.  *See* Mot. 25–26.  Such hearings

23  serve no purpose when a motion can be resolved on the papers and existing record.  *See, e.g.*, *United*

24  *States v. Bermudez*, 2014 WL 2111496, *4 (N.D. Cal. May 20, 2014) ("[T]he court finds an evidentiary

25  hearing unnecessary since the motion, relevant files and underlying record conclusively show that

26  Petitioner is not entitled to relief."); *United States v. Pacific Gas and Electric Co.*, 2016 WL 3255069,

27  *3 n.5 (N.D. Cal. June 14, 2016) (same); *Shoom, Inc. v. Eletronic Imaging Systems of America, Inc.*,

28  2006 WL 1529983, *4 n.2 (N.D. Cal. May 31, 2006) (same).  That is the case here.  Isaacs appears to

seek a hearing so that he can "testify … in further detail," Dkt. 118-10, ¶ 15, but there is nothing more to say.  He has already submitted a declaration, *id.*, and further proceedings would only waste time: This case was resolved on the pleadings as a matter of law, and no amount of testimony can change the insufficiency of Plaintiffs' complaint.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 674 (2009) ("Evaluating the sufficiency of a complaint is not a 'fact-based' question of law.").

For similar reasons, there is no basis for Isaacs' request to take discovery.  *See* Mot. 25–26. Isaacs cites no authority supporting this request, and post-judgment discovery is typically limited to "aid [in] the judgment or [its] execution"—not extended to litigants who have lost on the merits yet still want to harass their counterparty with fishing expeditions.  Fed. R. Civ. P. 69; *see also Gresset v. City of New Orleans*, 2019 WL 459182, at *3 (E.D. La. Feb. 6, 2019) (finding court "correctly denied plaintiff's request for a subpoena because plaintiff's claims had already been dismissed when he requested the subpoena"); *In re Taxotere (Docetaxel) Prod. Liab. Litig.*, 2024 WL 128608, at *6 (E.D. La. Jan. 11, 2024) ("Since Plaintiff unquestionably attempted to issue the subpoenas after her case was dismissed, the subpoenas were issued without this Court's authority, are null and void, and were never enforceable.").  Isaacs should not be afforded an opportunity to resume abusive discovery tactics.  *See*, *e.g.*, Dkt. 74 at 1–11 (describing Plaintiffs' attempt to subpoena Apple employees to a motion hearing and impose premature production obligations on Apple); Kleinbrodt Decl. Ex. 4 (recent correspondence outlining Isaacs' professed intent to serve burdensome discovery).  This long-closed case should remain so.

## CONCLUSION

"At some point, litigation must come to an end."  *Facebook, Inc. v. Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1042 (9th Cir. 2011).  Plaintiffs have had ample opportunity to state a claim and argue their case—to this Court, the Ninth Circuit, and the Supreme Court.  At each stage, Plaintiffs have consumed extensive party and judicial resources, and at each stage they have lost.  Isaacs' motion should be denied.

Gibson, Dunn &
Crutcher LLP

DEFENDANT APPLE INC.'S OPPOSITION TO ISAACS' MOTION FOR RELIEF FROM JUDGMENT
CASE NO. 3:24-CV-00476-RS

DATED: April 26, 2024

GIBSON, DUNN & CRUTCHER LLP
RACHEL S. BRASS
JULIAN W. KLEINBRODT

By: */s/ Julian W. Kleinbrodt*
Julian W. Kleinbrodt

*Attorneys for Defendant APPLE INC.*

1 | Dr. Jeffrey D. Isaacs
11482 Key Deer Circle
2 | Wellington, FL 33449

3

4

5 | IN THE UNITED STATES DISTRICT COURT

6 | FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8

9 | CORONAVIRUS REPORTER,     Case No. 3:21-cv-5567-EMC
CALID INC,
PRIMARY PRODUCTIONS LLC,
10 | DR. JEFFREY D. ISAACS,
on behalf of themselves and all others similarly
11 | situated                          **NOTICE OF MOTION AND
MOTION TO REOPEN CASE**

12 |                    Plaintiffs,

13 | vs.                              **Hearing**

14 | APPLE INC.
                   Defendant.        Date:    May 23, 2025
15 |                                  Time:    1:30PM
                                     Place:   Courtroom 5, 17th Floor
16 |                                          (videoconference)

17 |                                  The Honorable Edward M. Chen

18

19

20

21

22

23

24

**NOTICE OF MOTION TO REOPEN CASE PURSUANT TO FRCP 60(b)**

TO: ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on May 23, 2025, at 1:30 PM, or as soon thereafter as may be heard, Dr. Jeffrey D. Isaacs will motion the United States District Court for the Northern District of California, at 450 Golden Gate Avenue, San Francisco, California, Courtroom 5, 17th Floor (or by videoconference), for an order to reopen this case pursuant to Federal Rule of Civil Procedure 60(b). This motion will be made on the grounds of significant new developments in the economic and legal landscape impacting the case's original dismissal under Rule 12(b)(6), particularly concerning the market for "iOS notary stamps" in light of recent regulatory changes and judiciary rulings.

This motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the exhibits attached thereto, a requested Evidentiary Hearing, and all other records filed in this action. An Evidentiary Hearing with witnesses will substantiate the claim that Apple Inc. charges for digital notarization stamps / services to run software on the iPhone, constituting a significant factor for juridical evaluation under *Brown Shoe Co. v. United States* standards.

Given the extensive preparation required for such a hearing, the Plaintiffs respectfully request that if the Court opts to modify the evidentiary hearing or subject matter, it provides notification at least three weeks in advance of the scheduled hearing date. Absent such cancellation, subpoenas will be issued to appropriate witnesses three weeks prior to the hearing.

Submitted on this 12th day of April, 2024.

/s/ Dr. Jeffrey D. Isaacs

Dr. Jeffrey D. Isaacs

PLAINTIFF JEFFREY ISAACS' MOTION TO REOPEN PURSUANT TO FRCP 60
CASE NO. 3:21-CV-5567-EMC

MOTION TO REOPEN CASE UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(B)(6) DUE TO NEWLY REVEALED ECONOMIC LANDSCAPE BY THE IMPLEMENTATION OF THE EU DIGITAL MARKETS ACT ........................................................................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................. 1

    I.      INTRODUCTION ........................................................................................................ 1

    II.     LEGAL STANDARD FOR MOTION TO REOPEN UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(B)(5) AND 60(B)(6) ............................................................... 4

ANALYSIS OF LAW ....................................................................................................... **6**

    III.    REEVALUATION AS STRICT ENFORCEMENT: GLOBAL PATTERN OF ANTITRUST LAW EVASION EVIDENCED BY APPLE'S MALICIOUS COMPLIANCE IN THIS DISTRICT ..................................... 9

    IV.    APPLE'S DISPARAGEMENT OF MEDICAL DISABILITY UNDERMINED NOTARIZATION MARKET RECOGNITION ........................................................................................... 12

    V.    CHANGE IN CASE LAW REGARDING SINGLE-BRAND NOTARY STAMP MARKETS ..................... 15

    VI.    THE RECENT EPIC-GOOGLE VERDICT IN THIS DISTRICT DEMONSTRATES THE UTILITY OF SINGLE-BRAND MARKETS FOR JURIDICIAL ASSESSMENT OF SMARTPHONE APP DISTRIBUTION CONDUCT ............................................................. 16

    VII.    A COMPELLING DEMAND EXISTS FOR ADJUDICATING FREE APP DEVELOPER INJURY ...... 17

    VIII.    DOJ COMPLAINT SUPPORTS PRIVATE SUITS TO REDRESS DAMAGE TO THE CROSS-PLATFORM VIDEO MARKET ............................................................................ 18

    IX.    REOPENING IN LIEU OF CERTIORARI: A PATH TOWARD EXPEDITED ENFORCEMENT ............. 21

CONCLUSION ................................................................................................................. **21**

    X.    REQUEST FOR RELIEF ........................................................................................... 24

    XI.    EVIDENTIAL HEARING LIMITED DISCOVERY ..................................................... 24

    XII.    ORAL ARGUMENT ................................................................................................ 25

CERTIFICATE OF SERVICE ........................................................................................ **26**

<u>CASES</u>

*Agostini v. Felton*, 521 U.S. 203 (1997)----------------------------------------------------------- 5

*Epic Games, Inc. v. Apple Inc* ------------------------------------------------------------------- 7

*Foman v. Davis* --------------------------------------------------------------------------------- 6

*In Re Google Play Antitrust* (CAND-21-md- 02981-JD)-------------------------------------- 16

*Klapprott v. United States*, 335 U.S. 601 (1949)--------------------------------------------- 4

*Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847 (1988) ------------------------ 5

*Northern Pacific Railway Co. v. United States*, 356 US 1 (1958)---------------------------- 2

*Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992) ------------------------------- 5

*United States vs. Apple* (2024, New Jersey District). ------------------------------------- 18

<u>RULES</u>

Federal Rule of Civil Procedure 60(b) ------------------------------------------------------- 4

<u>REGULATIONS</u>

Digital Markets Act (DMA) ------------------------------------------------------------------- 1

**MOTION TO REOPEN CASE UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b)(6) DUE TO NEWLY REVEALED ECONOMIC LANDSCAPE BY THE IMPLEMENTATION OF THE EU DIGITAL MARKETS ACT MEMORANDUM OF POINTS AND AUTHORITIES**

## I.  INTRODUCTION

Recent, authoritative developments within the European Union, specifically the implementation of the Digital Markets Act (DMA), have brought to light the actuality and significance of "iOS notary stamps[1]" as a distinct market—a reality that was previously obscured and is now incontrovertibly demonstrated by Apple's own altered business practices in response to the new regulatory environment.

Furthermore, the recent pivotal ruling in favor of *Epic Games* against Google successfully employed single-brand market theories akin to those initially presented in the instant case. This substantial legal victory erodes the foundation upon which this Court's dismissal was based, as it directly contravenes the understanding that such market theories are inherently disfavored.

The underlying lawsuit was brought to prevent ongoing censorship of software and to establish a Developer Compensation Fund to mitigate damages from Apple's historic monopoly. It asserts that the vast network capabilities of interconnected smartphones are the property of the customers who paid for them. Apple iPhone users should enjoy unrestricted use of their smartphones to run necessary applications, such as *Coronavirus Reporter*, that ultimately are the *raison d'être* of this network. Apple previously sought consolidation of this case with *Cameron*, but notably, the Honorable Yvonne Gonzales Rogers determined that this case, concerning censorship of free apps, is different and worthy of independent adjudication. That remains the case today, more than ever.

---

[1] This Court's previous dismissal under Rule 12(b)(6) was primarily anchored in the absence of a plausibly alleged relevant market for antitrust claims, particularly targeting the market for "iOS notary stamps" which, at that juncture, was deemed not tethered to any commercial or economic reality, as well as disfavoring single-brand markets, a principle echoed in the *Epic Games* precedent.

1    In this lawsuit's appeal, Apple declared to the United States Court of Appeals that "censorship

2    is not an antitrust injury." Apple's position throughout the underlying litigation is wholly inexcusable

3    and necessitates a clear correction. Reopening this censorship case is warranted and urgently

4    necessary, in light of the evolving legal and regulatory landscape discussed herein.

5    Apple's censorship mechanism functions primarily by tying app distribution ("App Store") to

6    its iPhone smartphone, and using a "notary stamp" to mark each piece of software approved in the

7    App Store. The FAC invokes a *per se* tying claim between the iPhone and App Store; this is pernicious

8    conduct under *Northern Pacific*. That tying claim also alleges a Notary Stamp tax – which amounts

9    to the largest Stamp Tax in history.  Apple also conceded during appeal that Notarization stamps are

10   a tangible thing – an Apple mark of approval – refuting their MTD submission to this Court that that

11   Notarization Stamps aren't a product, and don't reflect economic reality. During oral argument, Apple

12   made the specific concession that notary stamps are indeed a digital product Apple designed to "mark

13   software as approved."

14   The tying of the iPhone to Notary Stamps, an electronic signature to censor and charge

15   commissions on software, is plainly alleged in the FAC's Tying Count V. Such description of tying

16   practices uniquely positions our case in the antitrust landscape; upon information and belief, this

17   lawsuit was the first (and remains the only) to assert a notary stamp antitrust theory. This is

18   significant, as we shall elucidate in this motion, because omitting this theory allowed malicious

19   compliance with EU App Store antitrust legislation.

20   Apple's requirement that third-party software be endorsed with a digital Notary Stamp to run

21   on an iPhone device evidences two distinct products: the notary stamp, and the smartphone. Notably,

22   Apple can't defend this conduct with the *Microsoft* exemption for software platforms, because there

23   is no platform in either of these two markets. For this reason, notary stamps are a powerful market

24

1    definition under Sherman Act, augmenting App Store markets, that have the potential to ameliorate

2    Apple's conduct efficiently.

3        No computing platform in history had such a notarization requirement. Apple's mandatory

4    notary stamp single handedly turned computers into supra-competitive profit tax centers, and even

5    authoritarian technology, where Apple decides the fate of every developer. This acknowledgment is

6    in direct contrast to the District Court's dismissal of the notary stamp as a fictional creation of the

7    Plaintiffs. Such a characterization fails to grasp the impact of notarization as a gatekeeping tool in the

8    software industry, and is precisely why a marketplace should be determined by fact-finding, per

9    *Brown Shoe*, and not on a motion to dismiss. Apple's notarization scheme represents far more than a

10    mere procedural hurdle or a fictionalized market—it is a monetization and control strategy deftly

11    positioned to exploit the indispensability of software distribution within the modern digital

12    ecosystem.

13        Embedding the notarization stamp requirement within a computing system showcases one of

14    the most pernicious tying arrangements presently conceivable—a mechanism monopolizing approval

15    and access within a field where openness[2] and competition birth innovation and consumer value. This

16    is not an obscure argument buried within the complexities of computational theory; it is the

17    recognition of a monopolist seizing control over the very arteries that feed the software industry. The

18    stark reality is that the practice of requiring notarization redefines power dynamics between platform

19    providers and software creators, setting dangerous precedents on market control and operational

20    freedom that the drafters of the Sherman Act envisioned in 1890.

21

22

23

24

---

[2] iPhone is based on IP and Unix open-source standards, evolved over decades long initiatives at MIT and other institutions. To see Apple commercially monopolize these technologies meant to facilitate open computing is disheartening and disrespectful to those who built the foundations of the modern internet.

PLAINTIFF JEFFREY ISAACS' MOTION TO REOPEN PURSUANT TO FRCP 60
CASE NO. 3:21-CV-5567-EMC

## II.  LEGAL STANDARD FOR MOTION TO REOPEN UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(B)(5) AND 60(B)(6)

Federal Rule of Civil Procedure 60(b) provides the grounds on which a party can seek relief from a final judgment or order. The relevant subsections for this motion include:

Rule 60(b)(5): This provision allows for relief from a judgment if "the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable." This rule is pertinent when ongoing conditions change such that the judgment's continued application is inequitable. Case law supports its application when legislative or regulatory changes affect the underlying principles of a court's final judgment, making its enforcement unfair in the new context.

Rule 60(b)(6): This catch-all provision is meant to embody the broadest spectrum of circumstances that permits the court to relieve a party from a final judgment for "any other reason that justifies relief." It is designed to address extraordinary circumstances that are not contemplated by the other subsections of Rule 60(b). The U.S. Supreme Court in *Klapprott v. United States*, 335 U.S. 601 (1949), noted that Rule 60(b)(6) provides courts with authority "to vacate judgments whenever such action is appropriate to accomplish justice," thereby giving courts ample scope to act when necessary to prevent a clear injustice.

The recent *Epic-Google* verdict, which demonstrated the feasibility and judicial acceptance of single-brand market theories in antitrust litigation similar to those presented in our case, reflects a significant change in the controlling legal principles relevant to our claims. This verdict supports an argument under Rule 60(b)(5) that applying the previous dismissal prospectively is no longer equitable due to a significant shift in the legal landscape regarding single-brand markets.

Moreover, the comprehensive changes introduced by the EU Digital Markets Act (DMA) which exposed the actuality and significance of "iOS notary stamps" as a distinct market, represent an extraordinary circumstance that was not and could not have been foreseen at the time of the initial

PLAINTIFF JEFFREY ISAACS' MOTION TO REOPEN PURSUANT TO FRCP 60
CASE NO. 3:21-CV-5567-EMC

1  dismissal. This aligns with Rule 60(b)(6), as these developments justify relief to prevent the manifest

2  injustice of barring a potentially meritorious antitrust claim based on outdated legal standards.

3      A cornerstone for the argumentation in supporting a motion under FRCP 60(b)(5) and

4  60(b)(6) can be anchored on the precedent set by *Rufo v. Inmates of Suffolk County Jail*, 502 U.S.

5  367 (1992). In *Rufo*, the Supreme Court clarified that Rule 60(b)(5) could indeed cater to

6  circumstances where a significant change in factual conditions or in law warrants the revision of a

7  decree. Especially in antitrust contexts, where market dynamics are perpetually in flux, *Rufo*

8  underscores the judiciary's responsibility to adapt legal conclusions to present realities.

9      Furthermore, the invocation of Rule 60(b)(6) for "any other reason justifying relief" warrants

10  flexibility, allowing for a broad constellation of extraordinary circumstances. *Liljeberg v. Health*

11  *Services Acquisition Corp.*, 486 U.S. 847 (1988) elaborates on preventing manifest injustice as a

12  critical metric guiding the Court's discretion under this clause. In *Gonzalez v. Crosby*, 545 U.S. 524

13  (2005), the Supreme Court emphasized that Rule 60(b)(6) relief is available under circumstances

14  suggesting that the judgment may no longer be equitable. Furthermore, in *Agostini v. Felton*, 521

15  U.S. 203 (1997), the Court overturned its previous judgment due to significant changes in factual

16  conditions and law, affirming the use of Rule 60(b)(5) when the factual or legal landscape has

17  significantly altered since judgment.

18      These precedents provide a strong foundation for arguing that both the evolving jurisprudence

19  around single-brand markets and the regulatory changes represented by the DMA constitute

20  significant shifts in both factual and legal landscapes, demanding reopening of underlying case. The

21  legal standards outlined by FRCP 60(b)(5) and 60(b)(6) are squarely met in this instance. The *Epic-*

22  *Google* verdict and the implications of the EU DMA epitomize the type of significant changes in law

23  and fact that the drafters of Rule 60 intended to address.

24

PLAINTIFF JEFFREY ISAACS' MOTION TO REOPEN PURSUANT TO FRCP 60
CASE NO. 3:21-CV-5567-EMC

1    A dismissal under Rule 12(b)(6) occurs at a preliminary stage in the proceedings, before any

2    fact-finding or evidentiary assessment has taken place. This procedural posture is significantly

3    different from a resolution post-trial or post-MSJ, where the court has engaged substantially with the

4    factual underpinnings and evidentiary record of the case. Consequently, the threshold for revisiting a

5    12(b)(6) dismissal should inherently consider, under Rule 60(b),  the preliminary nature of the initial

6    adjudication.

7    The Supreme Court in *Foman v. Davis* laid out factors that courts should consider when

8    deciding whether to grant leave to amend a pleading. When a case was dismissed under Rule 12(b)(6)

9    without leave to amend, particularly before substantive engagement with the merits, the *Foman*

10   factors offer a relevant framework for assessing a Rule 60 motion to reopen the case. When new

11   information is available, *Foman's* "futility of amendment" element is lodestar under Rule 60. The

12   very essence of a Rule 60 motion in this context is to assert that, in light of new considerations,

13   amendment would not be futile but potentially lead to a different outcome that aligns with justice and

14   equity. *Foman* criteria are rendered unequivocal by new circumstances in this case and leave to amend

15   should be granted.

16                                    **ANALYSIS OF LAW**

17   The European Union's Digital Markets Act (DMA) represents a landmark piece of legislation

18   designed to foster fair competition and innovation within the digital sector. Implemented last month,

19   the DMA has mandated significant changes to the operational practices of major tech companies,

20   including Apple. A central tenet of this regulation is the requirement for gatekeeper platforms, like

21   Apple's iPhone, to allow developers to directly distribute their applications, effectively

22   circumventing monopolized app store channels. Under FRCP Rule 60(b)(6), this regulatory shift

23   revealed emerging circumstances concerning "notarization" and the underlying economics of the

24

PLAINTIFF JEFFREY ISAACS' MOTION TO REOPEN PURSUANT TO FRCP 60
CASE NO. 3:21-CV-5567-EMC

1    "Apple Ecosystem." Such new developments significantly alter the legal landscape and warrant re-

2    opening.

3          This Court, in its order of dismissal, underscored that the "alleged markets of notary stamps

4    in particular do not pass muster on economic reality" reflecting a stance that the proposed relevant

5    market did not correspond to the commercial realities of the tech industry. *Order at p. 12*. Single-

6    brand markets were especially scrutinized, as they were deemed "disfavored," drawing support from

7    *Epic Games, Inc. v. Apple Inc.,* where the concept of a single brand Operating System constituting a

8    relevant market was deemed artificial and not representative of the competitive environment.

9          The clarity of newfound regulatory landscape not only underscores the viability of the "iOS

10   notary stamps" market but also showcases its growing importance and Apple's acknowledgment

11   thereof, as evidenced by their response to the newly enacted EU DMA. This evolution in the

12   economic landscape, coupled with the jurisprudential shift evidenced by Epic Games' success in

13   employing single-brand market theories against Google, constitutes a "significant change in the law"

14   (FRCP 60(b)(5)).

15         In what consensus press coverage has termed "malicious compliance," Apple has responded

16   to the DMA's directives by introducing a "Core Technology Fee (CTF)," ostensibly in compliance

17   with the law. *Exhibit A*. However, this fee is best interpreted as a strategic maneuver to undermine

18   the spirit of the DMA, as it imposes a financial burden on developers seeking to utilize direct app

19   distribution methods. This fee can be seen as an attempt to retain control over the iPhone profitability

20   while nominally adhering to the new legal framework. The fee effectively perpetuates the cost barrier

21   for developers, thus maintaining a status quo that the DMA seeks to disrupt, and raising questions

22   about the true openness of the iPhone ecosystem even under the new European regulations.

23         Defendant Apple refers to "Core Technology Fee" (CTF) as a measure to recoup the

24   company's investment in its platform. The CTF imposes a charge of approximately €0.50 per app

installation, applied uniformly to both free and paid applications on an annual basis. *Exhibit B*. This bad faith surtax by Apple, while superficially framed as a compliance measure with the DMA, effectively institutes a *de facto* "Notary Stamp Fee" for Apple's notarization process. It appears to be a strategic effort to sidestep the DMA's intention to open up the digital market to fair competition.

The CTF is a thinly veiled attempt to preserve Apple's censorship capabilities and economic leverage over its userbase, despite the introduction of the DMA. The fee acts as a gatekeeping mechanism, disincentivizing developers—particularly those offering free apps—from pursuing direct distribution by imposing a cost that may not be recuperable. It serves as a punitive financial barrier under the guise of a technology fee, which other computer platforms do not impose despite similar, if not equivalent, investments in their development.

By labeling the CTF as a necessary compensation for Apple's investment, the company fails to recognize that investment in platform technology is a standard cost of business borne by all technology manufacturers and is typically recouped through the sale of the hardware itself, not through per-use fees on software developers who add value to the hardware. The imposition of the CTF, therefore, does not align with industry norms and can be seen as an effort to maintain a stranglehold on the ecosystem it has created.

Relevant to the United States Market, the EU CTF evidences that Apple desperately seeks to hang on to the notary taxes it has imposed domestically for nearly two decades. Here, in the US, the stamps are simply obscured as part of the "Apple Ecosystem" through supra-competitive $99 developer memberships, and most importantly, 30% tax on paid app sales. This, fundamentally, was how Apple caused Plaintiff's notary stamp theory to be "laughed out" of a United States District Court as "untethered to reality." But time has shown that there was nothing funny about the "notary stamp" Sherman theory. Without notarization, there would be nothing to charge for, neither CTF,

IAP commissions, or annual developer fees would be necessary. Notarization fees are alive and well in the United States and Europe, despite DMA intent otherwise.

Hence, the CTF can be characterized as nothing more than a residual "Notary Stamp Tax," a remnant of the obfuscating Apple Ecosystem that the DMA tried to dismantle. This direct continuation of a monopolistic practice, albeit under a different moniker, clearly underscores the ongoing and crucial relevance of the "iOS notary stamps" market as a litigable antitrust concern.

In dismissing "iOS notary stamps," the Court held notary stamps "are neither *markets* nor do they describe *products* but integrated features of Apple's app approval process. Plaintiffs' articulation of these markets is contrived and does not reflect the reality of an actually-existing product market." *Order at 19.* The EU regulatory shift has indeed now revealed that CTF, i.e. notary stamps, are a fee, approximately €0.50, applied to even free apps. This fee was and is levied in the United States, and results in Apple's growing "services" revenues as alleged by DOJ. When these charges are properly dismantled, as the EU attempted, it is strikingly clear that Apple differs from every other computing platform in its intent to – and active practice – impose notarization fees.

The reality of notary stamps is a matter for jury deliberation pursuant to *Brown Shoe*. The Court should recognize these disputed product markets, and under 12(b)(6) standards, err on the side favorable to Plaintiff. Concluding the markets don't exist, or that they are bundled in other Apple components,  is not within the discretion of the Court. Plaintiff hereby requests an evidentiary hearing with witnesses from industry experts and the parties to this case.

## III. REEVALUATION AS STRICT ENFORCEMENT: GLOBAL PATTERN OF ANTITRUST LAW EVASION EVIDENCED BY APPLE'S MALICIOUS COMPLIANCE IN THIS DISTRICT

Apple's actions in the Northern California District, marked by a calculated defiance of the *Epic* injunction, are not isolated incidents but rather a component of a broader strategy of defiance against anticompetitive law enforcement worldwide. The parallels between Apple's conduct in response to this District's *Epic* injunction and its reaction to the EU DMA are unmistakably clear.

PLAINTIFF JEFFREY ISAACS' MOTION TO REOPEN PURSUANT TO FRCP 60
CASE NO. 3:21-CV-5567-EMC

1    Both instances exhibit a deliberate attempt to subvert the objectives of antitrust enforcement through

2    superficial compliance measures that, in reality, further entrench Apple's monopolistic control. This

3    pattern of behavior—evident in its global operations—underscores not just a defiance of specific legal

4    orders but a fundamental resistance to the principles of competition law, including the Sherman Act.

5            Given this context, the reopening of this case occurs at a critical juncture in the fight against

6    monopolistic malpractice by Defendant Apple. Apple's strategic evasion of antitrust laws,

7    characterized by a global pattern of malicious compliance, warrants a stringent reevaluation of its

8    practices and the imposition of measures that truly dismantle its anti-competitive barriers. Allowing

9    Apple to continue its current course of action unchallenged would not only undermine the efficacy of

10   competition law but would also set a perilous precedent, signaling to corporate giants that strategic

11   compliance loopholes are a viable means to evade substantive legal scrutiny. It is, therefore,

12   incumbent upon this Court to take decisive action, reopening this case on the merits, thereby

13   mitigating Defendant's calculated pattern of evasion.

14           Currently under review in this District's *Epic* case, the introduction of the StoreKit External

15   Purchase Link Entitlement (US), as detailed in Apple's Notice filed on January 16, 2024—the very

16   day the U.S. Supreme Court declined further review—embodies a guise of adherence that belies a

17   deeper commitment to preserving its market dominance at the expense of fair competition and

18   innovation. Apple's implementation of policies and protocols ostensibly designed to align with this

19   District's orders instead mounts new barriers to competition, betraying both the letter and spirit of

20   the injunction. The mechanism, far from fostering a competitive marketplace, imposes onerous

21   conditions on developers seeking to utilize external purchase links within their apps, effectively

22   bypassing the intended remedial effects of the Gonzales Rogers Court's *Epic* decision. Such actions,

23   as alleged by esteemed *amici* including Meta, Microsoft, and Twitter/X, underscore a systematic

24

PLAINTIFF JEFFREY ISAACS' MOTION TO REOPEN PURSUANT TO FRCP 60
CASE NO. 3:21-CV-5567-EMC

1    effort by Apple to circumvent judicial mandates aimed at promoting transparency, choice, and

2    competition. Exhibit C, *Microsoft Amici Brief, p.7.*

3          The purported compliance strategy outlined by Apple, particularly its maintenance of a 27%

4    commission on out-of-app purchases facilitated through external links, stands as a stark testament to

5    its continued exercise of monopolistic control. This commission structure, barely distinguishable

6    from the original In-App Purchase fees, ensures that no genuine alternative to Apple's proprietary

7    system can emerge, stifling innovation and entrenching its market position under the guise of

8    compliance (*Ibid* p.9).

9          Apple's conduct post-injunction does not represent a good faith effort to rectify the

10   anticompetitive harms identified the Northern California District, but rather signifies a strategic

11   continuation of those very practices under a different guise. The detailed account provided by the

12   *amici curiae* of the tangible and adverse impacts of Apple's actions not only on developers but also

13   on consumers, highlights the extent Apple will go to evade Sherman Act. This case, with their

14   unfounded attacks on FAC tying claims and its disabled writer, squarely fits that pattern.

15         This Court is thus implored to scrutinize Apple's malicious compliance for what it truly is: a

16   calculated effort to subvert judicial efforts aimed at ensuring fair competition within the app

17   distribution market. Such defiance warrants not leniency or an unfavored 12(b)(6) dismissal but

18   stringent enforcement of the Plaintiffs' rights. It is imperative that this Court holds Apple accountable

19   for its actions, which blatantly contravene both the letter and the spirit of the District's orders in other

20   cases. For this case, that means accepting that FAC Count V Tying is plausible – certainly not

21   fictitious – and permitting a trial by jury on the matter.

22

23

24

PLAINTIFF JEFFREY ISAACS' MOTION TO REOPEN PURSUANT TO FRCP 60
CASE NO. 3:21-CV-5567-EMC

1    **IV.    APPLE'S DISPARAGEMENT OF MEDICAL DISABILITY UNDERMINED**

2             **NOTARIZATION MARKET RECOGNITION**

3            In an unprecedented strategy that marred the integrity of judicial proceedings, Apple Inc.,

4    represented by Gibson Dunn, sought to discredit the innovative market claims surrounding notary

5    stamps by targeting the medical condition of the Plaintiff, a tactic that not only poisoned the Court's

6    perception of the case but also violated the principles of the Americans with Disabilities Act (ADA).

7    This approach, aimed at undermining Plaintiff's unique and original markets like notary stamps,

8    brazenly emphasized Dr. Isaacs' neurological impairment, improperly influencing the Court's view

9    and amounting to a denial of access to justice.

10            In the conduct of litigation, parties are expected to adhere to professional standards that uphold

11    dignity, respect, and fairness, principles enshrined not only in legal ethics but also in statutes such as

12    the Americans with Disabilities Act (ADA). It is with profound concern that these standards appear

13    to have been compromised through the disparagement of an individual based on disability. The

14    unfortunate attempts to undermine the credibility and integrity of a plaintiff through references to

15    their medical or neurological conditions does not align with the spirit of equitable and respectful legal

16    discourse. Such actions diverge markedly from the substantive legal issues at hand, in this case, the

17    examination of alleged antitrust violations and monopolistic practices in the tech industry. The focus

18    on disability, rather than the merits of the legal arguments, is both irrelevant and inappropriate.

19            This conduct not only violates the basic tenets of decency but potentially contravenes the

20    protections afforded by the Americans with Disabilities Act. The ADA was enacted to prevent

21    discrimination against individuals with disabilities in all areas of public life, including in legal

22    proceedings. It asserts that individuals with disabilities should be treated with the same respect and

23    given the same opportunities as anyone else. That is plainly not what happened here.

24

PLAINTIFF JEFFREY ISAACS' MOTION TO REOPEN PURSUANT TO FRCP 60
CASE NO. 3:21-CV-5567-EMC

1    In light of the foregoing, Plaintiff requests that the Court acknowledge the impropriety of

2    disparaging remarks related to disabilities made in the context of this litigation. Furthermore,

3    appropriate remedies to ensure that such conduct does not taint the equitable administration of justice

4    may include striking any references to the plaintiff's medical condition and investigating related

5    concerns. *See Declaration of Jeffrey D. Isaacs*.

6    The disparagement began when Apple, in their opposition to the Motion for Preliminary

7    Injunction, cited Dr. Isaacs' 1997 head injury, labeling it as "**neuropsychiatric illness**" in a manner

8    that was both irrelevant and discriminatory (*DE 32 p.6*). This narrative was further inflated by false

9    claims about Dr. Isaacs' professional background, attempting to sever any legitimate connection he

10   had to health or medicine, despite the contrary evidence presented by the involvement of renowned

11   cardiologist Dr. Robert Roberts in the project. Such tactics deviated sharply from factual arguments,

12   resorting instead to an *ad hominem* attack that sought to redirect the Court's focus from the merits of

13   the case to the plaintiff's medical disability.

14   Gibson Dunn ramped up improper mentions of Dr. Isaacs medical history as his antitrust

15   theories progressed. Gibson Dunn outlandishly broadcast that Isaacs "is a **former physician who**

16   **suffers from a neuropsychiatric illness**" to help win their antitrust case. This is unacceptable.

17   *Coring v. Apple,* MTV p.1.

18   The language used by Apple and Gibson Dunn in their filings was notably contemptuous,

19   referring to the lawsuit as "**Frankenstein's lab where dead claims are stitched together in an**

20   **attempt at resurrection**" (*DE 64, p.9*), a metaphor that not so subtly mirrored their strategy of

21   portraying the plaintiff as damaged and thereby discrediting his claims. This pattern of behavior is

22   not merely an isolated instance of poor judgment but reflects a systemic approach by Apple to

23   leverage personal attacks as a means to evade substantive legal debate, particularly when confronted

24   with claims it perceives as threatening to its monopolistic practices.

PLAINTIFF JEFFREY ISAACS' MOTION TO REOPEN PURSUANT TO FRCP 60
CASE NO. 3:21-CV-5567-EMC

1      There exists no doubt that Apple, by way of Gibson Dunn, sought to undermine free app

2    censorship antitrust claims on the basis of Isaacs' disability. Apple frequently remarked "Dr. Isaacs

3    is steering the ship," and that  "these claims brought by [Dr.] Isaacs either in his individual capacity

4    or on behalf of various entities under his control, including Coronavirus Reporter, CALID Inc., and

5    Primary Productions." Those pleadings were at the very least misleading, and in most cases

6    completely untrue. Dr. Isaacs is not a member of Primary Productions LLC and has absolutely no

7    control of that entity. He is a minority holder of Coronavirus Reporter, and Dr. Roberts and his family

8    have overseen all aspects of this litigation in connection with their attorney, Mr. Keith Mathews.

9       Moreover, the strategy employed by Apple and Gibson Dunn represents a pattern of malicious

10   litigation conduct and compliance. In this case, an attempt to dismiss a legitimate case was done at in

11   violation of the ADA. The case's unique position—where the plaintiff's neurological condition was

12   maliciously spotlighted—signals a distressing trend in Apple's defense mechanisms, aligning more

13   closely with malicious compliance than with legitimate legal argumentation.

14      Therefore, this particular case was dismissed as a result of Apple's malicious litigation

15   conduct, which broadly parallels the pattern malicious compliance conduct observed in EU and Epic.

16   This reprehensible strategy by Apple not only tainted the judicial process but also set a dangerous

17   precedent that could discourage future litigants with disabilities from pursuing valid claims, for fear

18   of undue humiliation and discrimination. The CTF has "exonerated" Dr. Isaacs and proven that

19   notarization fees are indeed what Apple is fighting for tooth and nail.

20      Apple's targeted disparagement of the plaintiff on the basis of his disability, designed to

21   discredit his antitrust claims, mirrors its broader pattern of malicious compliance and evasion of legal

22   accountability, as observed in its response to the EU DMA and the *Epic* case. Such conduct

23   undermines the sanctity of the judicial process. Pending litigation concerns potential witness

24   retaliation against Dr. Isaacs stemming from the aforementioned conduct. *Exhibit D.*

1

2

## V.    CHANGE IN CASE LAW REGARDING SINGLE-BRAND NOTARY STAMP MARKETS

3

This Court relied heavily on *Epic-Apple* throughout its analysis of the FAC's markets,

4

drawing a parallel between the FAC's notary stamps and *Epic's* single-brand Operating System

5

market. This comparison now fails, given the newly emerged circumstances. This new landscape

6

renders the Court's comparison to Operating System components inapt, or at the very least, subject

7

to evidentiary debate. The Court determined:

8

> "no basis supports Plaintiffs' notion that the proposed downstream

9

> markets of "iOS notary stamps" … are markets for products… [the notarization]
> markets refer to component parts a developer may access and use when a

10

> developer's app is approved for distribution on the App Store. These three
> markets are neither markets nor do they describe products but integrated features

11

> of Apple's app approval process." *Order at 19*. It is "illogical to argue that there
> is a market for something that is not licensed or sold to anyone." *Epic, 2021 WL*

12

> *4128925, at \*29*. "In the absence of information demonstrating that Plaintiffs'
> downstream markets describe actually existing products that are sold or licensed,

13

> Plaintiffs' aftermarkets are 'without a product, there is no market for the non-
> product, and the requisite analysis cannot occur.'" *Id*.

In light of the Court's reasoning, it is now evident FRCP 60 should be invoked and the case

14

reopened. The Court's logic must now be applied to the new circumstances and landscape. First, there

15

no longer exists an "absence of information" demonstrating that notary stamps are "actually existing

16

products that are sold or licensed." The aforementioned EU DMA malicious compliance aptly proves

17

otherwise. Apple is fighting tooth and nail to maintain the income it receives, domestically and

18

abroad, from selling notarization services. There is nothing else that could substantiate the Core

19

Technology Fee other than notarization, as experts will prove at trial. Apple's assertion that CTF

20

represents payments for "ongoing product development" is pretext. Product development could, and

21

indeed historically is, priced into the device sales. There is no reason why Apple couldn't charge its

22

CTF in the price of the iPhone, but for the fact that the CTF is an ongoing notary stamp tax for *future*

23

software launching and censorship rights. That is why it can't be charged at time of device purchase.

24

PLAINTIFF JEFFREY ISAACS' MOTION TO REOPEN PURSUANT TO FRCP 60
CASE NO. 3:21-CV-5567-EMC

1  This fact is abundantly clear to any expert computer scientist, and the Court must allow this theory to

2  proceed.

3  **VI.  THE RECENT EPIC-GOOGLE VERDICT IN THIS DISTRICT**
   **DEMONSTRATES THE UTILITY OF SINGLE-BRAND MARKETS FOR**
4  **JURIDICIAL ASSESSMENT OF SMARTPHONE APP DISTRIBUTION**
   **CONDUCT**

5  The legal landscape regarding single-brand markets, as applied to digital smartphone app

6  distribution, has likewise fundamentally changed in the last several months. Three months ago, a

7  Northern California District Jury found antitrust injury due to monopolization of smartphone app

8  distribution. See *In Re Google Play Antitrust* (CAND-21-md- 02981-JD), Exhibit E. The San

9  Francisco jury needed only three hours to "call a spade a spade" and denounce improper tying

10 restraints yielding duopoly control over the entire app industry. The duopoly exists in that Apple's

11 controls 80% of US app distribution, versus Android's 20%.

12 This ruling directly applies to and concerns identical conduct alleged in this lawsuit, hence

13 the Court should immediately reopen the case on these grounds alone. It is abundantly clear the

14 thresholds the Google jury faced were in all regards higher than Apple. Google's Android allows

15 sideloading. Google Play is tied to the Android software platform, whereas App Store is tied to a

16 physical iPhone device. Since the Google Jury found anticompetitive app distribution conduct under

17 the rule-of-reason, certainly Apple's hardware tying, which is more pernicious, violates Sherman.

18 FAC¶224 invoked *per se* tying since the outset of this case.

19 In the underlying case opinion, the Court treated the App Store as a single-brand market,

20 downstream from the US Smartphone device market. Plaintiffs have at all times alleged that they

21 "didn't need" single brand theory in order to prevail, because of Apple's aforementioned 80%

22 stranglehold over app distribution. But holding that aside, even under this Court's view that a single-

23 brand market was alleged for app distribution, that is now permitted and valid case law under *Epic-*

24

PLAINTIFF JEFFREY ISAACS' MOTION TO REOPEN PURSUANT TO FRCP 60
CASE NO. 3:21-CV-5567-EMC

*Google*. This Court must reopen the case on this basis alone to allow a single-brand App Store to proceed to a jury verdict, to maintain consistency with Epic-Google.

It is noted that Google filed several post-verdict motions under Rule 59 and other procedures, all of which failed to reverse that verdict. Hence, this District permits single-brand market theories to be applied to smartphone app distribution markets. The dismissal of the underlying lawsuit now rests on invalidated assumptions from *Epic-Apple* that were disproven by a jury in *Epic-Google*.

The first jury to address smartphone app distribution has spoken unambiguously. At least a dozen major news bureaus published the *Epic-Google* verdict "spells trouble for app stores," "threatens to roil an app store duopoly," "puts Apple back under pressure," "is bad news for Apple," etc. In that light, separate and apart from the aforementioned notary stamp matter, the *Epic-Google* verdict supports this Court reopening this case for adjudication on the merits of claims regarding app store distribution. For a USDC Northern California jury to enforce Sherman Act upon Google for single-brand app distribution, but dismiss Apple's more egregious conduct in the FAC, would be conflicting interpretation.

## VII.   A COMPELLING DEMAND EXISTS FOR ADJUDICATING FREE APP DEVELOPER INJURY

The Court should also consider new information about the compelling demand for adjudication of claims Apple censors and monopolized free app developers. PhantomAlert was a COVID-19 app censored by Apple several weeks after Coronavirus Reporter. That developer had protocols underway to liase with the Ethiopian government – where COVID had spread prior to reaching America – in March 2022, which were blocked by Apple. That developer, upon information and belief, just filed antitrust claims in the DC USDC after waiting three years to observe this underlying case's progress. *Exhibit F*. Similarly, The Coring Company had an open-source "App Place" competitor to the App Store, which permitted better safety and cryptocurrency functionality

PLAINTIFF JEFFREY ISAACS' MOTION TO REOPEN PURSUANT TO FRCP 60
CASE NO. 3:21-CV-5567-EMC

1    by way of its open platform. That case was transferred to this District from Southern Florida, but has

2    been held in voluntary abeyance, also awaiting this case's outcome. *Exhibit G*.

3           This present lawsuit sought to consolidate different developer teams, who did not know one

4    another, from Maine and New Hampshire. It also was first-to-file a free app censorship putative class,

5    as recognized by the YGR Cameron Court. But rather than recognize this effort to consolidate, the

6    Court incorrectly, and at Apple's suggestion, faulted Plaintiffs for having eight cumulative

7    complaints. It thus denied leave to amend to each and every Plaintiff, including Dr. Isaacs, who had

8    never even amended once of a "matter of course." The recent DOJ filing further evidences that Isaacs'

9    cross-platform video app was the subjected to the type of antitrust injury that resulted from Apple's

10    conduct.

11           In short, there now exists irrefutable information that a substantial number of developers seek

12    adjudication of this matter and a Developer Compensation Fund. A consolidated class action, as this

13    lawsuit attempted to bring three years ago, is warranted and mandated, given these circumstances.

14    This new, undeniable legal landscape also independently invokes and warrants FRCP 60 reopening.

15    In light of the new information about other cases, and the fact that no other lawsuit has yet to represent

16    a free-app class, as *Cameron* did for paid apps, it is imperative that this Court reopen this case and

17    allow for the creation of a Developer Compensation Fund for free apps.

18    **VIII.   DOJ COMPLAINT SUPPORTS PRIVATE SUITS TO REDRESS DAMAGE TO THE CROSS-PLATFORM VIDEO MARKET**

19           The DOJ's comprehensive investigation into Apple's business practices has uncovered

20    substantial evidence pointing to the company's deliberate actions to undermine competition and

21    innovation, especially in the realm of cross-platform video applications. DOJ's findings, described

22    extensively in their complaint, reveal Apple's strategic manipulation of market dynamics to

23    disadvantage and disincentivize the development and proliferation of cross-platform video services.

24    Exhibit H, *United States vs. Apple* (cv-24-4055, USDC NJ).

PLAINTIFF JEFFREY ISAACS' MOTION TO REOPEN PURSUANT TO FRCP 60
CASE NO. 3:21-CV-5567-EMC

1    DOJ's much needed complaint against Apple declares it is "Protecting competition and the

2    innovation that competition inevitably ushers in for consumers, developers, publishers, content

3    creators, and device manufacturers" *Id. p.18.* The DOJ Complaint not only underscores DOJ's

4    commitment to safeguarding competitive integrity, but also specifically substantiates Dr. Isaacs

5    litigation's core grievance—Apple's detrimental impact on the cross-platform video market.

6    DOJ alleges identical conduct the FAC regarding WebCaller: "Apple has impaired third-

7    party, cross-platform video communications apps while steering users to its own video

8    communication app, FaceTime." *Id. p.120.* The DOJ points to Apple's "exclusionary conduct

9    [which]... has delayed or suppressed the emergence of cross-platform technologies," (Id. p.129),

10    elucidating a pattern of behavior that chokes innovation and competition. This pattern is strikingly

11    similar to the barriers WebCaller encountered, bolstering the argument for reopening the case based

12    on newfound evidence and a parallel legal assessment by a federal body. This alone is independent

13    grounds for FRCP reopening of Dr. Isaacs' WebCaller lawsuit.

14    DOJ has also directly alleged Apple is in malicious compliance of this District's antitrust

15    orders:

16           "when one road is closed to Apple, Apple has demonstrated its ability
             to find new roads to the same or worse ends. For example, Apple was
17           recently ordered to stop blocking link-outs by third parties to their
             websites where users could buy the third party's product cheaper. In
18           response, Apple reportedly allowed link-outs to websites but now
             charges for purchases made on the web even if they are not an
19           immediate result of a click from a link in a native iPhone app." *Id.
             p.123.*
20    Similarly, DOJ presents evidence that in 2022, Apple CEO Tim Cook made statements

21    constituting willful antitrust law evasion. This comment alone, regarding cross platform video apps

22    like WebCaller, independently warrants reopening of this case:

23           "In 2022, Apple's CEO Tim Cook was asked whether Apple would fix
             iPhone-to- Android messaging. "It's tough," the questioner implored
24           Mr. Cook, "not to make it personal but I can't send my mom certain
             videos." Mr. Cook's response? "Buy your mom an iPhone."" *Id. p.92.*

PLAINTIFF JEFFREY ISAACS' MOTION TO REOPEN PURSUANT TO FRCP 60
CASE NO. 3:21-CV-5567-EMC

1    The DOJ's comprehensive complaint lays a foundation spotlighting the ramifications of

2    Apple's anticompetitive practices on cross-platform video applications, and a private right-of-action

3    and Developer Compensation Fund, as described by the FAC, now seems certain. Plaintiffs should

4    not be penalized for attempting to mitigate Apple's monopoly three years before PhantomAlert,

5    Coring, or the inevitable other private cases that will follow DOJ. This class action should proceed.

6    Plaintiffs implore the Court to reconsider the dismissal of this case, taking into account the

7    formidable evidence and legal arguments presented by the DOJ that resonate with the FAC. By

8    reopening the case, the Court has an opportunity to address the material harm caused by Apple's

9    monopolistic practices, reaffirming the principles of competition law and ensuring a fair, competitive

10   market landscape for cross-platform video applications, COVID-19 applications, and all others

11   represented in the putative class.

12   The EU DMA, aimed at curbing anti-competitive practices among tech giants, has forced

13   transparency and operational adjustments upon Apple, compelling them to disclose previously

14   obscured aspects of their business model. Apple's response to the DMA, specifically the unbundling

15   of notary stamp fees from its broader service offerings, serves as a vindication of Plaintiff's claims

16   and theories presented in this action four years prior. This unbundling has not only validated the

17   existence of a distinct notary stamps "CTF" market but has also exposed Apple's monopolistic control

18   and pricing strategies within this market. Rather than a neurologically impaired Plaintiff "in the

19   hinterlands," in Gibson Dunn's own words, Dr. Isaacs was spot-on, four years ahead of this matter

20   become front-and-center.

21   The Court's initial dismissal was predicated on the then-apparent absence of a discernible

22   market for notary stamps, an absence now contradicted by developments directly traceable to the EU

23   DMA's enforcement. The change in the economic landscape, as revealed by these developments,

24

PLAINTIFF JEFFREY ISAACS' MOTION TO REOPEN PURSUANT TO FRCP 60
CASE NO. 3:21-CV-5567-EMC

1    constitutes an extraordinary circumstance warranting relief under Rule 60(b)(6), as it fundamentally

2    alters the legal and factual basis upon which the dismissal rested.

3    **IX.  REOPENING IN LIEU OF CERTIORARI: A PATH TOWARD EXPEDITED ENFORCEMENT**

4        The decision by this Court to reopen the case on the grounds of new extraordinary

5    circumstances, and shifts in legal interpretations, would be judicially efficient and avert a pending

6    Supreme Court review. Exhibit I, SCOTUS Case No. 23-1089.  A reopening of the case under these

7    premises acknowledges the potential merit in the Plaintiffs' claims and would save at least a year

8    from the *certiorari* process. It would save three years, including the new circumstances described

9    herein. Given this Court's familiarity with the complexities and more recent developments of the

10   case, it is well-positioned to conduct a thorough and timely reconsideration. The doctrine of judicial

11   economy underscores the efficient utilization of judicial resources to expedite the resolution of legal

12   disputes. By reopening the case, this Court not only aligns with the principles encapsulated within

13   this doctrine but also alleviates the Supreme Court the sizeable task of a *certiorari* review on Apple.

14   It is within this Court's purview to effectively mitigate further protraction of legal proceedings by

15   reassessing the grounds for dismissal in light of the newly emerged circumstances that warrant

16   reopening on several independent grounds. This proactive approach preserves judicial resources and

17   expedites the deliverance of a resolution.

18                        **CONCLUSION**

19       Apple's reaction to new regulations, epitomized by the implementation of the Core

20   Technology Fee (CTF) as a form of 'malicious compliance,' exhibits a pattern of strategically

21   circumventing the essence of regulatory mandates aimed at fostering market competition. This

22   behavior not only underscores the necessity for judicial oversight but also presents a clear illustration

23   of how corporate maneuvering to maintain market dominance can effectively sidestep legislative

24   intentions. This pattern, matched by Apple's conduct in this jurisdiction, presents an extraordinary

PLAINTIFF JEFFREY ISAACS' MOTION TO REOPEN PURSUANT TO FRCP 60
CASE NO. 3:21-CV-5567-EMC

1   circumstance warranting relief under the catch-all provision of Rule 60(b)(6). The antitrust landscape,

2   particularly within the technology sector, is marked by rapid evolution. The recognition of single-

3   brand markets and the adjudication of monopolistic practices in digital platform contexts (e.g., the

4   Epic-Google verdict) reflect an evolving judicial perspective on antitrust enforcement in the digital

5   age. Dismissing claims based on preconceived notions of market structures, without allowing for the

6   presentation of evidence that might illustrate novel market dynamics, especially those influenced by

7   recent regulatory changes, contradicts the forward-moving trajectory of Apple antitrust jurisprudence.

8   　　　In light of the demonstrable and extreme efforts by Apple to avoid genuine compliance with

9   antitrust enforcement — efforts that constitute a direct evasion of felony statutes — it is submitted

10  that an "unfavored" 12(b)(6) dismissal is particularly inappropriate under the current circumstances.

11  Reopening this case is not only substantiated by the gravity of Apple's conduct but is necessitated by

12  the overriding interests of law enforcement principles. The Court is hereby motioned to reconsider

13  its prior dismissal and reopen the case, allowing for a comprehensive reevaluation of the claims in

14  light of the heightened scrutiny demanded by the circumstances.

15  　　　Addressing national concerns regarding censorship and the rights of developers within the

16  digital marketplace, it is evident matters remain of significant public interest and merit judicial

17  examination. At the time of dismissal, the economic reality of notary stamps as a distinct market and

18  Apple's involvement therein was obscured, not due to any oversight by Plaintiff but rather due to

19  Apple's strategic bundling and obfuscation of these sales within broader services, namely the App

20  Store In-App Purchases (IAP) and Developer Program Annual Fees. Last week, prompted by the

21  implementation of the EU Digital Markets Act ("DMA"), Apple unveiled its practices surrounding

22  the sale of notary stamps, revealing a fee of €0.50 per notary stamp CTF fee charged to developers

23  for each app installation. This legislative change and Apple's response have precipitated a seismic

24

PLAINTIFF JEFFREY ISAACS' MOTION TO REOPEN PURSUANT TO FRCP 60
CASE NO. 3:21-CV-5567-EMC

shift in the economic landscape, laying bare the reality of a market that Plaintiff, with considerable foresight, contended existed four years ago.

Apple's approach to compliance with antitrust orders — evidenced through a pattern of actions taken in this jurisdiction and abroad — signals a deliberate attempt to fulfill the letter of the law while effectively voiding its spirit. This District's orders in the *Epic* litigation and the regulatory framework established by the EU's DMA were both aimed at curbing Apple's monopolistic practices. However, Apple's responses have been superficial at best, designed to stave off the imposition of genuine competitive dynamics within the marketplace while ostensibly adhering to the formality of legal obligations.

This manipulation and subversion of legal mandates constitute not mere contraventions of civil statutes but implicate the commission of felony offenses under the Sherman Act. Antitrust violations, by their nature, strike at the heart of the fair and open market principles that underpin our economic system. When compliance with antitrust orders is carried out in bad faith, it not only contravenes the specific tenets of those orders but amounts to a serious and insidious form of legal defiance that undermines the foundational purposes of antitrust statutes.

Given the preceding context, the Court's dismissal of our case under Rule 12(b)(6) warrants cancellation, in favor of adjudication on merit. The principle of law enforcement, fundamental to the judicial process, requires that actions which bear the hallmarks of felony conduct — most notably, deliberate attempts to undermine the enforcement of statutes and court orders designed to mitigate antitrust injury — must be met with heightened scrutiny. Apple's willful, malicious compliance presents a danger not only to market competition but to the integrity of the legal system's response to monopolistic abuses. In also evidences Sherman Act felony intent, which this Court cannot turn a blind eye to.

PLAINTIFF JEFFREY ISAACS' MOTION TO REOPEN PURSUANT TO FRCP 60
CASE NO. 3:21-CV-5567-EMC

1    Additionally, this Court must consider the corroborating nature of allegations laid out by the

2    Department of Justice regarding Apple's monopolistic behavior and the specific grievances

3    enumerated in the present case. The precedence of malicious compliance, in light of similar

4    allegations corroborated at the federal level, underscores the imperative for this Court to reopen the

5    underlying case, especially when such dismissal has inevitably shielded behaviors tantamount to

6    felony crimes from due judicial scrutiny.

7    ## X.    REQUEST FOR RELIEF

8    Accordingly, Plaintiff respectfully requests that this Court:

9    A. Reopen the case pursuant to Federal Rule of Civil Procedure 60(b);

10   B. Vacate the dismissal order dated November 30, 2021;

11   C. Allow immediate limited discovery to proceed in light of the new, unequivocal change in

12   economic, regulatory, and case law legal landscape; and

13   D. Grant such other and further relief as the Court deems just and proper.

14   ## XI.   EVIDENTIAL HEARING LIMITED DISCOVERY

15   Plaintiff respectfully notices that three weeks prior to hearing, Plaintiff, and/or co-Plaintiff counsel

16   shall effect limited discovery to fully uncover the extent, nature, and implications of Apple's sale and

17   management of notary stamps. This discovery is crucial for several reasons:

18   A. Clarification of the Economic Landscape: Discovery will provide essential insights into

19   Apple's previously obscured economic activities related to notary stamps, including but not limited

20   to pricing strategies, market control mechanisms, and the impact on developers and competitors.

21   B. Evidence Collection: Internal memoranda, communications, and financial records

22   pertaining to the unbundling of notary stamp fees and the operational changes instigated by the EU

23   Digital Markets Act will be pivotal in substantiating the Plaintiff's claims that were dismissed under

24   the presumption of an absent market.

PLAINTIFF JEFFREY ISAACS' MOTION TO REOPEN PURSUANT TO FRCP 60
CASE NO. 3:21-CV-5567-EMC

C. Equity and Fairness: Allowing discovery ensures that the Plaintiff has a fair opportunity to present this case in light of the new developments, adhering to the principles of justice and equity that underpin the Federal Rules of Civil Procedure and the legal system at large.

Therefore, Plaintiff seeks the Court's permission to conduct discovery to obtain:

All internal memoranda and communications relating to notary stamp / notarization services sales, including domestic and EU Digital Markets Act compliance policies.

Third party competitor evidence and expert and testimony concerning this matter.

Any other documents or communications that reveal Apple's practices, policies, and perspectives on notary stamps, notarization services, and their market significance.

Plaintiff asserts that this discovery is essential for a comprehensive understanding of the case merits and for the just resolution of the issues at hand.

## XII.    ORAL ARGUMENT

Under the Local Rules, the Court may permit an evidentiary hearing if motioned by a party. Plaintiff hereby motions for such hearing, and to permit testimony by:  individual(s) reasonably believed to be knowledgeable as to the notarization practices in the computer and smartphone industry and their economic implications.

Submitted on this 12th day of April, 2024.


/s/ Dr. Jeffrey D. Isaacs
Dr. Jeffrey D. Isaacs
11482 Key Deer Circle
Wellington, FL 33449

PLAINTIFF JEFFREY ISAACS' MOTION TO REOPEN PURSUANT TO FRCP 60
CASE NO. 3:21-CV-5567-EMC

1

**CERTIFICATE OF SERVICE**

2

      I, Jeffrey Isaacs, do declare as follows:

3

I certify that a copy of the foregoing **NOTICE OF MOTION AND MOTION TO REOPEN CASE** was delivered electronically to counsel for the Defendant.

4

      Executed on this 12th day of April, 2024.

5

6

                        /s/ Dr. Jeffrey D. Isaacs

                        Dr. Jeffrey D. Isaacs

7

                        11482 Key Deer Circle

                        Wellington, FL 33449

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

PLAINTIFF JEFFREY ISAACS' MOTION TO REOPEN PURSUANT TO FRCP 60
CASE NO. 3:21-CV-5567-EMC

1

2

3

4 UNITED STATES DISTRICT COURT

5 NORTHERN DISTRICT OF CALIFORNIA

6

7  CORONAVIRUS REPORTER, et al.,           Case No.  21-cv-05567-EMC

8                    Plaintiffs,
                                           **ORDER GRANTING DEFENDANT'S**
9         v.                               **MOTION TO DISMISS, AND**
                                           **DENYING PLAINTIFFS' MOTIONS**
10  APPLE INC., et al.,                    **FOR PRELIMINARY INJUNCTION,**
                                           **TO STRIKE, AND TO APPEND CLAIM**
11                   Defendants.
                                           Docket Nos. 20, 45, 51, 52, 74
12

13

14                          **I.      INTRODUCTION**

15        Plaintiffs bring this action for antitrust and RICO violations, and breach of contract and

16  fraud against Apple, Inc. ("Apple") to challenge Apple's allegedly monopolist operation of its

17  "App Store" through "curation" and "censor[ship]" of smartphone apps.  Docket No. 41 ("FAC")

18  ¶ 1-2.  Plaintiffs seek to vindicate the right of "the end users of Apple's iPhone" to "enjoy

19  unrestricted use of their smartphones" to run "innovative applications, written by third party

20  developers."  *Id.* ¶ 5.

21        Now pending is Apple's motion to dismiss all of Plaintiffs' claims against Apple.  Docket

22  No. 45.  Additionally, Plaintiffs two motions for preliminary injunction, Docket Nos. 20, 52,

23  motion to strike Apple's motion to dismiss, Docket No. 51, and request to append a claim to its

24  FAC, Docket No. 52, are also pending.  Finally, Apple's motion to quash Plaintiffs' subpoena

25  request, Docket No. 74, is pending.  For the reasons explained below, the Court **GRANTS**

26  Apple's motion to dismiss all of Plaintiffs' claims against Apple, and **DENIES AS MOOT** each

27  of Plaintiffs' pending motions and Apple's motion to quash.

28

United States District Court
Northern District of California

## II.    **BACKGROUND**

A.    Summary of Allegations

Plaintiffs bring this antitrust and breach of contract action against Apple, Inc. ("Apple") to challenge Apple's allegedly monopolist operation of its "App Store" through "curation" and "censor[ship]" of smartphone apps. Docket No. 41 ("FAC") ¶ 1-2. Plaintiffs seek to vindicate the right of "the end users of Apple's iPhone" to "enjoy unrestricted use of their smartphones" to run "innovative applications, written by third party developers." *Id.* ¶ 5.

1.    Apple's App Approval Process

Apple launched the iPhone and its proprietary iOS ecosystem in 2007. *See Epic Games, Inc. v. Apple Inc.*, 2021 WL 4128925, at *17 (N.D. Cal. Sept. 10, 2021). Apple introduced the App Store the following year. *Id.* at *19. App developers wishing to distribute apps on the App Store must enter into two agreements with Apple: the Developer Agreement and the Developer Program License Agreement ("DPLA"). Developers must also abide by the App Store Review Guidelines (the "Guidelines").[1] The Developer Agreement governs the relationship between a developer and Apple, *see* Docket No. 42 ("Brass Decl."), Exh. 1 ("Developer Agreement"), while the DPLA governs the distribution of apps created using Apple's proprietary tools and software, *see id.*, Exh. 2 ("DPLA"). By signing the DPLA, developers "understand and agree" that Apple may reject apps in its "sole discretion." *Id.* § 6.9(b). The Guidelines set out the standards Apple applies when exercising that discretion to review and approve apps for distribution on the App Store, a process known as "App Review." *See generally id.,* Exh. 3 ("Guidelines").

2.    Plaintiffs' Apps

Plaintiffs allege they are developers of "a diverse group" of apps: Coronavirus Reporter, Bitcoin Lottery, CALID, WebCaller, and Caller-ID. FAC ¶¶ 8, 27–30. Two of these apps, Coronavirus Reporter and Bitcoin Lottery, were never approved for distribution on the App Store. *Id.* ¶¶ 29, 53.

---

[1] The agreements and Guidelines are "central" to Plaintiffs' claims, FAC ¶ 273, and incorporated by reference in the FAC. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003); *see also* FAC ¶¶ 19, 24, 56, 74, 113–14, 135, 145, 165, 186, 195–206, 245, 254–55, 258–59, 269–71.

United States District Court
Northern District of California

1    Coronavirus Reporter sought to collect "bioinformatics data" from users about COVID-19

2  symptoms that it would then share with "other users and [unidentified] epidemiology researchers."

3  FAC ¶¶ 48, 52.  The Coronavirus Reporter team allegedly included Dr. Robert Roberts, a former

4  cardiologist for NASA.  *Id.* ¶ 47.  The Coronavirus Reporter app was developed in February 2020,

5  and, if approved, "this startup COVID app" would allegedly have been "first-to-market."  *Id.*  The

6  Coronavirus Reporter app was rejected by Apple on March 6, 2020, under Apple's policy

7  requiring that any apps related to COVID-19 be submitted by a recognized health entity such as a

8  government organization or medical institution.  *Id.* ¶¶ 54, 56, 69, 94, 96, 98; *see also* Guidelines

9  § 5.1.1(ix) ("Apps that provide services in highly-regulated fields (such as banking and financial

10  services, healthcare, and air travel) or that require sensitive user information should be submitted

11  by a legal entity that provides the services, and not by an individual developer").  Apple allegedly

12  denied Coronavirus Reporter's appeal from rejection on March 26, 2020, which Plaintiffs alleged

13  was concurrent with "Apples internal discussions with its own partners" in order to "further

14  cement Apple's own monopolistic trust and medi[c]al endeavors."  FAC ¶ 56.

15    Similarly, Apple allegedly rejected Plaintiff Primary Productions' Bitcoin Lottery, a

16  "blockchain app" developed by Plaintiff Primary Productions, under its alleged policy "generally

17  block[ing] blockchain apps."  FAC ¶¶ 85–86.

18    Plaintiffs' other apps (CALID, Caller-ID, and WebCaller) allegedly were approved for

19  distribution on Apple's App Store.  FAC ¶¶ 97, 103.  CALID, "a cross-platform scheduling

20  platform with an initial focus on telehealth," *id.* ¶ 94, was approved after the developer addressed

21  several violations of Apple's Guidelines, including Apple's requirement that developers use

22  Apple's payment system for in-app purchases.  *Id.* ¶¶ 95, 97.  Although Plaintiffs state that they

23  later "abandoned" the app, *id.* ¶ 97, they allege "CALID was subject to ranking suppression," *id.* ¶

24  28.  Through "ranking suppression," Plaintiff allege that Apple rendered the app "invisible on App

25  Store searches" by end users.  *Id.*  Plaintiffs similarly allege that Apple "suppressed" Caller-ID

26  and WebCaller because it competed with Apple's own Facetime app and because Apple retaliated

27  against Plaintiff Isaacs after he "informed Apple he held a patent on web caller ID, and that

28  [Apple's] crony, Whitepages . . . violated his patent."  *Id.* ¶¶ 104–07, 305.  Plaintiffs concede,

United States District Court
Northern District of California

1    however, that Isaac's patent was invalidated.  *Id.* ¶ 305.

2         3.    <u>Plaintiffs' Antitrust Claim Theory</u>

3         The core of Plaintiffs antitrust claims are challenges to Apple's alleged exercise of market

4    power in reviewing proposed apps and to Apple's unilateral authority to approve or deny which

5    apps are allowed on the App Store.  Plaintiffs challenge Apple's unilateral control over the ability

6    of developers to access and provide apps to iOS users, including Apple's alleged practice of

7    suppressing the visibility of apps which compete with Apple's own apps or apps of Apple's

8    "cronies."  FAC ¶ 21-23, 127, 199.

9         Plaintiffs' FAC articulates at least fifteen different relevant markets to its antitrust claims

10   against Apple:

11            (1) a "Smartphone Enhanced National Internet Access Devices"
              market;

12
              (2) a "smartphone market";

13
              (3) a "single-product iOS Smartphone Enhanced Internet Access

14            Device" market;

15            (4) "[t]he iOS market";

16            (5) the "market for smartphone enhanced commerce and information
              flow (devices and apps) transacted via the national internet

17            backbone";

18            (6) the "institutional app market";

19            (7) the "iOS institutional app market";

20            (8) the "iOS notary stamps" market;

21            (9) the "iOS onboarding software" market;

22            (10) the market for access rights to the iOS userbase;

23            (11) the "national smartphone app distribution market";

24            (12) the "iOS App market";

25            (13) the "US iOS Device App market";

26            (14) the "market of COVID startups"; and

27            (15) "the App Market."

28   FAC ¶¶ 8 n.1, 11, 12, 17–18, 81, 121, 135–37, 142, 165–66, 168, 233, 235.  Plaintiffs' Opposition

brief attempts to clarify that certain of the alleged markets are synonyms for other alleged markets, and that, to simplify for purposes of the instant motion, Plaintiffs are focused on "two relevant foremarkets" (apparently the "US smartphone market" and the "US iOS smartphone market" which "is an alternative single-produce market to the US smartphone market") and "five downstream markets":

> (1) the institutional app market (i.e. wholesale app competition);
>
> (2) the iOS institutional app market (iPhone app single-product wholesale marketplace);
>
> (3) iOS notary stamps market (permission tokens to launch iOS apps);
>
> (4) iOS onboarding software ('Mac Finder' capability disabled on all nonenterprise iOS devices); and
>
> (5) access rights to the iOS userbase").

Docket No. 55 ("Opp.") at 7 (citing FAC ¶¶ 8 n.1, 16, 18).  Plaintiffs allege that its market definitions cover and "equally apply to free apps – a major component of the ecosystem" of iOS app purchases.  FAC ¶ 16.

Plaintiffs' antitrust theory allegedly "flow[s] logically" from the key fact that "the only marketplace, the only seller of apps to end-users, is Apple itself" and thus Apple monopolizes an "institutional smartphone application software marketplace" in which Apple "purchase[s]" apps from developers—by approving or rejecting them through the App Review process—and then resells them to consumers on its own terms.  *Id.* ¶¶ 9–11, 19.

Plaintiffs allege that "Apple's App Store retails approximately 80% of the apps in the US consumer-facing market for smartphone apps," but that the relevant market for its antitrust claims is the "national institutional app market" where Apple "is a monopsony buyer of developers' apps."  *Id.* ¶ 121.  Plaintiffs allege that "Apple has complete control of pricing and contractual terms in [the national institutional app market]" and, accordingly, "they can reject apps simply because the app competes with Apple's own competitor app, or its cronies."  *Id.* ¶ 127.  Plaintiffs allege that Apple monopolizes three additional downstream markets, (a) iOS notary stamps market (permission tokens to launch iOS apps), (b) iOS onboarding software, and (c) access rights to the iOS userbase, through Apple's unilateral control of access to those markets.  FAC ¶¶ 135-41.

United States District Court
Northern District of California

4.     Class Allegations

Plaintiffs propose to represent various classes pursuant to "Fed R. Civ. P. 23(b)(1), (2), and (3)," including for "All U.S. iOS developers of any app that was excluded through disallowance and/or ranking suppression on the App Store," and "Any iOS developer who paid a $99 annual subscription fee[] to Apple for access to the iOS userbase and/or 'app notarization.'" FAC ¶¶ 148-51. Plaintiffs allege that the $99 annual fee is required for app developers to access the "App Store Connect developer portal" to develop and test apps on Apple's software, and to submit apps to for Apple to consider for inclusion on the App Store. *Id.* ¶ 135.

5.     Causes of Action

Plaintiffs allege eleven causes of action against Apple:

(1)     Violation of § 2 of the Sherman Act for "interstate restriction of smartphone enhanced internet userbase access services, iOS notary stamp and iOS onboarding software markets." FAC ¶¶ 160-172.

(2)     Violation of § 2 of the Sherman Act for "denial of essential facility in the institutional app markets" for Apple's "exclusionary behavior that denies essential facilities" that are necessary to compete in the smartphone market, such as denying "notary stamps." *Id.* ¶¶ 180-88.

(3)     Violation of § 1 of the Sherman Act because the "DPLA [is an] unreasonable restraint of trade" by "limiting competition in the critically important US institutional app marketplace." *Id.* ¶¶ 195-206.

(4)     Violation of § 2 of the Sherman Act for "ranking suppression as restraint of interstate trade." *Id.* ¶¶ 207-212.

(5)     Violation of § 1 of the Sherman Act for "tying the App Store, Notary Stamps and Software Onboarding to the iOS device market." *Id.* ¶¶ 213-217. Plaintiffs allege that "Apple is able to unlawfully condition access to iOS device to the use of a second product—App Store app marketplace." *Id.* ¶ 217.

(6)     Violation of § 2 of the Sherman Act for "$99 fee illegality." FAC ¶¶ 231-234. Plaintiffs allege "Apple unlawfully maintains is monopoly powers in the aforementioned markets" by "issuing an illegal demand of money from 20 million aspiring developers" of $99 each year "if they wish to access the iOS userbase or get their software notarized on an iOS device." *Id.* ¶ 235.

(7)     "*Cameron* Antitrust Class Action Opt Out:" Plaintiffs CALID and Jeffrey Isaacs "assert claims for non-zero price apps

as specified in the already docketed complaint *Cameron v. Apple.*" *Id.* ¶¶ 241-43. Plaintiffs allege the *Cameron* case, No. 19-cv-3074-YGR (N.D. Cal.) is a "developer class-action antitrust suit" where the "class is restricted to app developers who sold apps for non-zero prices." *Id.* ¶ 36. Plaintiffs allege that certain Plaintiffs in this case are *Cameron* class action opt-outs, and state the *Cameron* causes of action in this suit through "reference to the *Cameron* complaint." *Id.* ¶ 132. Plaintiffs allege that Judge Gonzalez Rogers deemed this litigation not subject to consolidation with *Cameron*. *Id.* ¶ 243.

(8)    Breach of Contract for Apple's pretextual refusal to approve the Coronavirus Reporter app for distribution on the App Store in violation of the DPLA and Developer Agreement. *Id.* ¶¶ 244-260.

(9)    Breach of the Covenant of Good Faith and Fair Dealing for Apple's refusal to approve the Coronavirus Reporter app. FAC ¶¶ 261-66.

(10)    Violation of the Racketeer Influenced Corrupt Organization Act, 18 U.S.C. § 1962(c) because "Apple and its cronies formed an enterprise meant to exploit the work of developers by screening their ideas for purported compliance with DPLA, meanwhile lifting and appropriating their ideas for their own competing apps[.]" *Id.* ¶ 269.

(11)    Fraud for improper rejections of and ranking suppression of disfavored apps. *Id.* ¶¶ 309-23.

Plaintiffs initially alleged a twelfth claim against the Federal Trade Commission ("FTC") under the Administrative Procedure Act, FAC ¶¶ 324-25, but voluntarily dismissed and withdrew that claim on November 23, 201, *see* Docket No. 83.

Plaintiffs seek damages of an estimated $200 billion and a permanent injunction restraining Apple from "denying developers access to the smartphone enhance Internet userbase." FAC at 106-07.

B.    Procedural Background

On January 19, 2021, Plaintiff Coronavirus Reporter filed the first iteration of this lawsuit in the District of New Hampshire. *Coronavirus Reporter v. Apple, Inc.* ("DNH Docket."), No. 21-cv-47, Docket No. 1 (D.N.H.). Coronavirus Reporter twice amended its complaint in response to then-pending motions to dismiss, and then voluntarily dismissed the case when the court ordered it transferred to this jurisdiction. DNH Docket Nos. 17, 19, 26–27, 32–33, 39–40.

On May 17, 2021, Plaintiff Primary Productions—represented by the same counsel—filed

United States District Court
Northern District of California

1    a separate, nearly identical lawsuit in the District of Maine.  *Primary Prods. LLC v. Apple Inc.*

2    ("D. Me. Docket."), No. 21-cv-137, Docket No, 1 (D. Me.).  There, Primary Productions amended

3    its complaint in response to Apple's motion to dismiss.  D. Me. Docket Nos. 17, 21.  That case

4    was then transferred to this Court, and Apple moved to dismiss the action. *See Primary Prods.*

5    *LLC v. Apple Inc.*, No. 3:21-cv-6841-EMC, Docket Nos. 27 & 32 (N.D. Cal.). Thereafter, Plaintiff

6    Primary Productions voluntarily dismissed that action.  *Primary Prods.*, No. 3:21-cv-6841-EMC,

7    Docket. 36.

8        Plaintiffs Coronavirus Reporter and CALID filed this putative class action on July 20,

9    2021, raising substantially similar claims to the prior two actions.  Docket. 1. They then moved for

10    a preliminary injunction.  Docket No. 20.  Apple moved to dismiss the complaint, and Plaintiffs

11    again amended their complaint in response. Docket No. 41.  The FAC—a putative class action

12    was brought on behalf of Coronavirus Reporter, CALID, Primary Productions LLC, Jeffrey

13    Isaacs, and two different classes of app developers affected by Apple's practices —is thus the

14    seventh complaint filed by one or more of these related plaintiffs, all making similar allegations

15    and claims.

16        Apple moves to dismiss the FAC.  Docket No. 45 ("Motion to Dismiss").  After amending

17    their complaint, Plaintiffs did not withdraw their motion for preliminary injunction, Docket No.

18    20, which remains pending.  Instead, Plaintiff's filed a *second* motion for preliminary injunction,

19    which is also pending.  Docket No. 52.  In that motion, Plaintiffs also request "appending" another

20    claim to their FAC, under the California Unfair Competition Law (although Plaintiffs did not seek

21    leave to amend their complaint as required under Fed. R. Civ. P. 15(a)(2)).  *Id.*

22        Finally, in response to Apple's motion to dismiss the FAC, Plaintiffs filed a "motion to

23    strike" Apple's motion to dismiss (although Plaintiffs did not cite any legal authority authorizing

24    them to move to strike Apple's motion to dismiss).  Docket No. 51 ("MTS").  *Cf.* 5C Wright &

25    Miller, Fed. Prac. & Proc. Civ. § 1380 (3d ed.) ("Rule 12(f) motions [to strike] only may be

26    directed towards pleadings as defined by Rule 7(a); thus motions, affidavits, briefs, and other

27    documents outside of the pleadings are not subject to Rule 12(f).").

28

United States District Court
Northern District of California

United States District Court
Northern District of California

### III.   LEGAL STANDARD

A.     Failure to State a Claim (Rule 12(b)(6))

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  A complaint that fails to meet this standard may be dismissed pursuant to Rule 12(b)(6).  *See* Fed. R. Civ. P. 12(b)(6).  To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014).  The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (quoting *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014)).  "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

### IV.   ANALYSIS

A.     Antitrust Claims (Counts 1-7)

Apple argues that all seven of Plaintiffs' antitrust claims should be dismissed because Plaintiffs fail to allege facts sufficient to meet two threshold conditions to proceed on any antitrust theory: (1) Plaintiffs fail to allege a plausible relevant market for their claims, and (2) Plaintiffs fail to allege antitrust injury.

As explained below, the Court dismisses all of the antitrust claims for Plaintiffs' failure to satisfy these threshold conditions.  As such, the Court cannot and does not address whether

United States District Court
Northern District of California

1  Plaintiffs have sufficiently plead facts to state substantive antitrust claims.

   1.  Relevant Market for Antitrust Claims

"A threshold step in any antitrust case is to accurately define the relevant market, which refers to 'the area of effective competition.'"  *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) (citation omitted); *see also Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997) ("The relevant market is the field in which meaningful competition is said to exist." (citing *United States v. Continental Can Co.*, 378 U.S. 441, 449 (1964))).  Market definition is an essential predicate to the entire case, for "[w]ithout a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition.'"  *Ohio v. American Express Co.*, 138 S. Ct. 2274, 2285 (2018).

Typically, the relevant market is the "arena within which significant substitution in consumption or production occurs."  *Id.* (citation omitted).  But courts should "combine different products or services into 'a single market' when "that combination reflects commercial realities."  *Id.* (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 336–337 (1962) (pointing out that "the definition of the relevant market" must "'correspond to the commercial realities' of the industry")).  "The principle most fundamental to product market definition is 'cross-elasticity of demand' for certain products or services."  *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291–92 (9th Cir. 1979).  "Commodities which are 'reasonably interchangeable' for the same or similar uses normally should be included in the same product market for antitrust purposes."  *Id.*  "This interchangeability is largely gauged by the purchase of competing products for similar uses considering the price, characteristics and adaptability of the competing commodities."  *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 380–81 (1956).  "In defining the relevant market, the court must look beyond the particular commodity produced by an alleged monopolist because the relevant product market for determining monopoly power, or the threat of monopoly control, depends upon the availability of alternative commodities for buyers."  *Kaplan,* 611 F.3d at 292 (citing *Fount-Wip, Inc. v. Reddi-Wip, Inc.*, 568 F.2d 1296, 1301 (9th Cir. 1978)).  A plaintiff cannot ignore economic reality and "arbitrarily choose the product market relevant to its claims"; rather, the plaintiff must "justify any proposed market by defining it with reference to the rule of

1   reasonable interchangeability and cross-elasticity of demand." *Buccaneer Energy (USA) v.*

2   *Gunnison Energy Corp.*, 846 F.3d 1297, 1313 (10th Cir. 2017) (internal quotation marks and

3   citation omitted).

4   　　　　Where a complaint fails to adequately allege a relevant market underlying its antitrust

5   claims, those claims must be dismissed. *Pistacchio v. Apple Inc.*, 2021 WL 949422, at *2 (N.D.

6   Cal. Mar. 11, 2021).

7   　　　　　　　a.　　Unclear Market Definitions

8   　　　　First, Apple correctly observes that the FAC lacks clarity as to the relevant product

9   markets for Plaintiffs' antitrust claims. The FAC articulates and references at least fifteen

10  different markets and does not always define the boundaries of or differences between those

11  markets. *See e.g.,* FAC ¶¶ 8 n.1, 11, 12, 17–18, 81, 121, 135–37, 142, 165–66, 168, 233, 235;

12  Motion to Dismiss at 7-9. For example, Plaintiffs mention the "the App Market" twice in the

13  complaint but do not define it. FAC ¶¶ 109, 183. It is not clear whether this is the same as,

14  distinct from or overlapping with the "national market of apps for smartphone enhanced internet

15  access devices," *id.* ¶ 121; "the US consumer-facing market for smartphone apps," *id.*; or the

16  undefined "app submarkets" referenced elsewhere, *id.* ¶¶ 168, 235. Plaintiffs suggest at one point

17  that these "app markets . . . are downstream from the smartphone enhanced device market." *Id.* ¶

18  183. But this articulation would seem to contradict Plaintiffs' allegations that hardware and

19  software are "bundle[d]" together in a single "Smartphone Enhanced Internet Information and

20  Commerce Access Device" market, *id.* ¶¶ 15–16, which itself is an apparent sub-market of the

21  "market for smartphone enhanced commerce and information flow (devices and apps) transacted

22  via the national internet backbone," *id.* ¶ 234. The FAC does not define these terms. And,

23  depending on the boundaries of the alleged markets, they do not seem to correspond with the

24  products subject to the alleged antitrust conduct. For instance, it is not clear why the Coronavirus

25  Reporter is an app or program that can only be used on Apple smartphones and not on other

26  smartphone enhanced Internet access devices, or any other device that has access to the internet.

27  Why can the app not be used on laptops and desktops?

28  　　　　Plaintiffs attempt to bring clarity to the FAC through its briefing by seeking to narrow the

United States District Court
Northern District of California

11

1  relevant markets upon which it relies, and abandoning many markets alleged in the FAC.

2  However, it is not permissible for Plaintiffs to amend their complaint through motion practice.

3  *Tietsworth v. Sears*, 720 F. Supp. 2d 1123, 1145 (N.D. Cal. 2010). But even if the Court were to

4  credit Plaintiffs' attempt at clarifying the scope of the FAC through briefing, Plaintiffs' newly

5  proposed relevant markets still rely on inconsistent explanations regarding the relevant product

6  markets.

7  Plaintiffs now argue that the principal markets on which their antitrust claims are two

8  foremarkets – "US Smartphones" or "an alternative single brand foremarket" of "US iOS

9  Smartphones" – and *four* downstream markets, "which by definition, Apple has 100% control

10  over: the iOS institutional App Market, the iOS notary stamp market, the iOS application loader

11  market and the iOS userbase market." MTS ¶¶ 11-12. But then, in Plaintiffs' Opposition to

12  Apple's Motion to Dismiss, they contend that, notwithstanding the various references to other

13  markets throughout the complaint, their antitrust claims are predicated on two foremarkets and *five*

14  downstream markets. Docket No. 45 ("Opposition") at 7. More notably, the term "foremarket"

15  does not appear in Plaintiffs' FAC; it is an entirely new concept unanchored to the FAC.

16  Even if the Court were to proceed from Plaintiffs' narrowest formulation of the relevant

17  markets for its claims – the two foremarkets and four downstream markets to which Plaintiffs refer

18  in their Motion to Strike, MTS ¶¶ 11-12 – this attempt at creating a narrower framework for the

19  product market analysis fails to provide sufficient clarity to pass muster. Does the "market for

20  smartphone enhanced commerce and information flow (devices and apps) transacted via the

21  national internet backbone," FAC ¶ 234, correspond to Plaintiffs' now asserted "US smartphones"

22  foremarket or to one of Plaintiffs' single-brand downstream markets? What is included in the

23  market for U.S. smartphones? All brands? What about devices such as tablets? Do the included

24  products have to be Internet-enabled? What if they access the Internet only through a Wi-Fi

25  connection? And where do Plaintiffs' allegations about Apple's monopoly over "the iOS market,"

26  *id.* ¶ 124 fit into its proposed framework of two foremarkets and four downstream markets? How

27  do the newly asserted markets relate to Plaintiffs' allege antitrust injury in the "market of COVID

28  startups"? *Id.* ¶ 81.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    In summary, the FAC does not provide sufficient clarity for the Court to assess the

2  threshold question of whether there is a relevant market for Plaintiffs antitrust claims.  One cannot

3  discern what is included and what is not, and thus analysis of cross-elasticity of demand is not

4  possible.  Nor do the newly asserted markets appear to correspond to the markets and allegations

5  pleaded in the FAC.

6    The Court may dismiss Plaintiffs' antitrust claims based on these findings alone.  *Sumotext*

7  *Corp. v. Zoove, Inc.*, No. 16-CV-01370-BLF, 2016 WL 6524409, at *3 (N.D. Cal. Nov. 3, 2016)

8  ("The Court also finds the allegations of the relevant market to be unclear, and it disagrees with

9  Sumotext that the relevant market need not be alleged at the pleading stage."); *Newcal Indus., Inc.*

10  *v. Ikon Office Sol.*, 513 F.3d 1038, 1044 & n.3 (9th Cir. 2008) (a plaintiff alleging a claim under

11  either Section 1 or Section 2 of the Sherman Act must allege the existence of a relevant market

12  and that the defendant has power within that market); *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059,

13  1064 (9th Cir. 2001) (affirming dismissal based on contradictory market definitions).

14    b.    Plausibility of Alleged Product Markets

15    In light of the foregoing analysis that Plaintiffs' alleged product markets lack clarity, the

16  Court need not analyze the plausibility of any of the product markets which Plaintiffs allege.

17  Nonetheless, the Court will assume *arguendo* Plaintiffs' attempt to narrow the relevant markets to

18  two foremarkets and four downstream markets are defined with sufficient clarity, MTS ¶¶ 11-12,

19  and thus analyzes the plausibility of those six markets (while ignoring other markets that Plaintiffs

20  alleged in the FAC and now seem to abandon).  The Court finds that these alleged markets do not

21  satisfy Rule 12(b)(6)'s plausibility standard.

22    Plaintiffs' Motion to Strike proposes the following six markets to underlie Plaintiff's

23  antitrust claims:

24    (1) Foremarket 1: "US Smartphones." MTS ¶ 11; FAC ¶ 15
25       ("Smartphone Enhanced Internet Information and Commerce
        Access Device Marketplace"); *id.* ("A smartphone is an
26       ecosystem of hardware AND software. . . The iPhone exists
        within the marketplace for smartphones."); *id.* ¶ 16 ("The
27       marketplace here is the smartphone internet access device."); *id.*
        ¶ 121 ("There is a relevant national market of apps for
28       smartphone enhance internet access devices, which are critical to
        the flow of information and commerce.").

13

(2) Foremarket 2: "an alternative single brand foremarket" of "US iOS Smartphones." MTS ¶ 12; FAC ¶ 18 ("Lastly, we define the single-product marketplace for iOS devices, a subset (80%) of the US smartphone internet access device marketplace."); *id.* ¶ 124 ("the iOS smartphone internet access device market is a relevant market under Sherman.").

(3) Downstream Market 1: "iOS institutional App Market." MTS ¶ 12; FAC ¶ 18 ("iOS Device Application Institutional Marketplace. . . Distributors buy apps, like film studios buy movie rights. . . Largely Theoretical Marketplace: Apple does not recognize it as a legitimate market in their DPLA agreement. Nonetheless, Apple monopsony "buys" millions of apps at a price of zero."). Plaintiffs allege that "by definition, Apple controls nearly 100% of the iOS institutional App marketplace . . . and hence no competing institutional app buyers." FAC ¶ 126.

(4) Downstream Market 2: "iOS notary stamp market." MTS ¶ 12. Plaintiffs allege that "Apple must issue a 'notarization' or digital encryption signature, in order for an app to launch . . . Apple is the sole producer of these notarizations stamps." FAC ¶ 135.

(5) Downstream Market 3: "iOS application loader market." MTS ¶ 12. Plaintiffs allege that "like the iOS app notarization stamp, the iOS app onboarding software is a critical component to access the critical infrastructure that is the national iOS 'network effect.'" FAC ¶ 136.

(6) Downstream Market 4: "iOS userbase market." MTS ¶ 12. Plaintiffs allege that there is a market "for access rights to the smartphone enhanced internet userbase" and "Apple. . . charges developers $99 for these (partial, selectively limited) access rights." FAC ¶ 140.

There are several problems under Rule 12(b)(6) with the relevant markets which Plaintiffs propose.

First, Plaintiffs do not plead facts sufficient to justify their proposed relevant markets. Recall that the "principle most fundamental to product market definition is 'cross-elasticity of demand' for certain products or services." *Kaplan*, 611 F.2d at 291–92. The FAC lacks any discussion of cross-elasticity of demand for certain products or services (a point Plaintiffs concede, Opp. at 7). Moreover, five of the six markets that Plaintiffs allege are single-brand markets in which Plaintiffs have drawn the definitional lines to such that the *only market participant* is inherently and necessarily Apple, MTS ¶¶ 11-12, however, Plaintiffs have not alleged facts required to justify defining these markets as *single-brand* markets.

United States District Court
Northern District of California

14

1     "Single-brand markets are, at a minimum, extremely rare" and courts have rejected such

2     market definitions "[e]ven where brand loyalty is intense." *Apple, Inc. v. Psystar Corp.*, 586 F.

3     Supp. 2d 1190, 1198 (N.D. Cal. 2008) (internal quotation marks and citation omitted). *But see id.*

4     "It is an understatement to say that single-brand markets are disfavored. From nearly the inception

5     of modern antitrust law, the Supreme Court has expressed skepticism of single-brand markets[.]"

6     *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 361 F. Supp. 3d 324, 343 (E.D.N.Y. 2019);

7     Herbert J. Hovenkamp, *Markets in IP & Antitrust*, 100 Geo. L.J. 2133, 2137 (2012) ("[A]ntitrust

8     law has found that a single firm's brand constitutes a relevant market in only a few situations.").

9     To be sure, "[a]ntitrust markets consisting of just a single brand, however, are not per se

10    prohibited. . . . In theory, it may be possible that, in rare and unforeseen circumstances, a relevant

11    market may consist of only one brand of a product." *Apple, Inc. v. Psystar Corp.* at 1198. On the

12    other hand, as the court in *Epic v. Apple* recently reiterated, "[a] single brand is *never* a relevant

13    market when the underlying product is fungible." *Epic Games, Inc. v. Apple Inc.*, No. 4:20-CV-

14    05640-YGR, 2021 WL 4128925, at *87 (N.D. Cal. Sept. 10, 2021) (citation omitted, emphasis in

15    the original).

16           Despite the foregoing, "in some instances one brand of a product can constitute a separate

17    market." *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 482 (1992) ("*Eastman

18    Kodak*"). Determining whether a single-brand market is proper requires "a factual inquiry into the

19    'commercial realities' faced by consumers." *Id.* (quoting, *Grinnell Corp.*, 384 U.S. at 572). In

20    *Eastman Kodak*, the Supreme Court considered whether summary judgment was appropriate for

21    Kodak on Sections 1 and 2 claims where the plaintiffs had argued that Kodak possessed monopoly

22    power in the *aftermarket* of sales of parts and repair services, despite not having such power in the

23    foremarket of equipment sales. 504 U.S. at 466–471. In affirming the Ninth Circuit's reversal of

24    summary judgment, the Supreme Court identified two factors that supported the aftermarket

25    framework: the existence of significant (i) "information" costs and (ii) "switching costs." *Id.* at

26    473.

27           Since then, the Ninth Circuit in *Newcal Industries Inc. v. Ikon Office Solution* outlined four

28    factors that could indicate whether an alleged market is a properly defined single-brand

United States District Court
Northern District of California

15

1    aftermarket under *Eastman Kodak* at the motion to dismiss stage. *See* 513 F.3d 1038, 1049–50

2    (9th Cir. 2008). The first indicator of an aftermarket is that the market is "wholly derivative from

3    and dependent on the primary market." *Id.* at 1049. The second indicator is that the "illegal

4    restraints of trade and illegal monopolization relate only to the aftermarket, not to the initial

5    market." *Id.* at 1050. The third indicator is that the defendant's market power "flows from its

6    relationship with its consumers" and the defendant did "not achieve market power in the

7    aftermarket through contractual provisions that it obtains in the initial market." *Id.* The fourth

8    indicator is that "[c]ompetition in the initial market. . . does not necessarily suffice to discipline

9    anticompetitive practices in the aftermarket." *Id.*

10        "[T]o establish a single-brand aftermarket under *Kodak* and *Newcal*, the restriction in the

11    aftermarket must not have been sufficiently disclosed to consumers in advance to enable them to

12    bind themselves to the restriction knowingly and voluntarily." *Datel Holdings Ltd. v. Microsoft*

13    *Corp.*, 712 F. Supp. 2d 974, 987 (N.D. Cal. 2010). Indeed, "[m]arket imperfections" may

14    "prevent consumers from discovering" that purchasing a product in the initial market could restrict

15    their freedom to shop in the aftermarket. *Newcal*, 513 F.3d at 1048. In other words, a plaintiff

16    must show evidence "to rebut the economic presumption that [defendant's] consumers make a

17    knowing choice to restrict their aftermarket options when they decide in the initial (competitive)

18    market to" purchase in the foremarket. *Newcal*, 513 F.3d at 1050.

19        As to Plaintiffs' attempt to allege a single-brand market, Plaintiffs provide no response to

20    Apple's argument that they fail to allege facts going to the four factors as required by *Newcal* to

21    survive a motion to dismiss to justify their proposed *single brand aftermarkets*. 513 F.3d at 1049–

22    50. Plaintiffs *cannot* satisfy *Newcal* based on the facts they have alleged. Plaintiffs suggest that

23    the four *single-brand* downstream markets (or aftermarkets) flow from the **single-brand**

24    **foremarket** of iOS smartphones. *See* FAC ¶¶ 125 ("the iOS Institutional App marketplace is

25    downstream. . . from the single-product iOS device market."), 135 ("The citizens of our country

26    have invested around a trillion dollars in the iOS network effect. . . the market for iOS app

27    notarization stamps is a relevant antitrust market"), 136 ("Like the iOS app notarization stamp, the

28    iOS app onboarding software is a critical component to access the critical infrastructure that is the

United States District Court
Northern District of California

16

**ER_91**

1    national iOS network effect."); MTS ¶ 12 ("Four downstream markets are alleged, which by

2    definition, Apple has 100% control over."). Yet, Plaintiffs do not cite a single antitrust case that

3    has *ever* recognized a ***single-brand foremarket***, and their attempt to define a single-brand

4    foremarket market around "iOS smartphones" without any explanation for why that market should

5    be so limited and without any reference to competitor products or substitutes runs afoul of the

6    principle that "[a] single brand is *never* a relevant market when the underlying product is

7    fungible." *Epic,* 2021 WL 4128925, at *87.

8        Moreover, Plaintiffs do not attempt to plead facts to satisfy *Newcal's* four factors to justify

9    their proposed single brand aftermarkets. *Newcal* requires Plaintiffs to show (1) the aftermarket is

10   wholly derivative from the primary market, (2) the illegal restraints of trade relate only to the

11   aftermarket, (3) the defendant did not achieve market power in the aftermarket through contractual

12   provisions that it obtains in the initial market, and (4) competition in the initial market does not

13   suffice to discipline anticompetitive practices in the aftermarket. 513 F.3d at 1048-50.

14   Importantly, the *Newcal* factors require Plaintiffs to articulate the relationship between a *non-*

15   *brand limited foremarket* and *the single-brand aftermarkets*. But, here, Plaintiffs do not plead any

16   facts demonstrating the relationship between the non-brand limited foremarket of US Smartphones

17   and the four single-brand aftermarkets. Thus, Plaintiffs fail to allege facts as required by *Newcal*

18   to sustain their single-brand markets.

19       On a broader level, Plaintiffs fail to plead facts sufficient to justify any of the six alleged

20   relevant markets under the standard rules for *any* market, let alone do they plead the specific facts

21   required to justify its *five* single-brand markets as required by *Newcal* at the motion to dismiss

22   stage. *See Buccaneer Energy*, 846 F.3d at 1313 (A plaintiff cannot ignore economic reality and

23   "arbitrarily choose the product market relevant to its claims;" rather, the plaintiff must "justify any

24   proposed market by defining it with reference to the rule of reasonable interchangeability and

25   cross-elasticity of demand."). The asserted markets are not secondary markets derived from

26   consumers who are unknowingly captured and held prisoner through a primary market. Instead,

27   according to Plaintiffs' theory, the asserted markets appear to stand on their own, and, for the

28   reasons stated above, lack plausibility.

United States District Court
Northern District of California

1    Plaintiffs do not dispute Apple's arguments about lack of interchangeability analysis.

2    They argue that their failure to provide analysis of cross-elasticity of demand in the FAC "is not

3    fatal to Plaintiffs' claims" because each of the submarkets alleged are well-defined in themselves,

4    and their boundaries can be refined through discovery. Opp. at 7-8 (citing *Brown Shoe Co. v. U.S.*,

5    370 U.S. 294, 325 (1962)). This is incorrect. "Authorities far too numerous to cite or discuss in

6    detail have established" that "[t]he principle most fundamental to product market definition is

7    'cross-elasticity of demand.'" *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291 (9th Cir. 1979).

8    "[W]here the plaintiff fails to define its proposed relevant market with reference to the rule of

9    reasonable interchangeability and cross-elasticity of demand," therefore, "the relevant market is

10   legally insufficient." *City of N.Y. v. Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011).

11   But even if Plaintiffs' alleged Foremarket 1 of "US Smartphones" could be sustained, none

12   of Plaintiffs' antitrust claims about Apple's actions are shown to impact that market. Plaintiffs

13   must define "the relevant market, which refers to 'the area of effective competition.'" *Qualcomm.*,

14   969 F.3d at 992. Plaintiffs fail to define that area of effective competition in which they compete.

15   They are not smartphone manufacturers. Nor do they provide any other basis for the Court to find

16   that the market of US Smartphones is the "area of effective competition" for Plaintiffs' claims.

17   *See e.g., Pistacchio v. Apple Inc.*, No. 4:20-CV-07034-YGR, 2021 WL 949422, at *2 (N.D. Cal.

18   Mar. 11, 2021) ("[T]he relevant market definition contains sparse supporting allegations. First, as

19   noted, Pistacchio is required, and has not included appropriate allegations demonstrating that there

20   are *not* appropriate economic substitutes for Apple Arcade on the iOS platform. . . . The complaint

21   offers no specific allegations supporting the sole focus of the market definition on cloud gaming

22   alternatives as opposed to the broader video game market generally, including those individually

23   sold both in the Apple App Store or by competitors on computer or console platforms, nor does

24   the complaint contain allegations supporting the narrowing of a market to consideration of a

25   subscription based payment model.").

26   Second, the four downstream single-brand markets on which Plaintiffs' antitrust claims

27   rely run afoul of a fundamental principle for antitrust market definition: they are not markets for

28   products or services. *See e.g., Newcal*, 513 F.3d at 1045 ("First and foremost, the relevant market

United States District Court
Northern District of California

18

United States District Court
Northern District of California

1   must be a *product* market.  The consumers do not define the boundaries of the market; the

2   products or producers do.") (Emphasis in original); *Kaplan*, 611 F.2d at 292 ("In arriving at an

3   adequate market definition, price differential between competing products and services is a

4   relevant factor to consider[.]").  For example, Plaintiffs alleged iOS Institutional App Market is

5   defined as a market in which Apple "buy[s]" apps from developers by approving or rejecting them

6   for distribution on the App Store.  But Plaintiffs themselves admit this "market" is "largely

7   theoretical," "hypothetical," and untethered to the licensing arrangement on which the App Store

8   is actually predicated.  *Id.* ¶¶ 18, 19, 121.  Plaintiffs acknowledge that Apple's app review process

9   is not one in which Apple buys the apps of developers, but, rather the "DPLA and App Store

10  employ language that a free app is 'For Sale' or 'Available' through the App Store after gaining

11  'approval' by Apple for 'adherence to iOS standards.'"  *Id.* ¶ 19.  The DPLA confirms this

12  arrangement, explaining that "Applications that meet Apple's Documentation and Program

13  Requirements may be submitted for consideration by Apple for distribution via the App Store"

14  and if "selected by Apple, Your Applications will be digitally signed by Apple and distributed[.]"

15  DPLA § Purpose. The DPLA does not include any provisions indicating that Apple pays

16  developers or "buys" apps through the app review process.  Rather than buying apps, as discussed

17  in greater detail below, Apple enables the distribution of apps to end users through the app review

18  process.

19          Similarly, there is no basis supporting Plaintiffs' notion that the proposed downstream

20  markets of "iOS notary stamps," "iOS application loaders," and "iOS userbase" are markets for

21  *products*.  Rather, as Plaintiffs acknowledge, each of these three markets refer to component parts

22  a developer may access and use when a developer's app is approved for distribution on the App

23  Store.  *See* FAC ¶¶ 135-40.  These three markets are neither *markets* nor do they describe *products*

24  but integrated features of Apple's app approval process.  Plaintiffs' articulation of these markets is

25  contrived and does not reflect the reality of an actually-existing product market.  Indeed, the Court

26  in *Epic* rejected the alleged "foremarket for Apple's own operating system" on Apple mobile

27  devices as "'artificial,'" "entirely litigation driven, misconceived, and bear[ing] little relationship

28  to the reality of the marketplace" because the Court determined that the operating system was an

integrated feature of the mobile devices, and that it was "illogical to argue that there is a market for something that is not licensed or sold to anyone." *Epic*, 2021 WL 4128925, at *29. The *Epic* Court summarized that there were "fundamental factual flaws with Epic Games' market structure" because "[w]ithout a product, there is no market for the non-product, and the requisite analysis cannot occur." *Id.* at *86; *see also id.* ("Thus, where there is no product or market for smartphone operating systems, there are no derivative markets."). The *Epic* Court also rejected the proposed "payment solutions aftermarket" for "the independent reason that [the "In App Purchases" feature set out in Apple's DPLA] is not a product for which there is a market." *Id.* The same analysis applies here: in the absence of information demonstrating that Plaintiffs' downstream markets describe *actually existing products* that are sold or licensed, Plaintiffs' aftermarkets are "without a product, there is no market for the non-product, and the requisite analysis cannot occur." *Id.*

Third, the markets Plaintiffs allege fail to grapple with their own admission and economic reality that the "iOS App market is two-sided." FAC ¶ 12; *accord id.* ¶¶ 11, 17, 18, 123, 125. The Court in *Epic* addressed the nature of the Apple's iOS App marketplace, and Plaintiffs do not dispute its analysis or conclusion that as a two-sided market the iOS App marketplace is a market not for products but for *transactions*:

> As a threshold issue, the Court considers whether the App Store provides two-sided transaction services or as Epic Games argues "distribution services." The Supreme Court has seemingly resolved the question: two-sided transaction platforms sell transactions. In two-sided markets, a seller "offers different products or services to two different groups who both depend on the platform to intermediate between them." *Amex*, 138 S. Ct. at 2280. Here, try as it might, Epic Games cannot avoid the obvious. Plaintiff only sells to iOS users through the App Store on Apple's platform. No other channel exists for the transaction to characterize the market as one involving "distribution services." . . .Accordingly, the Court finds that the relevant App Store product is transactions[.]

*Epic*, 2021 WL 4128925, at *83. As such, Apple's iOS App two-sided app market is "best understood as supplying only one product—transactions—which is jointly consumed" by developers and consumers on opposing sides of the platform. *Amex*, 138 S. Ct. at 2286 n.8. Therefore, the relevant market must be some category of "transactions" between developers and consumers. *Epic*, 2021 WL 4128925, at *83–86; *accord Amex*, 138 S. Ct. at 2287 ("[W]e will analyze the two-

20

1    sided market for credit-card transactions as a whole to determine whether the plaintiffs have

2    shown that Amex's antisteering provisions have anticompetitive effects.").  As the court in *US*

3    *Airways v. Sabre Holdings Corp.*, 938 F.3d 43, 57 (2d Cir. 2019), explained, "A transaction

4    platform is a two-sided platform where the business "cannot make a sale to one side of the

5    platform without simultaneously making a sale to the other. . . As a result, "[e]valuating both sides

6    of a two-sided transaction platform is . . . necessary to accurately assess competition."

7            Despite conceding the fact that the iOS App market is a two-sided market of transactions,

8    Plaintiffs four proposed downstream single-brand markets each cut up the app marketplace into

9    admittedly "hypothetical" and "theoretical," FAC ¶¶ 18-19, one-sided markets, with no reference

10   to the *transaction between* developers and consumers that is the actual product on the platform.

11   Instead, it posits Apple as the monopsony buyer of the apps.  *See* FAC ¶ 121 ("The other side of

12   this market is the national institutional app market . . Apple is a monopsony buyer of developers'

13   apps, in the institutional app market, because they are sole distributor on the retail side.").

14   Specifically, Plaintiffs advance a *theory* that Apple is an "institutional buyer" of apps and that it

15   "sells" notary stamps, onboarding software and userbase access to developers.  But this theoretical

16   framework does not align with the economic reality that Plaintiffs concede: that the iOS App

17   market is a two-sided market of transactions between developers and consumers.  Developers are

18   engaged in a *transaction* with consumers, not selling to Apple.

19           As the court in *Epic* explained, although Apple may be involved in facilitating an exchange

20   through its operation of the App Store platform, ultimately "users and developers consume App

21   Store transactions."  2021 WL 4128925, at *83.  Plaintiffs' failure to allege relevant markets that

22   encompass or even address the two-sided nature of the iOS App market renders their market

23   definitions insufficient as a matter of law.  *Amex*, 138 S. Ct. at 2287 ("[C]ompetition cannot be

24   accurately assessed by looking at only one side of the platform in isolation."); *Sabre Holdings*

25   *Corp.*, 938 F.3d at 57 ("In other words: In cases involving two-sided transaction platforms, the

26   relevant market must, as a matter of law, include both sides of the platform."); *Epic*, 2021 WL

27   4128925, at *86 ("Epic Games' aftermarket approach to market definition is inconsistent with its

28   recognition that the App Store constitutes a two-sided transaction platform which it fails to

United States District Court
Northern District of California

21

1    properly analyze."). Plaintiffs offer no argument on this point.

2         In summary, missing from Plaintiffs' market definitions is the identification of *any* well-

3    pleaded allegations that support the boundaries they seek to defined. Plaintiffs fail to plead facts

4    sufficient to adequately define any of their markets (making any kind of analysis on

5    interchangeability and cross-elasticity of demand impossible), fail to rationalize and defend the

6    five single-brand markets; do not define markets for actual products; and ignore the two-sided

7    nature of the iOS app market. "A threshold step in any antitrust case is to accurately define the

8    relevant market." *Qualcomm Inc.*, 969 F.3d at 992. Because Plaintiffs have failed to "rigorously

9    address[]" market definition, their complaint warrants dismissal. *City of Oakland v. Oakland*

10   *Raiders*, 445 F. Supp. 3d 587, 600 (N.D. Cal. 2020).

11        2.    <u>Antitrust Injury</u>

12        Apple also argues that Plaintiffs fail to plead antitrust injury.

13        To plausibly state antitrust claims in this market for transactions of apps (which cannot

14   plausibly be limited to iOS apps based on the allegations in the FAC, as discussed above),

15   Plaintiffs must allege injury to "competition in the market as a whole"—such as marketwide

16   reduction in output or increase in prices—"not merely injury to itself as a competitor" in the

17   market. *Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1024–25 (9th

18   Cir. 2013). This alleged harm also must be "'attributable to an anticompetitive aspect of the

19   practice under scrutiny'"; "harm that could have occurred under the normal circumstances of free

20   competition" does not suffice. *In re NFL's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1150

21   (9th Cir. 2019) (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)).

22        Apple argues that Plaintiffs' theory of injury is that *their* apps were rejected from the App

23   Store or subjected to alleged ranking suppression. Motion to Dismiss at 6; FAC ¶¶ 28–30, 53, 87.

24   Yet, Apple contends, Plaintiffs make no allegation that Apple's conduct excluded Apple

25   competitors, suppressed output of the market, increased app prices, or otherwise harmed

26   competition *in the market* beyond Plaintiffs' conclusory allegations of "damage to an entire

27   market," FAC ¶ 81, or unadorned references to "restricted output, quality, and innovation." *Id.* ¶¶

28   115, 191. "[A] formulaic recitation of the elements of a cause of action will not do." *Twombly,*

United States District Court
Northern District of California

22

1    550 U.S. at 555.

2        Additionally, Apple argues that Plaintiffs ignore the nature of the App Store platform such

3    that for every app that is allegedly "suppressed" in search rankings, another app's visibility is

4    lifted.  Motion to Dismiss at 6.  The effect of "suppression" in search rankings affects the relative

5    positions among products in the market; but there is no showing of harm to competition across the

6    market.  Effects on *Plaintiffs'* apps alone, which may raise equitable issues as *between* app

7    developers, do not establish *antitrust* injury.  As the Court noted in *Brunswick Corp. v. Pueblo

8    Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977), "[t]he antitrust laws . . . were enacted for the

9    protection of competition not competitors." (Quotation marks omitted).

10       Finally, Apple argues that Plaintiffs cannot merely declare that every app rejection injures

11   competition by decreasing output and constricting consumer choice, because "if that were the rule,

12   the Sherman Act would inhibit competition by requiring all platforms to increase the number of

13   available apps—no matter if they contained malware, were offensive, sought to scam users, or

14   were inferior copycats that could confuse consumers."  Docket No. 64 ("Reply") at 8.  Relying on

15   the *Epic*'s analysis, Apple contends that consumers instead "should be able to choose between the

16   type of ecosystems and antitrust law should not artificially eliminate them."  *Epic*, 2021 WL

17   4128925, at *29.  The App Store's curation—which differentiates it from other platforms—helps

18   "maintain[] a healthy ecosystem that ultimately benefits" users and developers.  *Id.* at *75.  Thus,

19   Apple concludes, Plaintiffs offer no plausible theory that Apple's policies reduce the net quality of

20   transactions in a relevant market, their allegations amount only to individual harm.  *See Gorlick*,

21   723 F.3d at 1025.

22       Plaintiffs respond by arguing that they plead "harm to competitors" or "harm to the

23   market" throughout the FAC, and that it is enough that Plaintiffs plead the harm generally at the

24   motion to dismiss stage.  Opp. at 11-12 (citing FAC ¶¶ 53, 81, 173, 174, 179, 200).  Additionally,

25   Plaintiffs point to a Congressional Subcommittee report which they contend provides the requisite

26   detail to sustain their allegations of marketwide harm.  Opp. at 12.

27       The Court disagrees.  The allegations of injury contained in the FAC are either confined to

28   specific harms experienced by Plaintiffs or a small group of competitors, rather than harm to the

United States District Court
Northern District of California

23

1  market.  None of the allegations in the FAC allege harm generally to the market of transactions for

2  apps across a relevant market.

3           Plaintiffs' allege various types of antitrust injury, all of which are insufficient:

4           • "Apple's refusal to sell notarization stamps or onboarding
             software . . . is intended to harm competition app developers,
5           like Plaintiffs and Class Members."  FAC ¶ 173.

6           • "The artificial monopoly created by notarization stamps and
             software onboarding results in damages to nearly twenty
7           million proposed class members of approximately one
             thousand dollars each. . . When the stamps aren't issued,
8           further damages accrue from lost app revenues. . . In China,
             'open' app stores are ten times the size of Apple's App Store
9           in China."  FAC ¶ 174.

10          • "Much damage is done to the overall competition within the
             institutional app markets, as a result of Apple's
11          anticompetitive practices in userbase access, notarization and
             onboarding.  But the damages extend beyond those markets,
12          into the overall US economy, and even public health
             response, in the case of Coronavirus Reporter."  FAC ¶ 179

13          • "Apple's conduct and unlawful contractual restrains harm a
14          market that forms a substantial part of the domestic
             economy, the smartphone enhanced internet device app
15          market."  FAC ¶ 200.

16          The assertions at FAC ¶¶ 173, 179 and 200 amount to conclusory and "threadbare recitals"

17  of the elements of antitrust injury that are insufficient to state a claim.  *Iqbal*, 556 U.S. at 663; *see*

18  *also, e.g., NorthBay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.*, 305 F. Supp. 3d

19  1065, 1074 (N.D. Cal. 2018) (dismissing antitrust claims because "there are no non-conclusory

20  allegations that [Defendant's] actions restrained trade in the relevant market or injured overall

21  competition" and the allegations "lack factual enhancement and are conclusory."); *Eastman v.*

22  *Quest Diagnostics Inc.*, 108 F. Supp. 3d 827, 835 (N.D. Cal. 2015) (same); *Feitelson v. Google*

23  *Inc.,* 80 F. Supp. 3d 1019, 1029 (N.D. Cal. 2015) (same).  Additionally, as discussed above, these

24  allegations relate to harms in hypothetical, non-existent single-brand markets – not in a relevant,

25  actually-existing, two-sided, brand-differentiated market for app transactions.

26          Although the allegation at FAC ¶ 174 provides some factual basis for Plaintiffs' theory of

27  injury—asserting that Apple's App Review process necessarily injures competition by excluding a

28  number of developers from launching apps on Apple's App Store—this allegation on its own is

United States District Court
Northern District of California

not sufficient to plead to antitrust injury for two reasons. First, Plaintiffs ignore the App Store serves a two-sided transaction market. As *Epic* held, in a two-sided transaction market, there must be consideration of the "effects on both sides of the market." 2021 WL 4128925, at *102. Plaintiffs' theory of antitrust injury alleges injury on only one side of the transaction – developers – but fails to grapple with the second side of the transaction market, consumers. Indeed, that apps which comply with Apple's generally applicable "Guidelines" regarding security, functionality and reliability are approved over those that do not is consistent with "normal circumstances of free competition" and may well serve the best interests of consumers. *In re NFL's Sunday Ticket Antitrust Litig.*, 933 F.3d at 1150. It is not enough that conduct "has the effect of reducing consumers' choices or increasing prices to consumers." *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012)). That is because these effects may arise for procompetitive reasons, such as increased interbrand competition. *See Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 891-93 (2007). As the court held in *Epic*, Apple's "centralized app distribution and the 'walled garden' approach differentiates Apple from Google." 2021 WL 4128925, at *102. "That distinction ultimately increases consumer choice by allowing users who value open distribution to purchase Android devices, while those who value security and the protection of a 'walled garden' to purchase iOS devices." Although the conclusion in *Epic* is not necessarily controlling here, Plaintiffs alleged theory of antitrust injury fails to give *any* consideration of the consumer-side of the two-sided transaction market. Failure to allege injury that harmed overall competition in the relevant market—here, a two-sided market of transactions—undermines Plaintiffs' theory of antitrust injury. *See NorthBay Healthcare*, 305 F. Supp. 3d at 1074.

Second, even if it is assumed that Apple exercised monopsonist market power in the apps transaction market, its decisions as to which apps are allowed to sell through the App Store is not an act that in itself causes harm the antitrust laws were designed to protect. Plaintiffs failed to make any allegation the Apple benefits from its rejection of apps or from suppression of apps in the search function. There is no showing that Apple is reaping the fruits of anti-competitive conduct. The deficiency of Plaintiffs' claim in asserting an antitrust injury is demonstrated by the following analogy. Query: if the only newspaper in town decides which advertisements may

United States District Court
Northern District of California

1    properly be posted or which advertisements to accept, does a rejected advertiser suffer an anti-trust

2    injury?  No.  That is not the kind of injury antitrust laws are intended to protect.  As noted above,

3    antitrust law protections competition, not competitors.  In contrast, if the newspaper attempted to

4    squelch competition by telling advertisers if they dare advertise in an up-and-coming competing

5    newspaper or radio station, they will be barred from its newspaper, that could suffice to show anti-

6    trust injury.  *See e.g., Lorain J. Co. v. United States*, 342 U.S. 143, 150–51, 152 (1951) ("The

7    publisher's attempt to regain its monopoly of interstate commerce by forcing advertisers to boycott

8    a competing radio station violated § 2" of the Sherman Act).  Plaintiffs do not allege facts any

9    such antitrust injury in the FAC.

10          To be sure, Plaintiffs allege that:

11              "Apple rejected Coronavirus Reporter on March 6, 2020, knowing
                apps from large institutions and strategic partners were in the
12              pipeline but not yet ready.  Apple specifically strategized to prevent
                the Coronavirus Reporter app, and *all* COVID startup firms, from
13              setting a precedent or amassing a user base, which could jeopardize
                its own pipeline and/or the first-mover advantage of desirable
14              institutional partners of a monopolistic trust."  FAC ¶ 53.

15    If Apple were to reject or suppress Plaintiffs' apps to diminish competition for Apple's own apps

16    or apps of other developers with whom Apple is conspiring, that might be deemed to inflict

17    antitrust injury.  But the FAC and ¶ 53 fail to plausibly allege such conduct with any specificity.

18          Finally, Plaintiffs' argument that by incorporating by reference a "House Subcommittee

19    report" regarding Apple's business practices into the FAC they have sufficiently plead antitrust

20    injury is unavailing.  Opp. at 12.  Although the FAC makes reference to the report and states that

21    the report is incorporated by reference, FAC ¶¶ 37-45, Plaintiffs do not connect the findings in the

22    report to their theory and allegations of antitrust injury to the entire market in this case.  At most,

23    Plaintiffs allege that aspects of Apple's business practices described in the report "directly harmed

24    Plaintiffs and class members," FAC ¶¶ 40-41, but go no further in elaborating how the practices

25    alleged in this case inflicted antitrust injury in the two-sided market relevant here.

26          Thus, in addition to Plaintiffs failing to define a relevant market for their antitrust claims,

27    Plaintiffs fail to sufficiently plead antitrust injury in the FAC even if the Court were to assume a

28    relevant market had been defined.  This failure provides a second and independent basis for the

United States District Court
Northern District of California

26

1    Court to dismiss Plaintiffs' antitrust claims (Claims 1-7).  Because Plaintiffs have failed to make

2    the threshold showings of a plausible a relevant market and alleging antitrust injury, the Court

3    need not analyze whether they have alleged facts sufficient to satisfy the substantive elements of

4    Plaintiffs' particular antitrust claims.  *See e.g., Amex*, 138 S. Ct. at 2285 (Market definition is an

5    essential predicate to the entire case, for "[w]ithout a definition of [the] market there is no way to

6    measure [the defendant's] ability to lessen or destroy competition.'").

7    B.    <u>Contract Claims (Claims 8 and 9)</u>

8          Plaintiffs bring two breach of contract claims: (1) breach of contract for Apple's pretextual

9    refusal to approve the Coronavirus Reporter app for distribution on the App Store in violation of

10   the DPLA and Developer Agreement, FAC ¶¶ 244-260 (Claim 8), and (2) breach of the covenant

11   of good faith and fair dealing for Apple's refusal to approve the Coronavirus Reporter app, *id.* ¶¶

12   261-66 (Claim 9).  Plaintiffs fail to state claims for breach of contract and, accordingly, these

13   claims are dismissed.

14         To state a breach of contract claim under California law, DPLA § 14.10, a plaintiff must

15   plead: (1) a contract; (2) plaintiff's performance or excuse for nonperformance; (3) breach; and (4)

16   damages.  *Hamilton v. Greenwich Invs. XXVI, LLC*, 126 Cal. Rptr. 3d 174, 183 (Cal. Ct. App.

17   2011).  Plaintiffs fail to "identify the specific provision of the contract" at issue, much less allege

18   facts establishing breach.  *Donohue v. Apple, Inc.*, 871 F. Supp. 2d 913, 930 (N.D. Cal. 2012).

19         Plaintiffs allege that Apple breached the 'promise[]' in its "Developer Agreement as

20   amended in March 2020 . . . that entities with 'deeply rooted medical credentials' were permitted

21   to publish COVID apps on the App Store."  FAC ¶¶ 245, 254.  But nothing in the Developer

22   Agreement (or any other contract) contained such a promise, much less *obligated* Apple to

23   distribute any particular app through the App Store, even those submitted by institutions.  *See*

24   *Donohue*, 871 F. Supp. 2d at 931 (rejecting argument that a user guide contained contractual

25   promises because it "includes no 'promises' which plaintiff could have 'accepted'").  Plaintiffs do

26   not identify any contractual provision that they allege was breached.

27         Instead, Apple points out that the contract governing app distribution is the DPLA.  The

28   DPLA expressly states that approval decisions are in Apple's "sole discretion."  DPLA § 3.2(g)

1    ("Applications for iOS Products. . . **may be distributed only if selected by Apple (in its sole**

2    **discretion)** for distribution via the App Store. . . as contemplated in this Agreement.") (Emphasis

3    added).  Plaintiffs agreed to this arrangement in exchange for use to Apple's propriety software,

4    tools, and services.  *See* DPLA § 1.1 (developers must "accept and agree to the terms" of the

5    DPLA to "use the Apple Software or Services").  Thus, Plaintiffs fail to state a claim for breach of

6    contract (Claim 8) because they fail to allege a breach.

7         Similarly, Plaintiffs' claim for breach of the covenant of good faith and fair dealing (Claim

8    9) fails because it re-hashes Plaintiffs' breach allegations (*compare* FAC ¶¶ 254, 260, *with id.* ¶¶

9    263, 26).  Plaintiffs do not allege that Apple frustrated any specific contractual term.  *See*

10   *Soundgarden*, 2020 WL 1815855, at *17.  Thus, it is dismissed for the same reasons.  *See*

11   *Soundgarden v. UMG Recordings, Inc.*, 2020 WL 1815855, at *17 (C.D. Cal. Apr. 6, 2020) ("no

12   additional claim is actually stated" where allegations "do not go beyond the statement of a mere

13   contract breach and, relying on the same alleged acts, simply seek the same damages or other

14   relief").  Moreover, the "implied covenant is limited to assuring compliance with the express terms

15   of the contract, and cannot be extended to create obligations not contemplated by the contract."

16   *Donohue*, 871 F. Supp. 2d at 932 (quotation marks omitted).  The express conferral of "sole

17   discretion" upon Apple under the DPLA cannot be contradicted  by the implied covenant. *See*

18   *Rockridge Tr. v. Wells Fargo, N.A.*, 985 F. Supp. 2d 1110, 1156 (N.D. Cal. 2013) ("An implied

19   covenant of good faith and fair dealing cannot contradict the express terms of a contract.").

20   C.    RICO and Fraud Claims (Claims 10 and 11)

21        To plead a civil RICO claim under § 1962(c), Plaintiffs must allege "(1) conduct (2) of an

22   enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing

23   injury to plaintiff's business or property."  *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*,

24   431 F.3d 353, 361 (9th Cir. 2005) (quotation marks omitted).

25        Plaintiffs allege that Apple, unnamed "individuals within Apple," "Apple's App Review

26   team," "PR firms, law firms, and rival developer cronies," FAC ¶¶ 269, 270, 273, formed a RICO

27   enterprise and "engaged in a distinct pattern of predicate acts over a multi-year timespan," *id.* ¶

28   274, including "wire fraud and mail fraud by assigning junior App Review members to issue false,

United States District Court
Northern District of California

28

1  pretextual reasons for rejection to small developers," *id.* ¶ 275, and "lifting and appropriating their

2  ideas into their own competing apps, and suppressing the original creators' work by blocking app

3  store distribution," *id.* ¶ 269.

4        Plaintiffs' RICO claim sounds in fraud and must be pled with particularity under Rule 9(b).

5  *Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007) (en banc).  The FAC therefore "must

6  identify the who, what, when, where, and how of the misconduct charged, as well as what is false

7  or misleading about the purportedly fraudulent statement, and why it is false."  *Depot, Inc. v.*

8  *Caring for Montanans, Inc.*, 915 F.3d 643, 668 (9th Cir. 2019) (quotation marks omitted).

9  Plaintiffs' allegations do not meet Rule 9(b)'s standard.

10        Plaintiffs rely on vague, conclusory allusions to Apple's alleged practice of "assigning

11  junior App Review members to issue false, pretextual reasons for rejection to small developers."

12  FAC ¶ 275; *see also, e.g., id.* ¶¶ 42, 87, 104, 257.  These general allegations do not identify the

13  specific who, what, when, where, and how.  Plaintiffs' attempts to describe discrete instances of

14  fraud are no more detailed.  For example, Plaintiffs point to a communication from Apple stating

15  that Coronavirus Reporter was rejected because it contained "data that has not been vetted for

16  accuracy by a reputable source" and was not associated with a "recognized institution."  *Id.* ¶ 278.

17  There is no plausible allegation that this was false, *id.* ¶ 277, only, at most, that Apple's

18  requirements were poorly considered, *id.* ¶¶ 277–78.  The decision was consistent with Apple's

19  Guidelines.  *See* Guidelines § 5.1.1(ix).  Similarly, Plaintiffs suggest that Apple rejected Bitcoin

20  Lottery because its "primary purpose" was to "encourage users to watch ads or perform

21  marketing-oriented tasks," which was "not appropriate for the App Store."  *Id.* ¶ 280.  But here

22  too, Plaintiffs do not dispute that the rejection was made pursuant to Apple's Guidelines.  *See*

23  Guidelines § 3.2.2(vi) ("Apps should allow a user to get what they've paid for without performing

24  additional tasks. . . Apps should not require users to rate the app, review the app, watch videos,

25  download other apps. . . or take other similar actions in order to access functionality, content, use

26  the app, or receive monetary or other compensation, including but not limited to gift cards and

27  codes.").  Thus, Plaintiffs' RICO claim fails to sufficiently allege fraudulent behavior with

28  particularity as required under Rule 9(b) and should be dismissed.  Rule 9(b) also applies to

United States District Court
Northern District of California

1 Plaintiffs' derivative fraud claim (Count 11), and thus that claim fails for the same reason.

2  Additionally, Plaintiffs' RICO claim fails for another reason. Plaintiffs must allege an

3 enterprise that is *separate* from the "person employed by or associated with" that enterprise who

4 engaged in the unlawful RICO conduct. 18 U.S.C. § 1962(c); *see also Schreiber Distrib. Co. v.*

5 *Serv-Well Furniture Co.*, 806 F.2d 1393, 1396 (9th Cir. 1986). In other words, "[i]f [a

6 corporation] is the enterprise, it cannot also be the RICO defendant." *Rae v. Union Bank*, 725

7 F.2d 478, 481 (9th Cir. 1984). Plaintiffs' allegations make clear that the alleged enterprise *is*

8 Apple itself. According to the FAC, it consists of "Apple," *id.* ¶ 269, "Apple's App Review

9 team," and "senior Apple management," *id.* ¶ 270. Where, as here, the "enterprise consist[s] only

10 of [the corporation] and its employees, the pleading . . . fail[s] for lack of distinctiveness." *Living*

11 *Designs, Inc.*, 431 F.3d at 361.

12  Finally, Plaintiffs' assertions that the alleged enterprise consisted of Apple's "crony app

13 developers," "law firms," and "PR firms" who allegedly "divert profits," "spread Apple's gospel,"

14 or obfuscate "Apple's anticompetitive agenda," FAC ¶¶ 271–72, fails because none of these

15 groups are alleged to have participated in an alleged enterprise involving the predicate acts of wire

16 and mail fraud. The allegations are also conclusory.

17  Thus, the Court dismisses Plaintiffs' RICO and fraud claims (Claims 10 and 11).

18 D. <u>Leave to Amend</u>

19  Based on the foregoing analysis, the Court dismisses all eleven of Plaintiffs' claims against

20 Apple in the FAC. Accordingly, because all of the claims against Apple are dismissed, so too are

21 Plaintiffs' class allegations stemming from those claims.

22  The Court addresses whether Plaintiffs should be given leave to amend any or all of their

23 claims. While Fed. R. Civ. P. 15(a) states that leave to amend "shall be freely given when justice

24 so requires," nonetheless "[a] district court acts within its discretion to deny leave to amend when

25 amendment would be futile[.]" *Chappel v. Lab'y Corp. of Am.*, 232 F.3d 719, 725–26 (9th Cir.

26 2000).

27  Although Plaintiffs are correct to note that this will be the first ruling under rule 12(b)(6)

28 concerning Plaintiffs' complaint, Apple is also correct in observing that between the various

United States District Court
Northern District of California

United States District Court
Northern District of California

1  iterations of this case being filed across jurisdictions and by different configurations of Plaintiffs –

2  all challenging the same conduct by Apple and all by the same counsel – this is Plaintiff's *seventh*

3  amended complaint on these claims.  *See supra* Procedural Background.  Plaintiffs have had the

4  benefit of responding to Apple's fully briefed motions to dismiss in this case and previous cases,

5  and, yet, in this seventh complaint they still fail to state any claims.  Accordingly, the Court finds

6  that it would be futile to grant leave to Plaintiffs to bring an *eighth* amended complaint, and thus

7  dismisses the claims with prejudice.

8  E.       Other Issues

9          1.       Plaintiffs' Motions for Preliminary Injunction and to Strike

10         Because the Plaintiffs' claims against Apple are dismissed with prejudice, Plaintiffs

11 pending motions for preliminary injunction are denied as moot. Docket Nos. 20, 52.

12         The Court denies Plaintiffs' motion to strike Apple's motion to dismiss, Docket No. 51.

13 There is no basis for a party to strike a motion.  *See* 5C Wright & Miller, Fed. Prac. & Proc. Civ. §

14 1380 (3d ed.) ("Rule 12(f) motions [to strike] only may be directed towards pleadings as defined

15 by Rule 7(a); thus motions, affidavits, briefs, and other documents outside of the pleadings are not

16 subject to Rule 12(f).").

17         2.       Plaintiffs' Motion to Append Claim

18         Plaintiffs' second motion for preliminary injunction additionally asserts that Plaintiffs are

19 authorized to append an "addendum [] two-pages in length that succinctly raises" a new claim

20 (Claim 12) under California' Unfair Competition Law, and proceeds to assume that "the operative

21 complaint" is now "the FAC + UCL Addendum."  Docket No. 51 at 3.  The Court need not

22 consider Plaintiffs' procedurally improper attempt to amend their complaint.  This addendum is a

23 nullity because Plaintiffs did not notice a motion for such relief, much less complied with the

24 Court's procedures for doing so.  *See Hocking v. City of Roseville*, 2007 WL 3240300, at *5 (E.D.

25 Cal. Nov. 2, 2007) ("Because this request was not submitted by properly noticed motion, it is not

26 presently before the court and the court therefore declines to address it at this time."); *see also*

27 N.D. Cal. L.R. 7-1 & 10 (explaining the rules for moving for leave to amend a complaint).  The

28 Court denies the request to append a claim to the FAC on this procedural grounds.

1    Even if the Court were to consider Plaintiffs' request on the merits, it would deny the

2  motion.  Plaintiffs' proposed UCL claim draws from an article published in Politico describing

3  Apple's lobbying efforts in state legislature, which Plaintiff's characterize as allegedly "expos[ing]

4  a quid pro quo to rescind Apple's $25 million donation to an historically black college (HBCU) in

5  Georgia, alleged to be the most disgraceful scandal in Apple's forty-year history."  Docket No. 53

6  ("UCL Claim") ¶ 3.  Plaintiffs claim that this allegation presents additional predicate acts for their

7  RICO claim (Count 10), that the RICO enterprise should be amended to include the lobbyists and

8  law firms mentioned in the article, and that they bring a UCL claim under the "unfair" prong

9  derived from the RICO claim.  *Id.* ¶ 5.  Notably, the Politico article they reference was published

10  on August 20, 2021, which was 17 days *before* Plaintiffs filed their FAC.  There was no

11  superseding development warranting the amendment.  Moreover, this conduct has nothing to do

12  with Plaintiffs.  Plaintiffs do not include allegations about how they were injured by the actions

13  described in the article, and, thus, it is not apparent that the Plaintiffs have standing to pursue this

14  claim.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) ("[T]he irreducible constitutional

15  minimum of standing contains three elements.  First, the plaintiff must have suffered an 'injury in

16  fact'").

17    Furthermore, the attempted amendment is problematic because Apple's First Amendment-

18  protected lobbying activity cannot form the basis for antitrust liability, RICO and UCL liability

19  under the *Noerr-Pennington* doctrine.  *See Kottle v. Nw. Kidney Centers*, 146 F.3d 1056, 1059 (9th

20  Cir. 1998) ("This circuit has clarified that the *Noerr–Pennington* doctrine is not merely a narrow

21  interpretation of the Sherman Act in order to avoid a statutory clash with First Amendment values

22  . . . rather, the doctrine is a direct application of the Petition Clause, and we have used it to set

23  aside antitrust actions premised on state law, as well as those based on federal law."); *Sosa v.

24  DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006) (extending *Noerr-Pennington* to RICO);

25  *Multimedia Patent Tr. v. LG Elecs., Inc.*, 2013 WL 12073800, at *3 (S.D. Cal. Aug. 1, 2013)

26  (same for UCL).  Plaintiffs' asserted allegations appear meritless and it would likely be futile for

27  them to attempt to cure this deficiency.

28    Thus, on procedural grounds and on the merits, the Court denies Plaintiffs' attempt to add

United States District Court
Northern District of California

1    another claim to their complaint under the UCL.  Docket No. 52.

2              3.      Plaintiffs' Notices for Discovery and Apple's Motion to Quash

3              On October 25, 2021, Plaintiffs filed a notice informing the Court of recently submitted

4    petitions for cert. requesting that the U.S. Supreme Court "invoke original jurisdiction and assign a

5    special master to ensure" that proceedings involving antitrust claims against Apple, including this

6    case, "are not contaminated by Gibson Dunn's [counsel for Apple] political retaliation against Dr.

7    Isaacs," a party to this case.  Docket No. 65.  The information Plaintiffs bring to the Court's

8    attention in the notice is not relevant this case and the Court takes no action on the notice.

9              Plaintiffs appear to refer to a case in which Isaacs alleged a RICO claim against Gibson,

10   Dunn & Crutcher LLP but not any individual lawyers.  Plaintiffs do not allege that any attorneys

11   are Apple's attorneys of record in this case.  That case was dismissed—with fees awarded to the

12   defendants—and all appeals are exhausted.  *See Isaacs v. USC Keck Sch. of Med.*, 853 F. App'x

13   114, 117–18 (9th Cir. 2021); *Isaacs v. USC Keck Sch. of Med.*, No. 19-8000 DSF, Dkt. 112 (C.D.

14   Cal. May 15, 2020).

15             Apple's counsel filed a declaration stating, "We are aware of no reasonable basis for

16   Plaintiffs' assertion that counsel for Apple in this case (or, for that matter, any attorney of Gibson,

17   Dunn & Crutcher LLP) would be a witness in this litigation.  To the extent that Plaintiffs have

18   asserted that Gibson, Dunn & Crutcher LLP as an entity may be a witness, we are aware of no

19   reasonable basis for that statement either.  Nor are we aware of any reasonable basis for Plaintiffs'

20   assertion that counsel for Apple have a conflict of interest or are subject to disqualification for any

21   reason. Gibson Dunn has been retained by Apple to represent the company in this litigation, and

22   we will continue to do so."  Docket No. 63 ¶¶ 2-3.

23             Plaintiffs also filed notices pursuant to California Code of Civil Procedure § 1987

24   purporting to require Apple executives and Lina Khan, Chair of the Federal Trade Commission, to

25   appear for live examination at the hearing on November 4, 2021.  Docket Nos. 66-68.  Those state

26   civil procedure notices have no effect in federal court and were improper.  *See Castillo-Antonio v.*

27   *Hernandez*, 2019 WL 2716289, at *3 (N.D. Cal. June 28, 2019).  Plaintiffs did not seek nor obtain

28   leave to present live testimony at the upcoming November 4 motions hearing, and in any event, no

33

1    live testimony is needed. *See* N.D. Cal. L.R. 7-6 ("No oral testimony will be received in

2    connection with any motion, unless otherwise ordered by the assigned Judge."). Furthermore, the

3    hearing has passed – any issues that were raised by the notices are now moot.

4        Finally, Apple moved to quash Plaintiffs' subpoena requests. Docket No. 74. However,

5    now that the Court has dismissed all of Plaintiffs' claims against Apple with prejudice, there is no

6    basis for Plaintiffs' subpoena requests. Thus, Apple's motion to quash is also denied as moot.

7                         **V.**     **CONCLUSION**

8        For the foregoing reasons, the Court **GRANTS** Apple's motion to dismiss all of Plaintiffs'

9    claims against Apple. Docket No. 45. The Court **DENIES AS MOOT** Plaintiffs' pending

10    motions for preliminary injunction, to strike and to append claim, as well as Apple's motion to

11    quash. Docket Nos. 20, 51, 52, 74.

12        This order disposes of Docket Nos. 20, 45, 51, 52, and 74. The Clerk is instructed to enter

13    Judgment and close the case.

15       **IT IS SO ORDERED**.

17    Dated: November 30, 2021

20        EDWARD M. CHEN
          United States District Judge

United States District Court
Northern District of California

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CORONAVIRUS REPORTER; CALID, INC.; PRIMARY PRODUCTIONS LLC, | No. 22-15166 |
| *Plaintiffs-Appellants*, | D.C. No. 3:21-cv-05567-EMC |
| and | OPINION |
| JEFFREY D. ISAACS, Dr., | |
| *Plaintiff*, | |
| v. | |
| APPLE, INC., | |
| *Defendant-Appellee*, | |
| and | |
| FEDERAL TRADE COMMISSION, | |
| *Defendant*. | |

2          CORONAVIRUS REPORTER V. APPLE, INC.

| | |
|---|---|
| JEFFREY D. ISAACS, Dr., | No. 22-15167 |
| *Plaintiff-Appellant*, | D.C. No. 3:21-cv- |
| and | 05567-EMC |
| CORONAVIRUS REPORTER; CALID, INC.; PRIMARY PRODUCTIONS LLC, | |
| *Plaintiffs*, | |
| v. | |
| APPLE, INC., | |
| *Defendant-Appellee*, | |
| and | |
| FEDERAL TRADE COMMISSION, | |
| *Defendant*. | |

Appeal from the United States District Court
for the Northern District of California
Edward M. Chen, District Judge, Presiding

Argued and Submitted March 29, 2023
San Francisco, California

Filed November 3, 2023

Before:  Ronald M. Gould, Marsha S. Berzon, and Sandra
S. Ikuta, Circuit Judges.

Opinion by Judge Gould

## SUMMARY[*]

### Antitrust

The panel affirmed the district court's dismissal, for
failure to state a claim, of an antitrust action against Apple,
Inc., alleging monopolist operation of the Apple App Store.

The panel held that appellants failed to state an antitrust
claim under Section 1 or Section 2 of the Sherman Act,
arising from Apple's rejection of their apps for distribution
through the App Store, because they did not sufficiently
allege a plausible relevant market, either for their rejected
apps as compared to other apps, or for apps in general.

The panel held that appellants failed to state a claim for
breach of contract under California law because they did not
identify relevant specific provisions of Apple's Developer
Agreement or Developer Program License Agreement or
show that Apple breached a specific provision.

Appellants also failed to state a claim under the
Racketeer Influenced and Corrupt Organizations Act or for
fraud.

---

[*] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

4          CORONAVIRUS REPORTER V. APPLE, INC.

## COUNSEL

Keith Mathews (argued), American Wealth Protection, Manchester, New Hampshire; Stephan M. Kernan, The Kernan Law Firm, Beverly Hills, California; for Plaintiffs-Appellants.

Jeffrey D. Isaacs (argued), West Palm Beach, Florida, pro se Petitioner.

Julian W. Kleinbrodt (argued) and Rachel S. Brass, Gibson Dunn & Crutcher LLP, San Francisco, California; Cynthia E. Richman, Zachary B. Copeland, and Harry R.S. Phillips, Gibson Dunn & Crutcher LLP, Washington, D.C.; Mark A. Perry, Weil Gotshal & Manges LLP, Washington, D.C.; for Defendants-Appellee.

## OPINION

GOULD, Circuit Judge:

Plaintiffs-Appellants Coronavirus Reporter, CALID, Inc., Primary Productions LLC, and Dr. Jeffrey D. Isaacs sued Defendant-Appellee Apple for its allegedly monopolist operation of the Apple App Store. The district court dismissed the claims with prejudice for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and denied the remaining motions as moot. Plaintiffs-Appellants appealed. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

CORONAVIRUS REPORTER V. APPLE, INC.          5

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 2008, a year after launching the iPhone, Apple introduced the App Store. In order to distribute apps on the App Store, app developers must abide by the App Store Review Guidelines ("the Guidelines") and enter into two agreements with Apple: the Developer Agreement and the Developer Program License Agreement ("DPLA"). By signing these agreements, app developers expressly "understand and agree" that Apple has "sole discretion" to reject apps. The Guidelines provide developers with the standards Apple applies when it reviews apps.

Plaintiffs-Appellants developed a group of apps that they sought to distribute on Apple's App Store. Two of their apps—Coronavirus Reporter and Bitcoin Lottery—were not approved for distribution. The Coronavirus Reporter app sought to collect "bioinformatics data" from users about COVID-19 symptoms that the app would then share with "other users and [unidentified] epidemiology researchers." The Coronavirus Reporter team allegedly included Dr. Robert Roberts, a former cardiologist for NASA. Apple rejected Coronavirus Reporter under Apple's policy requiring that any apps related to COVID-19 be submitted by a recognized health entity such as a government organization or medical institution.[1] Apple rejected Bitcoin Lottery, a blockchain app, under its policy "generally block[ing] blockchain apps."

Plaintiffs-Appellants brought claims against Apple for antitrust violations pursuant to Sections 1 and 2 of the

---

[1] Guidelines § 5.1.1(ix): "Apps that provide services in highly-regulated fields (such as banking and financial services, healthcare, and air travel) or that require sensitive user information should be submitted by a legal entity that provides the services, and not by an individual developer."

Sherman Act, breach of contract, racketeering, and fraud, challenging Apple's allegedly monopolist operation of the iPhone "App Store" through the "curation" and "censor[ship]" of apps. Plaintiffs-Appellants assert that they "seek to vindicate" the right of "the end users of Apple's iPhone" to "enjoy unrestricted use of their smartphones" to run "innovative applications, written by third party developers."

The district court dismissed Plaintiffs-Appellants' First Amended Complaint ("FAC") with prejudice on November 30, 2021. The district court dismissed Plaintiffs-Appellants' antitrust claims because they did not allege a plausible relevant market nor antitrust injury. The district court likewise dismissed the claims for breach of contract, racketeering, and fraud because the Plaintiffs-Appellants failed to plead required elements for each. Accordingly, the district court denied as moot Plaintiffs-Appellants' two preliminary injunction motions, Plaintiffs-Appellants' "motion to strike" Apple's motion to dismiss, and Plaintiffs-Appellants' Notices for Discovery of Apple executives and FTC Chair Lina Khan, along with Defendant-Appellee's motion to quash these requests. The district court later rejected Plaintiffs-Appellants' motions for reconsideration.

Plaintiffs-Appellants appeal the district court's dismissal of their claims, as well as the denial of their motions for reconsideration and for preliminary injunction.

## II. STANDARDS OF REVIEW

We review *de novo* a district court's grant of a motion to dismiss under Rule 12(b)(6), "accepting all factual allegations in the complaint as true and construing them in the light most favorable to the nonmoving party." *Ebner v. Fresh, Inc.*, 838 F.3d 958, 962 (9th Cir. 2016) (quoting

*Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1014 (9th Cir. 2012)).  The complaint must "plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).    "Conclusory allegations and unreasonable inferences" do not provide such a basis. *Sanders v. Brown*, 504 F.3d 903, 910 (9th Cir. 2007).  A dismissal may be affirmed on any proper ground that is supported by the record.  *See Johnson v. Riverside Healthcare System, LP*, 534 F.3d 1116, 1121 (9th Cir. 2008); *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004); *Papa v. United States*, 281 F.3d 1004, 1009 (9th Cir. 2002).

Although decisions by the district court on the substance and merits of claims are reviewed *de novo*, *see Ebner*, 838 F.3d at 962, many matters that routinely come before a district court are committed to the sound discretion of the district court and reviewed for abuse of discretion.  *See e.g.*, *Ordonez v. Johnson*, 254 F.3d 814, 815 (9th Cir. 2001) (per curiam) (dismissal with prejudice); *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1123 (9th Cir. 2014) (denial of a preliminary injunction); *Kerr v. Jewell*, 836 F.3d 1048, 1053 (9th Cir. 2016) (denial of a motion for reconsideration), *cert. denied sub nom. Kerr v. Haugrud*, 580 U.S. 1198 (2017); *cf. Ryan v. Editions Ltd. W., Inc.*, 786 F.3d 754, 759 (9th Cir. 2015) (denying leave to amend), *cert. denied*, 577 U.S. 876 (2015).

### III. DISCUSSION

#### A.  Antitrust claims

An antitrust claim brought pursuant to Section 1 of the Sherman Act requires a plaintiff to show: "(1) the existence of an agreement, and (2) that the agreement was in unreasonable restraint of trade." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1177–78 (9th Cir.

8          CORONAVIRUS REPORTER V. APPLE, INC.

2016) (quoting *Am. Needle, Inc. v. Nat'l Football League*,
560 U.S. 183, 189-90 (2010)); *FTC v. Qualcomm Inc.*, 969
F.3d 974, 988 (9th Cir. 2020) (citing *Ohio v. Am. Express
Co.*, 138 S. Ct. 2274, 2283 (2018)).

An antitrust claim brought pursuant to Section 2 of the
Sherman Act requires proving the following two elements:
"(1) the defendant has monopoly power in the relevant
market, and (2) the defendant has willfully acquired or
maintained    monopoly    power    in    that    market."
*Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1137
(9th Cir. 2022) (citing *United States v. Grinnell Corp.*, 384
U.S. 563, 570–71 (1966)). To meet the first element, a
plaintiff must "(1) define the relevant market, (2) establish
that the defendant possesses market share in that market
sufficient to constitute monopoly power, and (3) show that
there are significant barriers to entering that market." *Id.*
The second element requires showing that the defendant
undertook    anticompetitive    conduct    that    harms    the
competitive process as a whole, rather than the success or
failure of individual competitors. *Id.*; *see also Brunswick
Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488–89
(1977).

"A threshold step in any antitrust case is to accurately
define the relevant market." *Qualcomm*, 969 F.3d at 992.
For both Section 1 and Section 2 of the Sherman Act, a
relevant market defines "the field in which meaningful
competition is said to exist." *Image Tech. Servs., Inc. v.
Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997).
Market definition is essential to any antitrust case because
"[w]ithout a definition of [the] market there is no way to
measure [the defendant's] ability to lessen or destroy
competition.'" *Am. Express*, 138 S. Ct. at 2285 (quoting
*Walker Process Equip., Inc. v. Food Mach. & Chem.*

**ER_117**

(118 of 149) 24-7288, 03/11/2025, DktEntry: 9.1, Page 118 of 149
Case 3:21-cv-05567-EMC    Document 113    Filed 11/03/23    Page 9 of 1

CORONAVIRUS REPORTER V. APPLE, INC.          9

*Corp.,* 382 U.S. 172, 177 (1965) (alternations in original). "The principle most fundamental to product market definition is 'cross-elasticity of demand' for certain products or services." *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291 (9th Cir. 1979). Cross-elasticity of demand refers to the extent to which consumers view two "products [as] be[ing] reasonably interchangeable" or substitutable for one another. *Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1025 (9th Cir. 2013) (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)). Products or services that are "reasonably interchangeable" should be considered as being in the same market for the purpose of an antitrust claim. *Kaplan*, 611 F.2d at 291–92 (citing *U.S. v. E.I. DuPont De Nemous & Co.*, 351 U.S. 377 (1956)). "A relevant market contains both a geographic component and a product or service component." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 975 (9th Cir. 2023) (citing *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018)). Courts also consider the "practical indicia" of a market, including industrial or public recognition of a market as a separate entity or sensitivity to price changes. *Id.* at 976 (citing *Brown Shoe Co.*, 370 U.S. at 325).

A relevant market can be an aftermarket in which demand depends entirely upon prior purchases in a foremarket. *Id.* (citing *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992) and *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1048 (9th Cir. 2008)). However, such a market generally shows that the defendant exploited consumers' unawareness of the restrictions on the aftermarket and must still show the cross-elasticity required to define a market. *Id.*

10          CORONAVIRUS REPORTER V. APPLE, INC.

The relevant market can also be a two-sided market, with
consumers on both sides of a platform.[2] *PLS.Com, LLC v.
Nat'l Ass'n of Realtors*, 32 F.4th 824, 837–39 (9th Cir.
2022); *see, e.g.*, *Epic Games*, 67 F.4th at 985 (discussing the
"two-sided market for mobile-game transactions," in which
the relevant consumers are both game developers and users).
Under these circumstances, an antitrust plaintiff must show
anticompetitive impact on the "market as a whole." *Id.* at
839 (quoting *Am. Express*, 138 S. Ct. at 2287).

Here, Plaintiffs-Appellants have not adequately defined
the relevant market. Plaintiffs-Appellants' FAC alleged in
scattergun fashion that there were at least fifteen "relevant
markets" pertinent to its antitrust claims but made no effort
at all to define the markets or to distinguish them from one
another.[3] For example, Plaintiffs-Appellants did not clarify

---

[2] "[A] two-sided platform offers different products or services to two
different groups who both depend on the platform to intermediate
between them." *PLS.Com, LLC*, 32 F.4th at 837 (quoting *Am. Express
Co.*, 138 S. Ct. at 2280). In *American Express*, the Supreme Court gave
two examples of two-sided platforms: credit card companies and
newspapers. "Credit card companies, the Court explained, sell credit to
consumers on one side of the market and sell transaction-processing
services to merchants on the other side of the market. Newspapers are
also 'arguably' two-sided platforms: they sell advertising space to
advertisers and news to subscribers." *Id.* (citing *Am. Express*, 138 S. Ct.
at 2280, 2286).

[3] Plaintiffs-Appellants' alleged "relevant markets" are: (1) a
"Smartphone Enhanced National Internet Access Devices" market; (2) a
"smartphone market"; (3) a "single-product iOS Smartphone Enhanced
Internet Access Device" market; (4) "[t]he iOS market"; (5) the "market
for smartphone enhanced commerce and information flow (devices and
apps) transacted via the national internet backbone"; (6) the "institutional
app market"; (7) the "iOS institutional app market"; (8) the "iOS notary
stamps" market; (9) the "iOS onboarding software" market; (10) the
market for access rights to the iOS userbase; (11) the "national

CORONAVIRUS REPORTER V. APPLE, INC.          11

whether the markets that Plaintiffs-Appellants identified are completely different from one another or whether they overlap. Plaintiffs-Appellants later impermissibly tried through a Motion to Strike to narrow their relevant markets to "two foremarkets" and "four downstream markets," but our "[r]eview is limited to the complaint." *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (quoting *Cervantes v. City of San Diego,* 5 F.3d 1273, 1274 (9th Cir.1993)).

Even if we were to review the narrower set of markets posited in Plaintiffs-Appellants' Motion to Strike, the alleged markets lack sufficient clarity to state an antitrust claim plausibly. *See Am. Express*, 138 S. Ct. at 2285. The FAC does not attempt to demonstrate the cross-elasticity of iOS end users' demand either for Plaintiffs-Appellants' rejected apps as compared to other apps, or for apps in general, as it must. *See Kaplan*, 611 F.2d at 291-92. The FAC fails to draw the market's boundaries to "encompass the product at issue as well as all economic substitutes for the product." *Hicks*, 897 F.3d at 1120 (quoting *Newcal*, 513 F.3d at 1045).

Additionally, the Plaintiffs-Appellants allege downstream markets in a manner that implies that the Apple App Store's apps constitute their own market, which amounts to an allegation of a single-brand market. This allegation fails because Plaintiffs-Appellants did not allege the prerequisites for a single-brand market. For example, Plaintiffs-Appellants do not demonstrate that iOS end consumers lacked awareness that buying an iPhone

---

smartphone app distribution market"; (12) the "iOS App market"; (13) the "US iOS Device App market"; (14) the "market of COVID startups"; and (15) "the App Market."

12          CORONAVIRUS REPORTER V. APPLE, INC.

constrains which apps would be available to them through the App Store. *See Epic Games*, 67 F.4th at 976–77 ("[T]o establish a single-brand aftermarket, a plaintiff must show . . . the challenged aftermarket restrictions are 'not generally known' when consumers make their foremarket purchase."). Nor do Plaintiffs-Appellants demonstrate that iOS end users would, if they could do so more readily, obtain apps through means other than Apple's App Store due to cost sensitivity or for other reasons. *See id.* at 976–77 ("[T]o establish a single-brand aftermarket, a plaintiff must show . . . 'significant' monetary or non-monetary switching costs exist."). To the extent that Plaintiffs-Appellants attempt to define a two-sided platform market, they fail to properly allege a relevant market (that is, a category of transactions between developers and consumers on a two-sided platform), given their reference to a broader market for smartphones and the corresponding ability to access apps outside of the Apple App Store's two-sided platform. *See id.* at 976, 985.

Because Plaintiffs-Appellants do not meet the threshold step of defining a relevant market, we reject their antitrust claims and need not proceed further with the analysis. Failing to define a relevant market alone is fatal to an antitrust claim. *See Qualcomm*, 969 F.3d at 992. Without a defined relevant market in terms of product or service, one cannot sensibly or seriously assess market power. *See Epic Games*, 67 F.4th at 975.

Because the Plaintiffs-Appellants did not define the relevant market, it follows that they could not, and did not, establish that the Defendant-Appellee created an agreement that unreasonably restrained trade, as required for a Section 1 claim. *See Aerotec Int'l*, 836 F.3d at 1177–78; *Qualcomm*, 969 F.3d at 988. It also follows that they could not, and did

CORONAVIRUS REPORTER V. APPLE, INC.          13

not, establish that the Defendant-Appellee possesses a market share in a relevant market sufficient to constitute monopoly power, nor did they show that there were existing barriers to entry to that market, as required for a Section 2 claim. *See Dreamstime.com*, 54 F.4th at 1137.[4]

Further, Plaintiffs-Appellants did not demonstrate that the Defendant-Appellee undertook anticompetitive conduct in that market sufficient to harm the competitive process as a whole. *See id.*; *see also Brunswick*, 429 U.S. at 489. Two of Plaintiffs-Appellants' five apps did not get approved for distribution for reasons explicitly set out in the Developer Agreement and the DPLA. Antitrust law does not seek to punish economic behavior that benefits consumers. *See Dreamstime.com*, 54 F.4th at 1137. Disapproval of these two apps on grounds ostensibly designed to protect consumers, absent factual allegations to believe that these disapprovals occurred for pretextual reasons, does not suffice to demonstrate anticompetitive conduct. Further, Plaintiffs-Appellants have not explained why or how they could not distribute their apps by other means, even if not by their most preferred means.

For all of these reasons, Plaintiffs-Appellants' antitrust claims must fail.

### B. Breach of contract

To state a breach of contract claim under California law, plaintiffs must show: (1) there was a contract, (2) plaintiff either performed the contract or has an excuse for nonperformance, (3) defendant breached the contract, and

---

[4] We do not address whether, under different circumstances, a complaint alleging antitrust claims could define a cognizable market encompassing the Apple App Store.

14      CORONAVIRUS REPORTER V. APPLE, INC.

(4) plaintiff suffered damages as a result of defendant's breach. *Hamilton v. Greenwich Invs. XXVI, LLC*, 126 Cal. Rptr. 3d 174, 183 (Cal. Ct. App. 2011).

Here, Plaintiffs-Appellants do not identify relevant specific provisions of the Developer Agreement or the DPLA, much less show that Apple breached a specific provision.   Plaintiffs-Appellants contend that there is a "promise" in the Developer Agreement that "entities with 'deeply rooted medical credentials' were permitted to publish COVID apps on the App Store."   But neither the Developer Agreement nor any other contract between Plaintiffs-Appellants and Defendant-Appellee contains any such guarantee.   Instead, and sharply to the contrary, the DPLA specifically states that Apple has "sole discretion" to approve or deny requests to distribute apps on the App Store. Plaintiffs-Appellants' contract claim fails because there was no breach of contract.   Similarly, in an attempt to make a claim for breach of the covenant of good faith and fair dealing, Plaintiffs-Appellants simply repeat their breach allegations.   This claim likewise fails.

## C.  RICO or fraud

To plead a civil claim under 18 U.S.C. § 1962(c) of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, Plaintiffs must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's business or property." *Living Designs, Inc. v. E.I. Dupont de Nemours & Co*., 431 F.3d 353, 361 (9th Cir. 2005) (quotation marks omitted).   If a corporation is the enterprise, it cannot also at the same time be the RICO defendant.   *See Rae v. Union Bank*, 725 F.2d 478, 481 (9th Cir. 1984).   Parties must allege fraud with particularity under Federal Rule of Civil

Procedure 9(b), including the "who, what, when, where, and how of the misconduct charged . . . ." *See Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 668 (9th Cir. 2019) (internal quotations and citations omitted).

Here, Plaintiffs-Appellants allege that Apple and individuals within Apple's App Store management, App Review, their counsel, and friends formed a RICO enterprise and engaged in predicate acts such as screening Plaintiffs-Appellants' apps for purported compliance with the DPLA while appropriating Plaintiffs-Appellants' ideas into Apple's own competing apps, as well as wire and mail fraud by assigning Apple's App Review employees to give false, pretextual reasons for rejecting the apps of small developers. These allegations center on the conduct of Apple and its employees without describing in any particularity conduct or activity outside of Apple as a corporation. As articulated, this claim makes Apple as a corporation both the enterprise and the RICO defendant, which is not permitted in a RICO claim. *See Rae*, 725 F.2d at 481. To the extent the Plaintiffs-Appellants attempt to make out a further claim for fraud, their allegations are vague and conclusory without the particularity required by FRCP 9(b). *See Depot, Inc.*, 915 F.3d at 668.

## D. Dismissal without leave to amend

Federal Rule of Civil Procedure 15(a) states that leave to amend "shall be freely given when justice so requires," but "[a] district court acts within its discretion to deny leave to amend when amendment would be futile[.]" *Chappel v. Lab'y Corp. of Am.*, 232 F.3d 719, 725–26 (9th Cir. 2000). Here, the district court did not abuse its discretion in concluding that further amendment was not warranted. While the district court dismissed the Plaintiffs-Appellants'

16          CORONAVIRUS REPORTER V. APPLE, INC.

first amended complaint in this case, Plaintiffs-Appellants
were given a total of seven opportunities to amend similar
complaints across jurisdictions and between various
permutations of plaintiffs, but still failed to state their claims
here adequately. It is within the district court's discretion to
determine that an eighth opportunity would produce a
similar result. *See Ryan*, 786 F.3d at 759.

## E. Remaining motions

Because the district court properly dismissed with
prejudice all of the claims against Apple, it correctly denied
the remaining pending motions as moot. The court also
properly denied the motions for reconsideration by finding
that the Plaintiffs-Appellants simply reiterated their prior
claims and did not present newly discovered evidence or
controlling law, nor an error of law or manifest injustice. *See
Sch. Dist. No. 1J v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th
Cir. 1993); *Kerr*, 836 F.3d at 1053.

## IV. CONCLUSION

We affirm the decisions of the district court to dismiss
Plaintiffs-Appellants' FAC for failure to state any claim
under Federal Rule of Civil Procedure 12(b)(6) and to deny
Plaintiffs-Appellants' motions for reconsideration and for
preliminary injunction.

## AFFIRMED.

# Supreme Court of the United States
## Office of the Clerk
## Washington, DC 20543-0001

**Scott S. Harris**
Clerk of the Court
(202) 479-3011

May 13, 2024

Clerk
United States Court of Appeals for the Ninth
Circuit
95 Seventh Street
San Francisco, CA 94103-1526

      Re:  Coronavirus Reporter, et al.
           v. Apple Inc.
           No. 23-1089
           (Your No. 22-15166, 22-15167)

Dear Clerk:

      The Court today entered the following order in the above-entitled case:

      The petition for a writ of certiorari is denied.

Sincerely,

**Scott S. Harris**, Clerk

Dr. Jeffrey D. Isaacs
11482 Key Deer Circle
Wellington, FL 33449

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORONAVIRUS REPORTER,<br>CALID INC,<br>PRIMARY PRODUCTIONS LLC,<br>DR. JEFFREY D. ISAACS,<br>on behalf of themselves and all others similarly situated<br><br>                    Plaintiffs,<br><br>vs.<br><br>APPLE INC.<br>                    Defendant. | Case No. 3:21-cv-5567-EMC<br><br><br>**NOTICE OF APPEAL** |

## NOTICE OF APPEAL

TO: ALL PARTIES AND THEIR COUNSEL OF RECORD:

Notice is hereby given that Dr. Jeffrey D. Isaacs, Plaintiff in the above-named case, hereby appeals to the United States Court of Appeals for the Ninth Circuit from the Order denying the Rule 60 motion, entered on October 28, 2024 as Docket Entry #129, pertaining to the judgment entered on November 30, 2021 as Docket Entry #86 .

Submitted on this 27th day of November, 2024.

/s/ Dr. Jeffrey D. Isaacs
Dr. Jeffrey D. Isaacs
11482 Key Deer Circle
Wellington, FL 33449

## CERTIFICATE OF SERVICE

I, Jeffrey Isaacs, do declare as follows:

I certify that a copy of the foregoing **NOTICE OF APPEAL** was delivered electronically to counsel for the Defendant.

Executed on this 27th day of April, 2024.

/s/ Dr. Jeffrey D. Isaacs
Dr. Jeffrey D. Isaacs
11482 Key Deer Circle
Wellington, FL 33449

ADRMOP,APPEAL,CLOSED,E-ProSe,ProSe,RELATE

# U.S. District Court
## California Northern District (San Francisco)
## CIVIL DOCKET FOR CASE #: 3:21-cv-05567-EMC

Coronavirus Reporter et al v. Apple Inc. et al
Assigned to: Judge Edward M. Chen
Demand: $1,200,000,000
Relate Case Cases:  3:24-cv-08660-EMC
                3:21-cv-06841-EMC
                3:22-cv-01044-EMC
Case in other court:  U.S. Court of Appeals for the Ninth Circuit,
                22-15166
                U.S. Court of Appeals for the Ninth Circuit,
                22-15167
                **21-17123**
Cause: 28:1331 Fed. Question: Anti-trust

Date Filed: 07/20/2021
Date Terminated: 11/30/2021
Jury Demand: Plaintiff
Nature of Suit: 410 Anti-Trust
Jurisdiction: Federal Question

**Plaintiff**

| **Coronavirus Reporter** | represented by | **Keith Mathews** |
|---|---|---|
| | | Associated Attorneys of New England |
| | | 1000 Elm Street, #800 |
| | | Manchester, NH 03101 |
| | | (603) 622-8100 |
| | | Email: Keith@aaone.law |
| | | *LEAD ATTORNEY* |
| | | *PRO HAC VICE* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Keith Mathews , Esq.** |
| | | American Wealth Protection |
| | | 1000 Elm Street, Ste 800 |
| | | 03101 |
| | | Manchester, NH 03101 |
| | | 603-552-5244 |
| | | Email: keith@awplegal.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **S. Michael Kernan** |
| | | Kernan Law Firm |
| | | 9336 Santa Monica Blvd., Suite 450 |
| | | Beverly Hills, CA 90210 |
| | | (323) 802-1741 |
| | | Email: mkernan@kernanlaw.net |
| | | *ATTORNEY TO BE NOTICED* |

Daniel de Zouza Clasen
3746 Foothill Boulevard, Suite 1132
Glendale, CA 91214
(747) 221-4144
Email: info@clasen.law
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Calid Inc**                        represented by  **Keith Mathews**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Keith Mathews , Esq.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**S. Michael Kernan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel de Zouza Clasen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Dr. Jeffrey D Isaacs**          represented by  **Jeffrey D Isaacs**
3553 W CHester Pk
Unit 177
Newtown Square, PA 19073
212-257-0737
Email: jeffreydi@gmail.com
PRO SE

**Plaintiff**

**Primary Productions LLC**    represented by  **S. Michael Kernan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Keith Mathews , Esq.**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Apple Inc.**                       represented by  **Mark A. Perry**

Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
(202) 955-8500
Fax: (202) 467-0539
Email: Mark.Perry@weil.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rachel S. Brass**
Gibson, Dunn & Crutcher LLP
One Embarcadero Center
Suite 2600
San Francisco, CA 94111-3715
415-393-8293
Fax: 415-393-8306
Email: rbrass@gibsondunn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Julian Wolfe Kleinbrodt**
Gibson, Dunn & Crutcher LLP
One Embarcadero Center
Suite 2600
San Francisco, CA 94111-3715
415-393-8382
Email: JKleinbrodt@gibsondunn.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Federal Trade Commission**                  represented by   **Lisa Zeidner Marcus**
*TERMINATED: 11/28/2021*                                        U.S. Department of Justice
                                                               Civil Division, Federal Programs Branch
                                                               1100 L Street, N.W.
                                                               Washington, DC 20005
                                                               (202) 514-3336
                                                               Email: lisa.marcus@usdoj.gov
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

**Interested Party**

**Coronavirus Reporter Corporation**          represented by   **Keith Mathews , Esq.**
                                                               (See above for address)
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/20/2021 | 1 | CLASS ACTION COMPLAINT (with jury demand) against All Defendants (Filing |

**ER_131**

| | | |
|---|---|---|
| | | fee $402, receipt number 0971-16199168). Filed by Coronavirus Reporter, Calid Inc. (Attachments: # 1 Exhibit A - Dr. Roberts CV and CNBC Interview, # 2 Exhibit B - News and Proceedings, # 3 Civil Cover Sheet)(de Souza Clasen, Daniel) (Filed on 7/20/2021) Modified on 7/22/2021 (cjlS, COURT STAFF). (Entered: 07/20/2021) |
| 07/20/2021 | 2 | Proposed Summons. (Attachments: # 1 Summons)(de Souza Clasen, Daniel) (Filed on 7/20/2021) (Entered: 07/20/2021) |
| 07/20/2021 | 3 | MOTION for leave to appear in Pro Hac Vice Re: Keith Mathews (Filing fee $ 317, receipt number 0971-16199183) filed by Coronavirus Reporter. (Attachments: # 1 Exhibit Certificate of Good Standing)(de Souza Clasen, Daniel) (Filed on 7/20/2021) Modified on 7/22/2021 (cjlS, COURT STAFF). (Entered: 07/20/2021) |
| 07/21/2021 | 4 | Case assigned to Magistrate Judge Donna M. Ryu. Counsel for plaintiff or the removing party is responsible for serving the Complaint or Notice of Removal, Summons and the assigned judge's standing orders and all other new case documents upon the opposing parties. For information, visit *E-Filing A New Civil Case* at http://cand.uscourts.gov/ecf/caseopening. Standing orders can be downloaded from the court's web page at www.cand.uscourts.gov/judges. Upon receipt, the summons will be issued and returned electronically. Counsel is required to send chambers a copy of the initiating documents pursuant to L.R. 5-1(e)(7). A scheduling order will be sent by Notice of Electronic Filing (NEF) within two business days. Consent/Declination due by 8/4/2021. (haS, COURT STAFF) (Filed on 7/21/2021) (Entered: 07/21/2021) |
| 07/22/2021 | 5 | Summons Issued as to Apple Inc. (cjlS, COURT STAFF) (Filed on 7/22/2021) (Entered: 07/22/2021) |
| 07/22/2021 | 6 | Summons Issued as to Federal Trade Commission. (cjlS, COURT STAFF) (Filed on 7/22/2021) (Entered: 07/22/2021) |
| 07/22/2021 | 7 | **Initial Case Management Scheduling Order with ADR Deadlines: Case Management Statement due by 10/13/2021. Initial Case Management Conference set for 10/20/2021 01:30 PM in Oakland, Courtroom 4, 3rd Floor. (cjlS, COURT STAFF) (Filed on 7/22/2021) (Entered: 07/22/2021)** |
| 07/23/2021 | | Electronic filing error. This filing will not be processed by the clerks office.Please re-file in its entirety. Re: 3 MOTION for leave to appear in Pro Hac Vice Re: Keith Mathews filed by Coronavirus Reporter. Local co-counsel's address of record listed on the application is located in Wyoming. Counsel is referred to Civil Local Rule 11-3 (3). (amgS, COURT STAFF) (Filed on 7/23/2021) (Entered: 07/23/2021) |
| 07/27/2021 | 8 | MOTION for leave to appear in Pro Hac Vice Re: Keith Mathews (Filing fee $317, receipt number 0971-16199183.) Filing fee previously paid on July 20, 2021 filed by Calid Inc, Coronavirus Reporter. (Attachments: # 1 Exhibit Certificate of Good Standing)(de Souza Clasen, Daniel) (Filed on 7/27/2021) Modified on 7/28/2021 (cjlS, COURT STAFF). (Entered: 07/27/2021) |
| 07/27/2021 | 9 | CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by Calid Inc, Coronavirus Reporter.. (de Souza Clasen, Daniel) (Filed on 7/27/2021) (Entered: 07/27/2021) |

| | | |
|---|---|---|
| 07/27/2021 | 10 | CLERK'S NOTICE OF IMPENDING REASSIGNMENT TO A U.S. DISTRICT COURT JUDGE: The Clerk of this Court will now randomly reassign this case to a District Judge because either (1) a party has not consented to the jurisdiction of a Magistrate Judge, or (2) time is of the essence in deciding a pending judicial action for which the necessary consents to Magistrate Judge jurisdiction have not been secured. You will be informed by separate notice of the district judge to whom this case is reassigned.<br><br>ALL HEARING DATES PRESENTLY SCHEDULED BEFORE THE CURRENT MAGISTRATE JUDGE ARE VACATED AND SHOULD BE RE-NOTICED FOR HEARING BEFORE THE JUDGE TO WHOM THIS CASE IS REASSIGNED.<br><br>*This is a text only docket entry; there is no document associated with this notice*. (ig, COURT STAFF) (Filed on 7/27/2021) (Entered: 07/27/2021) |
| 07/28/2021 | 11 | **ORDER REASSIGNING CASE. Case reassigned using a proportionate, random, and blind system pursuant to General Order No. 44 to Judge Edward M. Chen for all further proceedings. Magistrate Judge Donna M. Ryu no longer assigned to case, Signed by the Clerk on 7/28/2021. (Attachments: # 1 Notice of Eligibility for Video Recording)(anjS, COURT STAFF) (Filed on 7/28/2021) (Entered: 07/28/2021)** |
| 08/04/2021 | 12 | NOTICE of Appearance by Mark A. Perry *(for Apple Inc.)* (Perry, Mark) (Filed on 8/4/2021) (Entered: 08/04/2021) |
| 08/04/2021 | 13 | NOTICE of Appearance by Rachel S. Brass *(for Apple Inc.)* (Brass, Rachel) (Filed on 8/4/2021) (Entered: 08/04/2021) |
| 08/04/2021 | 14 | Corporate Disclosure Statement by Apple Inc. *and Certificate of Interested Entities or Persons* (Brass, Rachel) (Filed on 8/4/2021) (Entered: 08/04/2021) |
| 08/04/2021 | 15 | NOTICE by Apple Inc. *of Related Case* (Attachments: # 1 Exhibit A)(Brass, Rachel) (Filed on 8/4/2021) (Entered: 08/04/2021) |
| 08/04/2021 | 16 | **ORDER by Judge Edward M. Chen granting 8 Motion for Pro Hac Vice. (afmS, COURT STAFF) (Filed on 8/4/2021) (Entered: 08/04/2021)** |
| 08/05/2021 | 17 | OBJECTION to 15 Ex Parte Application for Relation to App Store Fees Case; Referral for Attorney Misconduct by Calid Inc, Coronavirus Reporter. (Mathews, Keith) (Filed on 8/5/2021) Modified on 8/6/2021 (gbaS, COURT STAFF). (Entered: 08/05/2021) |
| 08/05/2021 | 18 | **ORDER Re 15 Notice of Related Case. Signed by Judge Edward M. Chen on 8/5/2021. (emcsec, COURT STAFF) (Filed on 8/5/2021) (Entered: 08/05/2021)** |
| 08/05/2021 | 19 | **Judicial Referral for Purpose of Determining Relationship of Cases re 18 re C-19-3074, *Cameron v. Apple*. Signed by Judge Edward M. Chen on 8/5/2021. (afmS, COURT STAFF) (Filed on 8/5/2021) (Entered: 08/05/2021)** |
| 08/08/2021 | 20 | MOTION for Preliminary Injunction *Enjoining Restriction of Interstate Institutional App Marketplace, Including Critical COVID 19 Pandemic Response Applications* filed by Calid Inc, Coronavirus Reporter. Motion Hearing set for 9/9/2021 01:30 PM in San Francisco, Courtroom 05, 17th Floor before Judge Edward M. Chen. Responses due by 8/23/2021. Replies due by 8/30/2021. (Attachments: # 1 Proposed Order Proposed App Store Injunction)(Mathews, Keith) (Filed on 8/8/2021) (Entered: 08/08/2021) |

| 08/09/2021 | 21 | **ORDER re CASES ARE NOT RELATED.** Signed by Judge Yvonne Gonzalez Rogers on 8/9/2021. (fs, COURT STAFF) (Filed on 8/9/2021) (Entered: 08/09/2021) |
|---|---|---|
| 08/09/2021 | 22 | **CLERK'S NOTICE: Pursuant to Local Rule 7-2(a), Court RESCHEDULES motion hearing from 9/9/2021 to 9/16/2021 at 1:30PM:** Motion hearing re **20** MOTION for Preliminary Injunction *Enjoining Restriction of Interstate Institutional App Marketplace, Including Critical COVID 19 Pandemic Response Applications* erroneously set for 9/9/2021 is vacated and rescheduled for 9/16/2021 01:30 PM in San Francisco, - Videoconference Only before Judge Edward M. Chen. This proceeding will be held via a Zoom webinar. Motion briefing deadlines remain unchanged.<br><br>**Webinar Access:** All counsel, members of the public, and media may access the webinar information at **https://www. cand.uscourts.gov/emc**<br><br>**General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.<br><br>**Zoom Guidance and Setup: https://www.cand.uscourts.gov/zoom/.**<br><br>**Motion Hearing set for 9/16/2021 01:30 PM in San Francisco, - Videoconference Only before Judge Edward M. Chen.** *(This is a text-only entry generated by the court. There is no document associated with this entry.)*(afmS, COURT STAFF) (Filed on 8/9/2021) (Entered: 08/09/2021) |
| 08/09/2021 | 23 | **CLERK'S NOTICE RESCHEDULING HEARING RE 20 MOTION FOR PRELIMINARY INJUNCTION FROM 9/16/2021 TO 10/14/2021 AT 1:30PM.** Hearing as to **20** MOTION for Preliminary Injunction set for 9/16/2021 is vacated and rescheduled for 10/14/2021 01:30 PM in San Francisco, - Videoconference Only before Judge Edward M. Chen. Motion briefing deadlines remain unchanged. This proceeding will be held via a Zoom webinar.<br><br>**Webinar Access:** All counsel, members of the public, and media may access the webinar information at **https://www.cand.uscourts.gov/emc**<br><br>**General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are remin ded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.<br><br>**Zoom Guidance and Setup: https://www.cand.uscourts.gov/zoom/.**<br><br>**Motion Hearing set for 10/14/2021 01:30 PM in San Francisco, - Videoconference Only before Judge Edward M. Chen.** *(This is a text-only entry generated by the court. There is no document associated with this entry.)*(afmS, COURT STAFF) (Filed on 8/9/2021) (Entered: 08/09/2021) |
| 08/09/2021 | 24 | MOTION for Extension of Time to File Answer filed by Apple Inc.. (Attachments: # 1 |

| | | |
|---|---|---|
| | | Proposed Order)(Brass, Rachel) (Filed on 8/9/2021) Modified on 8/11/2021 (gbaS, COURT STAFF). (Entered: 08/09/2021) |
| 08/09/2021 | 25 | Declaration of Rachel S. Brass in Support of 24 MOTION for Extension of Time to File Answer filed by Apple Inc.. (Related document(s) 24 ) (Brass, Rachel) (Filed on 8/9/2021) Modified on 8/11/2021 (gbaS, COURT STAFF). (Entered: 08/09/2021) |
| 08/10/2021 | 26 | **CLERK'S NOTICE RE: 24 MOTION for Extension of Time to File Answer: Plaintiff's opposition is due no later than 8/11/2021 by 9:00AM. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (afmS, COURT STAFF) (Filed on 8/10/2021) (Entered: 08/10/2021)** |
| 08/11/2021 | 27 | OPPOSITION/RESPONSE (re 24 MOTION for Extension of Time to File Answer *(Defendant's Rule 6-3 Motion to Enlarge Time to Respond to Plaintiffs' Complaint)* ) filed byCalid Inc, Coronavirus Reporter. (Mathews, Keith) (Filed on 8/11/2021) (Entered: 08/11/2021) |
| 08/11/2021 | 28 | AMENDED Objection by Calid Inc, Coronavirus Reporter. Amendment to 27 Opposition/Response to Motion. (Attachments: # 1 Exhibit Exhibit A March 2020 Notice of Injunctive Relief)(Mathews, Keith) (Filed on 8/11/2021) Modified on 8/12/2021 (gbaS, COURT STAFF). (Entered: 08/11/2021) |
| 08/11/2021 | 29 | **ORDER by Judge Edward M. Chen granting 24 Motion for Extension of Time to Respond to Plaintiff's Complaint. Answer due 8/23/2021. (afmS, COURT STAFF) (Filed on 8/11/2021) (Entered: 08/11/2021)** |
| 08/16/2021 | 30 | NOTICE of Pendency of Other Action or Proceeding by Apple Inc. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Brass, Rachel) (Filed on 8/16/2021) Modified on 8/19/2021 (gbaS, COURT STAFF). (Entered: 08/16/2021) |
| 08/16/2021 | 31 | NOTICE of Appearance by Julian Wolfe Kleinbrodt (Kleinbrodt, Julian) (Filed on 8/16/2021) (Entered: 08/16/2021) |
| 08/23/2021 | 32 | OPPOSITION/RESPONSE (re 20 MOTION for Preliminary Injunction *Enjoining Restriction of Interstate Institutional App Marketplace, Including Critical COVID 19 Pandemic Response Applications* ) filed byApple Inc.. (Brass, Rachel) (Filed on 8/23/2021) (Entered: 08/23/2021) |
| 08/23/2021 | 33 | Declaration of RACHEL S. BRASS in Support of 32 Opposition/Response to Motion, *(re 20 MOTION for Preliminary Injunction)* filed byApple Inc.. (Attachments: # 1 Exhibit 1, Brass Decl., # 2 Exhibit 2, Brass Decl., # 3 Exhibit 3, Brass Decl., # 4 Exhibit 4, Brass Decl., # 5 Exhibit 5, Brass Decl., # 6 Exhibit 6, Brass Decl., # 7 Exhibit 7, Brass Decl., # 8 Exhibit 8, Brass Decl., # 9 Exhibit 9, Brass Decl., # 10 Exhibit 10, Brass Decl., # 11 Exhibit 11, Brass Decl., # 12 Exhibit 12, Brass Decl., # 13 Exhibit 13, Brass Decl., # 14 Exhibit 14, Brass Decl., # 15 Exhibit 15, Brass Decl., # 16 Exhibit 16, Brass Decl., # 17 Exhibit 17, Brass Decl., # 18 Exhibit 18, Brass Decl., # 19 Exhibit 19, Brass Decl., # 20 Exhibit 20, Brass Decl., # 21 Exhibit 21, Brass Decl., # 22 Exhibit 22, Brass Decl., # 23 Exhibit 23, Brass Decl., # 24 Exhibit 24, Brass Decl., # 25 Exhibit 25, Brass Decl.)(Related document(s) 32 ) (Brass, Rachel) (Filed on 8/23/2021) (Entered: 08/23/2021) |
| 08/23/2021 | 34 | Declaration of TRYSTAN KOSMYNKA in Support of 32 Opposition/Response to Motion, *(re 20 MOTION for Preliminary Injunction)* filed byApple Inc.. (Attachments: # 1 Exhibit A, T. Kosmynka Decl'n)(Related document(s) 32 ) (Brass, Rachel) (Filed |

| | | |
|---|---|---|
| | | on 8/23/2021) (Entered: 08/23/2021) |
| 08/23/2021 | 35 | MOTION to Dismiss filed by Apple Inc.. Motion Hearing set for 10/14/2021 01:30 PM in San Francisco, Courtroom 05, 17th Floor before Judge Edward M. Chen. Responses due by 9/7/2021. Replies due by 9/14/2021. (Attachments: # 1 Proposed Order)(Brass, Rachel) (Filed on 8/23/2021) (Entered: 08/23/2021) |
| 08/23/2021 | 36 | Declaration of RACHEL S. BRASS in Support of 35 MOTION to Dismiss filed byApple Inc.. (Attachments: # 1 Exhibit A, Brass Decl'n, # 2 Exhibit B, Brass Decl'n, # 3 Exhibit C, Brass Decl'n, # 4 Exhibit D, Brass Decl'n, # 5 Exhibit E, Brass Decl'n, # 6 Exhibit F, Brass Decl'n, # 7 Exhibit G, Brass Decl'n, # 8 Exhibit H, Brass Decl'n) (Related document(s) 35 ) (Brass, Rachel) (Filed on 8/23/2021) (Entered: 08/23/2021) |
| 08/28/2021 | 37 | STIPULATION WITH PROPOSED ORDER re 32 Opposition/Response to Motion, *Stipulation Regarding Briefing Schedules* filed by Calid Inc, Coronavirus Reporter. (Mathews, Keith) (Filed on 8/28/2021) (Entered: 08/28/2021) |
| 08/30/2021 | 38 | **ORDER GRANTING 37 STIPULATION REGARDING BRIEFING SCHEDULE RELATING TO PLAINTIFFS MOTION FOR PRELIMINARY INJUNCTION AND DEFENDANTS MOTION TO DISMISS. Plaintiffs Reply to Defendant Apple Inc.s Opposition to Motion For Preliminary Injunction due on 9/7/2021; Apples Reply in Support of its Motion to Dismiss will be due on 9/21/2021. Signed by Judge Edward M. Chen on 8/30/2021. (afmS, COURT STAFF) (Filed on 8/30/2021) (Entered: 08/30/2021)** |
| 09/01/2021 | 39 | NOTICE of Appearance by S. Michael Kernan (Kernan, S.) (Filed on 9/1/2021) (Entered: 09/01/2021) |
| 09/03/2021 | 40 | MOTION to Relate Case filed by Apple Inc.. (Attachments: # 1 Exhibit A (Redline Comparison of Operative Complaints), # 2 Declaration of Rachel Brass, # 3 Proposed Order)(Brass, Rachel) (Filed on 9/3/2021) (Entered: 09/03/2021) |
| 09/06/2021 | 41 | AMENDED COMPLAINT against Apple Inc., Federal Trade Commission. Filed byCalid Inc, Coronavirus Reporter, Dr. Jeffrey D. Isaacs, Primary Productions LLC. (Attachments: # 1 Exhibit A - International Consensus of App Store Monopoly, # 2 Exhibit B - Evidence submitted by Dr. Roberts, # 3 Exhibit C - Apple Anticompetitive Behavior, Conclusions of Law by Cravath)(Mathews, Keith) (Filed on 9/6/2021) (Entered: 09/06/2021) |
| 09/07/2021 | 42 | REPLY (re 20 MOTION for Preliminary Injunction *Enjoining Restriction of Interstate Institutional App Marketplace, Including Critical COVID 19 Pandemic Response Applications* ) filed byCalid Inc, Coronavirus Reporter. (Mathews, Keith) (Filed on 9/7/2021) (Entered: 09/07/2021) |
| 09/08/2021 | 43 | **ORDER RELATING CASE. Civil action 21-cv-06841-JSC, *Primary Productions LLC v. Apple Inc*. related. Signed by Judge Edward M. Chen on 9/8/2021. (afmS, COURT STAFF) (Filed on 9/8/2021) (Entered: 09/08/2021)** |
| 09/09/2021 | 44 | Notice of Withdrawal of Motion *to Dismiss and Motion to Strike* (Brass, Rachel) (Filed on 9/9/2021) (Entered: 09/09/2021) |
| 09/20/2021 | 45 | MOTION to Dismiss *and Motion to Strike Plaintiffs' Amended Complaint* filed by Apple Inc.. Motion Hearing set for 10/28/2021 01:30 PM in San Francisco, Courtroom 05, 17th Floor before Judge Edward M. Chen. Responses due by 10/4/2021. Replies due by 10/12/2021. (Attachments: # 1 Proposed Order)(Brass, Rachel) (Filed on |

| | | 9/20/2021) (Entered: 09/20/2021) |
|---|---|---|
| 09/20/2021 | 46 | Declaration of Rachel S. Brass in Support of 45 MOTION to Dismiss *and Motion to Strike Plaintiffs' Amended Complaint* filed byApple Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Related document(s) 45 ) (Brass, Rachel) (Filed on 9/20/2021) (Entered: 09/20/2021) |
| 09/20/2021 | 47 | ADMINISTRATIVE MOTION for Leave to File Sur-Reply Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction filed by Apple Inc.. Responses due by 9/24/2021. (Attachments: # 1 Sur-Reply Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction, # 2 Proposed Order)(Brass, Rachel) (Filed on 9/20/2021) (Entered: 09/20/2021) |
| 09/20/2021 | 48 | Declaration of Rachel S. Brass in Support of 47 ADMINISTRATIVE MOTION for Leave to File Sur-Reply Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction filed byApple Inc.. (Related document(s) 47 ) (Brass, Rachel) (Filed on 9/20/2021) (Entered: 09/20/2021) |
| 09/21/2021 | 49 | **CLERK'S NOTICE RESCHEDULING HEARINGS ON 20 AND 45 TO NOVEMBER 4, 2021 AT 1:30PM: Motion Hearing re: 20 Motion for Preliminary Injunction and 45 Motion to Dismiss set for 11/4/2021 01:30 PM in San Francisco, - Videoconference Only before Judge Edward M. Chen. This proceeding will be held via a Zoom webinar. Motion briefing deadlines remain unchanged.** <br><br>**Webinar Access: All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/emc** <br><br>**General Order 58. Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.** <br><br>**Zoom Guidance and Setup: https://www.cand.uscourts.gov/zoom/ .** <br><br>**20 MOTION for Preliminary Injunction *Enjoining Restriction of Interstate Institutional App Marketplace, Including Critical COVID 19 Pandemic Response Applications*, 45 MOTION to Dismiss *and Motion to Strike Plaintiffs' Amended Complaint*. Motion Hearing set for 11/4/2021 01:30 PM in San Francisco, - Videoconference Only before Judge Edward M. Chen. *(This is a text-only entry generated by the court. There is no document associated with this entry.)*(afmS, COURT STAFF) (Filed on 9/21/2021) (Entered: 09/21/2021)** |
| 09/24/2021 | 50 | **\*\*Duplicate entry of docket no. 52 \*\*** <br><br>MOTION for Preliminary Injunction *and to Append UCL Count from Epic Guilty Verdict* filed by Calid Inc, Coronavirus Reporter. Motion Hearing set for 11/4/2021 01:30 PM in San Francisco, Courtroom 05, 17th Floor before Judge Edward M. Chen. Responses due by 10/8/2021. Replies due by 10/15/2021. (Attachments: # 1 Proposed Order Proposed Injunction to Stop Apple's Strangling of Competitor Apps, # 2 Exhibit Proposed FAC Addendum addressing Apple guilty UCL verdict and Apple RICO conduct evidenced by quid pro quo at Historically Black College University(HBCU) scandal)(Mathews, Keith) (Filed on 9/24/2021) Modified on 9/27/2021 (gbaS, COURT STAFF). (Entered: 09/24/2021) |

| 09/24/2021 | 51 | MOTION to Strike 45 MOTION to Dismiss *and Motion to Strike Plaintiffs' Amended Complaint* filed by Calid Inc, Coronavirus Reporter, Primary Productions LLC. Motion Hearing set for 11/4/2021 01:30 PM in San Francisco, Courtroom 05, 17th Floor before Judge Edward M. Chen. Responses due by 10/8/2021. Replies due by 10/15/2021. (Mathews, Keith) (Filed on 9/24/2021) (Entered: 09/24/2021) |
| 09/24/2021 | | Electronic filing error. Re: 50 MOTION for Preliminary Injunction and to Append UCL Count from Epic Guilty Verdict filed by Calid Inc, Coronavirus Reporter. This filing w ill not be processed by the clerks office. Please re-file attachment -2 as the document is corrupt. (gbaS, COURT STAFF) (Filed on 9/24/2021) (Entered: 09/24/2021) |
| 09/24/2021 | 52 | MOTION for Preliminary Injunction *and to Append UCL Count from Epic Guilty Verdict* filed by Calid Inc, Coronavirus Reporter. Motion Hearing set for 11/4/2021 01:30 PM in San Francisco, Courtroom 05, 17th Floor before Judge Edward M. Chen. Responses due by 10/8/2021. Replies due by 10/15/2021. (Attachments: # 1 Proposed Order Proposed Order Proposed Injunction to Stop Apple's Strangling of Competitor Apps, # 2 **document is corrupt, refer to docket no. 53** Exhibit Proposed FAC Addendum addressing Apple guilty UCL verdict and Apple RICO conduct evidenced by quid pro quo at Historically Black College University(HBCU) scandal)(Mathews, Keith) (Filed on 9/24/2021) Modified on 9/27/2021 (gbaS, COURT STAFF). (Entered: 09/24/2021) |
| 09/24/2021 | 53 | EXHIBITS re 50 MOTION for Preliminary Injunction *and to Append UCL Count from Epic Guilty Verdict*, 52 MOTION for Preliminary Injunction *and to Append UCL Count from Epic Guilty Verdict Proposed FAC Addendum addressing Apple guilty UCL verdict and Apple RICO conduct evidenced by quid pro quo at Historically Black College University(HBCU) scandal* filed byCalid Inc, Coronavirus Reporter. (Related document(s) 50 , 52 ) (Mathews, Keith) (Filed on 9/24/2021) (Entered: 09/24/2021) |
| 09/26/2021 | **54** | **ORDER by Judge Edward M. Chen granting 47 Administrative Motion for Leave to File Sur-Reply Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction filed by Apple Inc. (afmS, COURT STAFF) (Filed on 9/26/2021) (Entered: 09/26/2021)** |
| 10/04/2021 | 55 | OPPOSITION/RESPONSE (re 45 MOTION to Dismiss *and Motion to Strike Plaintiffs' Amended Complaint* ) filed byCalid Inc, Coronavirus Reporter, Jeffrey D Isaacs, Primary Productions LLC. (Kernan, S.) (Filed on 10/4/2021) (Entered: 10/04/2021) |
| 10/04/2021 | 56 | Request for Judicial Notice re 55 Opposition/Response to Motion filed byCalid Inc, Coronavirus Reporter, Jeffrey D Isaacs, Primary Productions LLC. (Related document(s) 55 ) (Kernan, S.) (Filed on 10/4/2021) (Entered: 10/04/2021) |
| 10/05/2021 | 57 | OPPOSITION/RESPONSE (re 45 MOTION to Dismiss *and Motion to Strike Plaintiffs' Amended Complaint* ) *CORRECTION OF DOCKET # 55* filed byCalid Inc, Coronavirus Reporter, Jeffrey D Isaacs, Primary Productions LLC. (Kernan, S.) (Filed on 10/5/2021) (Entered: 10/05/2021) |
| 10/05/2021 | 58 | Request for Judicial Notice re 57 Opposition/Response to Motion, *CORRECTION OF DOCKET # 56* filed byCalid Inc, Coronavirus Reporter, Jeffrey D Isaacs, Primary Productions LLC. (Related document(s) 57 ) (Kernan, S.) (Filed on 10/5/2021) (Entered: 10/05/2021) |

| | | |
|---|---|---|
| 10/06/2021 | 59 | ADMINISTRATIVE MOTION for Leave to File a Consolidated Opposition to Plaintiffs' Motion to Strike and Reply in Support of Defendant's Motion to Dismiss filed by Apple Inc.. Responses due by 10/12/2021. (Attachments: # 1 Declaration of Rachel S. Brass, # 2 Proposed Order)(Brass, Rachel) (Filed on 10/6/2021) (Entered: 10/06/2021) |
| 10/07/2021 | 60 | OPPOSITION/RESPONSE (re 59 ADMINISTRATIVE MOTION for Leave to File a Consolidated Opposition to Plaintiffs' Motion to Strike and Reply in Support of Defendant's Motion to Dismiss ) filed byCalid Inc, Coronavirus Reporter, Primary Productions LLC. (Mathews, Keith) (Filed on 10/7/2021) (Entered: 10/07/2021) |
| 10/07/2021 | 61 | **ORDER by Judge Edward M. Chen granting 59 Administrative Motion for leave to file a consolidated opposition. Apple may file a single 25-page brief in response to 51 45 no later than 10/12/2021. (afmS, COURT STAFF) (Filed on 10/7/2021) (Entered: 10/07/2021)** |
| 10/08/2021 | 62 | OPPOSITION/RESPONSE (re 52 MOTION for Preliminary Injunction *and to Append UCL Count from Epic Guilty Verdict* ) filed byApple Inc.. (Attachments: # 1 Appendix A)(Brass, Rachel) (Filed on 10/8/2021) (Entered: 10/08/2021) |
| 10/08/2021 | 63 | Declaration of Rachel S. Brass in Support of 62 Opposition/Response to Motion filed byApple Inc.. (Related document(s) 62 ) (Brass, Rachel) (Filed on 10/8/2021) (Entered: 10/08/2021) |
| 10/12/2021 | 64 | OPPOSITION/RESPONSE (re 51 MOTION to Strike 45 MOTION to Dismiss *and Motion to Strike Plaintiffs' Amended Complaint* ) and REPLY (re *45 MOTION to Dismiss and Motion to Strike Plaintiffs' Amended Complaint)* filed byApple Inc.. (Brass, Rachel) (Filed on 10/12/2021) (Entered: 10/12/2021) |
| 10/25/2021 | 65 | NOTICE by Calid Inc, Coronavirus Reporter *Of Related Petitions to United States Supreme Court Regarding Gibson Dunn Litigation Conduct* (Attachments: # 1 Exhibit Exhibit A - Fees certiorari petition re Defendants Gibson Dunn, University of Southern California, # 2 Exhibit Exhibit B- MTD certiorari petition re Defendants Gibson Dunn, USC)(Mathews, Keith) (Filed on 10/25/2021) (Entered: 10/25/2021) |
| 10/25/2021 | 66 | NOTICE by Calid Inc, Coronavirus Reporter *for Mr. Eddy Cue to Appear at Preliminary Injunction Hearing On App Store Censorship* (Attachments: # 1 Exhibit A- Subpoena for Apple Senior Vice President Mr. Eddy Cue to testify at November 4 hearing for Preliminary Injunction to stop App Store censorship; service accepted by stipulation with Apple on October 24)(Mathews, Keith) (Filed on 10/25/2021) (Entered: 10/25/2021) |
| 10/25/2021 | 67 | NOTICE by Calid Inc, Coronavirus Reporter *for FTC Chair Lina Khan to Appear at Preliminary Injunction Hearing On App Store Censorship* (Mathews, Keith) (Filed on 10/25/2021) (Entered: 10/25/2021) |
| 10/25/2021 | 68 | NOTICE by Calid Inc, Coronavirus Reporter *for Defendant Apple Inc to appear by representative at Preliminary Injunction Hearing on App Store Censorship. Document production subpoena concerning March 2020 COVID-19 app ban & apparent spoliation of App Store correspondence. Request for Court allocation of four hours for hearing proceeding.* (Mathews, Keith) (Filed on 10/25/2021) (Entered: 10/25/2021) |
| 10/27/2021 | 69 | NOTICE of Appearance by Lisa Zeidner Marcus *on behalf of federal defendant the Federal Trade Commission* (Marcus, Lisa) (Filed on 10/27/2021) (Entered: |

| | | 10/27/2021) |
|---|---|---|
| 10/27/2021 | 70 | EXHIBITS re 41 Amended Complaint, *Exhibit A - International Consensus of App Store Monopoly, resubmission due to PDF error* filed byCalid Inc, Coronavirus Reporter, Primary Productions LLC. (Related document(s) 41 ) (Mathews, Keith) (Filed on 10/27/2021) (Entered: 10/27/2021) |
| 10/27/2021 | 71 | EXHIBITS re 55 Opposition/Response to Motion *White House Letter substantiating Gibson Dunn political retaliation against Dr. Jeffrey Isaacs and conflict of interest in representing Apple Inc* filed byCalid Inc, Coronavirus Reporter. (Related document(s) 55 ) (Mathews, Keith) (Filed on 10/27/2021) (Entered: 10/27/2021) |
| 10/29/2021 | 72 | RESPONSE re 67 Notice (Other), 66 Notice (Other), 68 Notice (Other), by Apple Inc.. (Brass, Rachel) (Filed on 10/29/2021) (Entered: 10/29/2021) |
| 10/31/2021 | 73 | RESPONSE re 72 Response ( Non Motion ) *In Support of Live Testimony of Mr. Eddy Cue As Requested on August 8th* by Calid Inc, Coronavirus Reporter. (Attachments: # 1 Exhibit Deposition and testimony emails with Gibson Dunn)(Mathews, Keith) (Filed on 10/31/2021) (Entered: 10/31/2021) |
| 11/01/2021 | 74 | MOTION to Quash *and for Protective Order* filed by Apple Inc.. Motion Hearing set for 12/9/2021 01:30 PM in San Francisco, Courtroom 05, 17th Floor before Judge Edward M. Chen. Responses due by 11/15/2021. Replies due by 11/22/2021. (Attachments: # 1 Proposed Order)(Brass, Rachel) (Filed on 11/1/2021) (Entered: 11/01/2021) |
| 11/01/2021 | 75 | Declaration of Rachel S. Brass in Support of 74 MOTION to Quash *and for Protective Order* filed byApple Inc.. (Related document(s) 74 ) (Brass, Rachel) (Filed on 11/1/2021) (Entered: 11/01/2021) |
| 11/02/2021 | 76 | OPPOSITION/RESPONSE (re 74 MOTION to Quash *and for Protective Order* ) *Positing Live Testimony at November 4 Injunction Hearing-Trial by Mr. Eddy Cue, or alternatively Apple CEO Tim Cook, is required by governing ad testificandum subpoena, and does not constitute early discovery, as Gibson Dunn improperly alleges* filed byCalid Inc, Coronavirus Reporter. (Mathews, Keith) (Filed on 11/2/2021) (Entered: 11/02/2021) |
| 11/04/2021 | 77 | **Minute Entry for proceedings held before Judge Edward M. Chen:**<br><br>**Motion Hearing held on 11/4/2021. Court takes under submission re 45 , 51 , 45 , 52 , 20 Motions for Preliminary Injunction and Motions to Dismiss and Strike.**<br><br>**Total Time in Court: 26 Minutes.**<br>**Court Reporter: Belle Ball.**<br><br>**Plaintiff Attorneys: Keith Mathews, Jeffrey Isaacs.**<br>**Defendant Attorneys: Rachel Brass, Julian Kleinbrodt.**<br><br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)* **(afm, COURT STAFF) (Date Filed: 11/4/2021) (Entered: 11/04/2021)** |
| 11/05/2021 | 78 | TRANSCRIPT ORDER for proceedings held on 11/04/2021 before Judge Edward M. |

| | | |
|---|---|---|
| | | Chen by Apple Inc., for Court Reporter Belle Ball. (Brass, Rachel) (Filed on 11/5/2021) (Entered: 11/05/2021) |
| 11/08/2021 | 79 | MOTION to Dismiss filed by Federal Trade Commission. Motion Hearing set for 1/20/2022 01:30 PM in San Francisco, - Videoconference Only before Judge Edward M. Chen. Responses due by 11/22/2021. Replies due by 11/29/2021. (Attachments: # 1 Ex. A (Decl. of Lisa Zeidner Marcus), # 2 Ex. A-1, # 3 Ex. A-2, # 4 Ex. A-3, # 5 Ex. A-4, # 6 Ex. A-5, # 7 Ex. A-6, # 8 Ex. A-7, # 9 Proposed Order)(Marcus, Lisa) (Filed on 11/8/2021) (Entered: 11/08/2021) |
| 11/09/2021 | 80 | STIPULATION WITH PROPOSED ORDER *Setting Briefing Schedule for Federal Defendants Motion to Dismiss* filed by Federal Trade Commission. (Marcus, Lisa) (Filed on 11/9/2021) (Entered: 11/09/2021) |
| 11/09/2021 | 81 | **STIPULATION AND ORDER RE 80 Setting Briefing Schedule for Federal Defendants Motion to Dismiss. Opposition due by 12/3/2021. Replies due by 12/17/2021.Signed by Judge Edward M. Chen on 11/9/2021. (cl, COURT STAFF) (Filed on 11/9/2021)** <br><br> Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF) <br><br> **(Entered: 11/09/2021)** |
| 11/15/2021 | 82 | Transcript of Proceedings held on 11/4/21, before Judge Edward M. Chen. Court Reporter Belle Ball, CSR, telephone number (415)373-2529, belle_ball@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re 78 Transcript Order ) Redaction Request due 12/6/2021. Redacted Transcript Deadline set for 12/16/2021. Release of Transcript Restriction set for 2/13/2022. (Related documents(s) 78 ) (Ball, Belle) (Filed on 11/15/2021) (Entered: 11/15/2021) |
| 11/23/2021 | 83 | NOTICE of Voluntary Dismissal *as to Federal Trade Commission*. *The Administrative Procedure Act (APA) cause of action is withdrawn by agreement*. by Coronavirus Reporter (Mathews, Keith) (Filed on 11/23/2021) (Entered: 11/23/2021) |
| 11/29/2021 | 84 | TRANSCRIPT ORDER for proceedings held on 11/04/2021 before Judge Edward M. Chen by Coronavirus Reporter, for Court Reporter Belle Ball. (Kernan, S.) (Filed on 11/29/2021) (Entered: 11/29/2021) |
| 11/30/2021 | 85 | **ORDER GRANTING DEFENDANT'S MOTION TO DISMISS, AND DENYING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION, TO STRIKE, AND TO APPEND CLAIM by Judge Edward M. Chen. (afm, COURT STAFF) (Filed on 11/30/2021)** <br><br> Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF) <br><br> **(Entered: 11/30/2021)** |
| 11/30/2021 | 86 | **JUDGMENT. Signed by Judge Edward M. Chen on 11/30/2021. (afm, COURT STAFF) (Filed on 11/30/2021)** <br><br> Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic |

| | | |
|---|---|---|
| | | **(Entered: 11/30/2021)** |
| 12/27/2021 | 87 | MOTION for Reconsideration and Relief from Judgment for manifest error failing to recognize relevant Sherman markets for zero-priced digital goods re 85 Order on Motion to Dismiss, Order on Motion to Strike, Order on Motion for Preliminary Injunction, Order on Motion to Quash, filed by Calid Inc, Coronavirus Reporter, Primary Productions LLC. (Attachments: # 1 Proposed Order Denying Defendant Apple's Motion to Dismiss, # 2 Exhibit The Coring Company vs. Apple complaint filed in Florida Southern District, Alleging Patent Infringement and Related Sherman Act violations for Patent Issued to Plaintiff Dr. Jeffrey Isaacs December 7 2021) (Mathews, Keith) (Filed on 12/27/2021) Modified on 12/28/2021 (gba, COURT STAFF). (Entered: 12/27/2021) |
| 12/27/2021 | 88 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Calid Inc, Coronavirus Reporter. Appeal of Order on Motion to Dismiss,, Order on Motion to Strike,, Order on Motion for Preliminary Injunction, Order on Motion to Quash, 85 , MOTION for Preliminary Injunction *Enjoining Restriction of Interstate Institutional App Marketplace, Including Critical COVID 19 Pandemic Response Applications* 20 , *MOTION for Preliminary Injunction and to Append UCL Count from Epic Guilty Verdict* 52 *(Appeal fee Not Paid) Preliminary Injunction Appeal to Restrain Apple from Censorship of Free Apps (Attachments: # 1 Supplement Completed Ninth Circuit Appeal Form)(Mathews, Keith)* **21-17123** *(Filed on 12/27/2021) Modified on 12/28/2021 (gba, COURT STAFF). Modified on 12/28/2021 (gba, COURT STAFF). (Entered: 12/27/2021)* |
| 12/28/2021 | 89 | **CLERK'S NOTICE Continuing Motion Hearing as to 87 MOTION for Reconsideration and Relief from Judgment. Motion Hearing set for 2/10/2022 01:30 PM in San Francisco, - Videoconference Only before Judge Edward M. Chen. This proceeding will be held via a Zoom webinar.** ***Responses due by 1/10/2022. Replies due by 1/17/2022.*** <br><br> ***(This is a text-only entry generated by the court. There is no document associated with this entry.)***,(vla, COURT STAFF) (Filed on 12/28/2021) <br><br> Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF) <br><br> **(Entered: 12/28/2021)** |
| 12/28/2021 | | Set/Reset Deadlines as to 87 MOTION for Reconsideration and Relief from Judgment. Replies due by 1/17/2022. (vla, COURT STAFF) (Filed on 12/28/2021) (Entered: 12/28/2021) |
| 12/28/2021 | 90 | USCA Case Number **21-17123** for 88 Notice of Appeal to the Ninth Circuit, filed by Calid Inc, Coronavirus Reporter. (gba, COURT STAFF) (Filed on 12/28/2021) (Entered: 12/28/2021) |
| 12/28/2021 | 91 | MOTION for Reconsideration and Relief from Judgment re 85 Order on Motion to Dismiss, Order on Motion to Strike, Order on Motion for Preliminary Injunction, Order on Motion to Quash, filed by Jeffrey D Isaacs. (Attachments: # 1 Exhibit A - IP Counsel Recommendation, # 2 Exhibit B - Email correspondence evidencing Gibson Dunn's interference with due process, # 3 Exhibit C - News coverage of MTD verdict) (Isaacs, Jeffrey) (Filed on 12/28/2021) Modified on 12/28/2021 (gba, COURT |

| | | |
|---|---|---|
| | | STAFF). (Entered: 12/28/2021) |
| 12/29/2021 | 92 | **CLERK'S NOTICE: Set/Reset Deadlines as to 91 MOTION for Reconsideration and Relief from Judgment. Motion Hearing set for 2/10/2022 01:30 PM in San Francisco, - Videoconference Only before Judge Edward M. Chen. Responses due by 1/10/2022. Replies due by 1/17/2022.** <br><br> *(This is a text-only entry generated by the court. There is no document associated with this entry.)*,(vla, COURT STAFF) (Filed on 12/29/2021) <br><br> ───────────────────── <br> Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF) <br><br> **(Entered: 12/29/2021)** |
| 12/30/2021 | 93 | ORDER of USCA as to 88 Notice of Appeal to the Ninth Circuit **No. 21-17123** filed by Calid Inc, Coronavirus Reporter. (wsn, COURT STAFF) (Filed on 12/30/2021) (Entered: 12/30/2021) |
| 01/10/2022 | 94 | OPPOSITION/RESPONSE (re 87 MOTION for Reconsideration and Relief from Judgment re 85 Order on Motion to Dismiss,, Order on Motion to Strike,, Order on Motion for Preliminary Injunction,, Order on Motion to Quash ) filed byApple Inc.. (Brass, Rachel) (Filed on 1/10/2022) (Entered: 01/10/2022) |
| 01/18/2022 | 95 | REPLY (re 87 MOTION for Reconsideration and Relief from Judgment re 85 Order on Motion to Dismiss,, Order on Motion to Strike,, Order on Motion for Preliminary Injunction,, Order on Motion to Quash ) *, Request for Judicial Notice of Newly Discovered Apple Safari Safety Failure, and simultaneously filed Motion for Sanctions against Defendant Apple and counsel Gibson Dunn* filed byCalid Inc, Coronavirus Reporter, Primary Productions LLC. (Mathews, Keith) (Filed on 1/18/2022) (Entered: 01/18/2022) |
| 01/19/2022 | 96 | Motion for Rule 11 & Rule 37 Sanctions against Apple Inc and Gibson Dunn for sustained litigation abuse on the basis of medical condition, and evidence spoliation by Jeffrey D Isaacs (Isaacs, Jeffrey) (Filed on 1/19/2022) Modified on 1/21/2022 (gba, COURT STAFF). (Entered: 01/19/2022) |
| 01/19/2022 | | Set/Reset Deadlines as to 96 MOTION for Rule 11 & Rule 37 Sanctions. Responses due by 2/2/2022. Replies due by 2/9/2022. Motion Hearing set for 3/3/2022 01:30 PM in San Francisco, Courtroom 05, 17th Floor before Judge Edward M. Chen. (gba, COURT STAFF) (Filed on 1/19/2022) (Entered: 01/21/2022) |
| 01/24/2022 | 97 | MOTION for Sanctions *pursuant to Rule 37 and inherent authority of the USDC for evidence spoliation, fraud on the Court by Apple, Gibson Dunn* filed by Jeffrey D Isaacs. Motion Hearing set for 3/3/2022 01:30 PM in San Francisco, - Videoconference Only before Judge Edward M. Chen. Responses due by 2/7/2022. Replies due by 2/14/2022. (Attachments: # 1 Exhibit A - Dr. Isaacs medical diploma, AAMC termination of investigation subsequent to USC acquittal, # 2 Exhibit B - Law360 article COVID App Programmer Accuses Gibson Dunn Of Retaliation) (Isaacs, Jeffrey) (Filed on 1/24/2022) (Entered: 01/24/2022) |
| 01/25/2022 | 98 | ADMINISTRATIVE MOTION For An Order Summarily Denying Plaintiff Isaacs Motions for Sanctions filed by Apple Inc.. Responses due by 1/31/2022. (Attachments: # 1 Proposed Order, # 2 Declaration of R. Brass, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Exhibit D, # 7 Exhibit E)(Brass, Rachel) (Filed on 1/25/2022) (Entered: |

| | | 01/25/2022) |
|---|---|---|
| 01/26/2022 | 99 | ORDER of USCA as to 88 Notice of Appeal to the Ninth Circuit **No. 21-17123** filed by Calid Inc, Coronavirus Reporter.<br><br>*[T]his appeal is dismissed for failure to prosecute.*<br><br>(wsn, COURT STAFF) (Filed on 1/26/2022) (Entered: 01/26/2022) |
| 01/26/2022 | 100 | **ORDER by Judge Edward M. Chen Granting 98 Defendant Apple Inc.'s Motion for an Order Summarily Denying Plaintiff Jeffrey D. Isaacs' 96 97 Motions for Sanctions. (emcsec, COURT STAFF) (Filed on 1/26/2022)**<br><br>Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF)<br><br>**(Entered: 01/26/2022)** |
| 01/29/2022 | 101 | Request for Judicial Notice re 91 MOTION for Reconsideration and Relief from Judgment re 85 Order on Motion to Dismiss,, Order on Motion to Strike,, Order on Motion for Preliminary Injunction,, Order on Motion to Quash, *of January 28 2022 DOJ Amicus Brief Concerning relevant "errors that could imperil effective antitrust enforcement, especially in the digital economy"* filed byJeffrey D Isaacs. (Attachments: # 1 Exhibit 1- DOJ Ninth Circuit Amicus Brief re Apple Sherman Conduct in Epic)(Related document(s) 91 ) (Isaacs, Jeffrey) (Filed on 1/29/2022) (Entered: 01/29/2022) |
| 01/31/2022 | 102 | Brief *in Opposition to Plaintiff's 101 Request for Judicial Notice* filed byApple Inc.. (Brass, Rachel) (Filed on 1/31/2022) (Entered: 01/31/2022) |
| 02/02/2022 | 103 | **ORDER by Judge Edward M. Chen Denying 87 91 Plaintiffs' Motions for Reconsideration and Relief from Judgment. (emcsec, COURT STAFF) (Filed on 2/2/2022)**<br><br>Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF)<br><br>**(Entered: 02/02/2022)** |
| 02/02/2022 | 104 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Jeffrey D Isaacs. Appeal of Order on Motion to Dismiss,, Order on Motion to Strike,, Order on Motion for Preliminary Injunction,, Order on Motion to Quash,,,,, 85 , Order on Motion for Reconsideration,,, 103 , Judgment, 86 (Appeal fee of $505 receipt number ACANDC-16867292 paid.) (Attachments: # 1 Exhibit - Ninth Circuit Form 1 and Form 6 Notice of Appeal and Representation)(Isaacs, Jeffrey) (Filed on 2/2/2022) (Entered: 02/02/2022) |
| 02/02/2022 | 105 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Calid Inc, Coronavirus Reporter, Primary Productions LLC. Appeal of Order on Motion to Dismiss,, Order on Motion to Strike,, Order on Motion for Preliminary Injunction,, Order on Motion to Quash,,,,, 85 , Order on Motion for Reconsideration,,, 103 , Judgment, 86 (Pay.gov Agency Tracking ID ACANDC-168672.) (Attachments: # 1 Exhibit USCA Ninth Circuit Notice of Appeal)(Mathews, Keith) (Filed on 2/2/2022) (Entered: 02/02/2022) |
| 02/03/2022 | 106 | USCA Case Number 22-15166 U.S. Court of Appeals for the Ninth Circuit for 104 Notice of Appeal to the Ninth Circuit,, filed by Jeffrey D Isaacs. (ark, COURT |

| | | STAFF) (Filed on 2/3/2022) (Entered: 02/03/2022) |
|---|---|---|
| 02/03/2022 | 107 | USCA Case Number 22-15167 U.S. Court of Appeals for the Ninth Circuit for 105 Notice of Appeal to the Ninth Circuit, filed by Primary Productions LLC, Calid Inc, Coronavirus Reporter. (ark, COURT STAFF) (Filed on 2/3/2022) (Entered: 02/03/2022) |
| 02/25/2022 | 108 | MOTION to Relate Case *(Coring Co. v. Apple Inc., No. 22-cv-1044)* filed by Apple Inc.. (Attachments: # 1 Declaration of R. Brass, # 2 Exhibit A, Brass Declaration, # 3 Proposed Order)(Brass, Rachel) (Filed on 2/25/2022) (Entered: 02/25/2022) |
| 03/10/2022 | 109 | **ORDER by Judge Edward M. Chen Granting 108 Motion to Relate Cases 3:21-CV-05567-EMC and 3:22-CV-1044-JSW. (cl, COURT STAFF) (Filed on 3/10/2022)** <hr> Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF) <br> **Modified on 3/10/2022 (cl, COURT STAFF). (Entered: 03/10/2022)** |
| 04/05/2022 | 110 | Transcript Designation Form for proceedings held on 1104/2021 before Judge EMC, Transcript due by 4/4/2022. (Mathews, Keith) (Filed on 4/5/2022) (Entered: 04/05/2022) |
| 04/05/2022 | 111 | Transcript Designation Form for proceedings held on 11/04/2021 before Judge EMC, Transcript due by 4/4/2022. (Mathews, Keith) (Filed on 4/5/2022) (Entered: 04/05/2022) |
| 11/03/2023 | 112 | MANDATE of USCA as to 104 Notice of Appeal to the Ninth Circuit,, filed by Jeffrey D Isaacs "AFFIRMED." (msr, COURT STAFF) (Filed on 11/3/2023) (Entered: 11/03/2023) |
| 11/03/2023 | 113 | OPINION of USCA as to 104 Notice of Appeal to the Ninth Circuit **No. 22-15166**. (wsn, COURT STAFF) (Filed on 11/3/2023) (Entered: 11/03/2023) |
| 11/22/2023 | 114 | ORDER of USCA as to 105 Notice of Appeal to the Ninth Circuit **No. 22-15167**, filed by Primary Productions LLC, Calid Inc, Coronavirus Reporter, 104 Notice of Appeal to the Ninth Circuit **22-15166**, filed by Jeffrey D Isaacs (wsn, COURT STAFF) (Filed on 11/22/2023) (Entered: 11/22/2023) |
| 01/04/2024 | 115 | ORDER of USCA as to 88 Notice of Appeal to the Ninth Circuit, filed by Calid Inc, Coronavirus Reporter (sec, COURT STAFF) (Filed on 1/4/2024) (Entered: 01/04/2024) |
| 01/12/2024 | 116 | MANDATE of USCA as to 105 Notice of Appeal to the Ninth Circuit, filed by Primary Productions LLC, Calid Inc, Coronavirus Reporter, 104 Notice of Appeal to the Ninth Circuit,, filed by Jeffrey D Isaacs (ark, COURT STAFF) (Filed on 1/12/2024) (Entered: 01/12/2024) |
| 04/05/2024 | 117 | Supreme Court of the United States petition for a writ of certiorari case Number 22-15166, 22-15167 United States Court of Appeals for the Ninth. (kmg, COURT STAFF) (Filed on 4/5/2024) (Entered: 04/09/2024) |
| 04/12/2024 | 118 | MOTION to Reopen Case *pursuant to FRCP 60(b) in light of recently emerged regulatory landscape following EU DMA implementation and Apple's subsequent malicious compliance implementing "Core Technology Fees", aka notarization services surtax,* filed by Jeffrey D Isaacs. (Attachments: # 1 Exhibit A - Apple Core |

| | | Technology Fee Disclosure (EU DMA), # 2 Exhibit B - Consensus Press Coverage of Apple's Global Antitrust Malicious Compliance, # 3 Exhibit C - Microsoft Amicus Concerning Malicious Compliance with CAND Epic YGR Court, # 4 Exhibit D - Google Lawsuit Concerning Dr. Isaacs' Reissue Patent and Suspected Witness Retaliation, # 5 Exhibit E - Jury Verdict Form from Epic v. Google Litigation Supporting Single-Brand Markets for App Stores and Notary Stamps, # 6 Exhibit F - Coronavirus App "PhantomALERT" antitrust complaint filed in DC USDC, # 7 Exhibit G - The Coring Company antitrust complaint for "App Place" open source blockchain friendly app distribution, presently held in abeyance, # 8 Exhibit H - United States v. Apple Antitrust action (2024, NJ USDC), # 9 Exhibit I - SCOTUS Petition 23-1089, # 10 Declaration Declaration of Jeffrey D. Isaacs, M.D.)(Isaacs, Jeffrey) (Filed on 4/12/2024) (Entered: 04/12/2024) |
|---|---|---|
| 04/26/2024 | 119 | OPPOSITION/RESPONSE (re 118 MOTION to Reopen Case *pursuant to FRCP 60(b) in light of recently emerged regulatory landscape following EU DMA implementation and Apple's subsequent malicious compliance implementing "Core Technology Fees", aka notarization services ) filed by*Apple Inc.. (Attachments: # 1 Declaration of Julian W. Kleinbrodt, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4)(Kleinbrodt, Julian) (Filed on 4/26/2024) (Entered: 04/26/2024) |
| 04/30/2024 | 120 | **CLERK'S NOTICE SCHEDULING IN-PERSON MOTION HEARING.** <br><br> **Motion Hearing as to 118 MOTION to Reopen Case *pursuant to FRCP 60(b) in light of recently emerged regulatory landscape following EU DMA implementation and Apple's subsequent malicious compliance implementing "Core Technology Fees", aka notarization services set for 7/11/2024, at 1:30 PM in San Francisco, Courtroom 05, 17th Floor before Judge Edward M Chen.*** <br><br> ***ALL COUNSEL ARE REQUIRED TO APPEAR IN COURTROOM 5, 17TH FLOOR AT 1:10 PM TO CHECK-IN WITH THE COURTROOM DEPUTY.*** <br><br> ***(This is a text-only entry generated by the court. There is no document associated with this entry.)(vla, COURT STAFF) (Filed on 4/30/2024)*** <br><br> *Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF)* <br><br> ***(Entered: 04/30/2024)*** |
| 05/03/2024 | 121 | REPLY (re 118 MOTION to Reopen Case *pursuant to FRCP 60(b) in light of recently emerged regulatory landscape following EU DMA implementation and Apple's subsequent malicious compliance implementing "Core Technology Fees", aka notarization services ) filed by*Jeffrey D Isaacs. (Attachments: # 1 Exhibit A - Evidence Apple rejected Coronavirus Reporter on basis of Dr. Robert's Medical Authority Purportedly Not Being Institutionally Related)(Isaacs, Jeffrey) (Filed on 5/3/2024) (Entered: 05/03/2024) |
| 05/13/2024 | 122 | ORDER of USCA for the Supreme Court Denying Petition for a Writ of Certiorari as to 105 Notice of Appeal to the Ninth Circuit, filed by Primary Productions LLC, Calid Inc, Coronavirus Reporter. (gba, COURT STAFF) (Filed on 5/13/2024) (Entered: 05/15/2024) |
| 06/14/2024 | | **ORDER re 118 MOTION to Reopen Case *pursuant to FRCP 60(b) in light of*** |

*recently emerged regulatory landscape following EU DMA implementation and Apple's subsequent malicious compliance implementing "Core Technology Fees", aka notarization services filed by Jeffrey D Isaacs, 121 Reply to Opposition/Response, filed by Jeffrey D Isaacs.*

*The Court ORDERS Plaintiff to re-file 118 and 121 briefings in compliance with the formatting requirements under Civil Local Rule 3-4(c). Plaintiff shall re-file by 6/18/2024 at 4 p.m.*

*Signed by Judge Edward M. Chen on 06/14/2024. (This is a text-only entry generated by the court. There is no document associated with this entry.) (emclc3, COURT STAFF) (Filed on 6/14/2024)*

---

Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF)
*Modified on 6/14/2024 (vla, COURT STAFF). (Entered: 06/14/2024)*

| 06/14/2024 | 123 | STIPULATION WITH PROPOSED ORDER *Continuing Hearing on Plaintiff's Rule 60(B) Motion to Reopen Case* filed by Apple Inc.. (Kleinbrodt, Julian) (Filed on 6/14/2024) (Entered: 06/14/2024) |
| --- | --- | --- |
| 06/16/2024 | 124 | NOTICE by Jeffrey D Isaacs re 121 Reply to Opposition/Response,, 118 MOTION to Reopen Case *pursuant to FRCP 60(b) in light of recently emerged regulatory landscape following EU DMA implementation and Apple's subsequent malicious compliance implementing "Core Technology Fees", aka notarization services Filing of Compliant Document Formatting (Attachments: # 1 Rule 60 Motion (Reformatted), # 2 Rule 60 Reply (Reformatted))(Isaacs, Jeffrey) (Filed on 6/16/2024) (Entered: 06/16/2024)* |
| 06/20/2024 | 125 | **Order by Judge Edward M Chen GRANTING 123 STIPULATION CONTINUING HEARING ON PLAINTIFFS RULE 60(B) MOTION TO REOPEN CASE. (vla, COURT STAFF) (Filed on 6/20/2024)** <br><br> Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF) <br><br> **(Entered: 06/20/2024)** |
| 06/20/2024 | 126 | **CLERK'S NOTICE RESCHEDULING MOTION HEARING.** <br><br> **Motion hearing as to 118 MOTION to Reopen Case** *pursuant to FRCP 60(b) in light of recently emerged regulatory landscape following EU DMA implementation and Apple's subsequent malicious compliance implementing "Core Technology Fees", aka notarization services* **reset from 7/11/2024 to 9/26/2024, at 1:30 PM in San Francisco, Courtroom 05, 17th Floor before Judge Edward M Chen.** <br><br> **ALL PARTIES PARTICIPATING IN THE HEARING ARE TO ARRIVE IN THE COURTROOM NO LATER THAN 1:00 PM TO CHECK-IN WITH THE COURTROOM DEPUTY.** <br><br> *(This is a text-only entry generated by the court. There is no document associated with this entry.)*(vla, COURT STAFF) (Filed on 6/20/2024) <br><br> Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF) |

| | | |
|---|---|---|
| | | **(Entered: 06/20/2024)** |
| 08/07/2024 | 127 | **CLERK'S NOTICE RESCHEDULING MOTION HEARING.**<br><br>**Motion Hearing as to 118 MOTION to Reopen Case pursuant to FRCP 60(b) in light of recently emerged regulatory landscape following EU DMA implementation and Apple's subsequent malicious compliance implementing "Core Technology Fees", aka notarization services reset from 9/26/2024 to 10/10/2024, at 1:30 PM in San Francisco, Courtroom 05, 17th Floor before Judge Edward M Chen.**<br><br>**ALL PARTIES PARTICIPATING IN THE HEARING ARE REQUIRED TO ARRIVE IN COURTROOM 5, 17TH FLOOR NO LATER THAN 1:00 PM TO CHECK-IN WITH THE COURTROOM DEPUTY.**<br><br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)*(vla, COURT STAFF) (Filed on 8/7/2024)<br><br><small>Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF)</small><br>**(Entered: 08/07/2024)** |
| 09/17/2024 | 128 | CLERK'S NOTICE REGARDNG MOTION HEARING:<br><br>MOTION [118 ] SCHEDULED FOR HEARING ON 10/10/2024, at 1:30 P.M. SHALL BE SUBMITTED WITHOUT ORAL ARGUMENT PURSUANT TO CIVIL LOCAL RULE 7-1(b). ACCORDINGLY, THE MOTION HEARING IS VACATED.<br><br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)* (vla, COURT STAFF) (Filed on 9/17/2024)<br><br><small>Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF)</small><br>(Entered: 09/17/2024) |
| 10/28/2024 | 129 | **ORDER by Judge Edward M. Chen denying 118 Motion to Reopen Case. (emclc3, COURT STAFF) (Filed on 10/28/2024)**<br><br><small>Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF)</small><br>**(Entered: 10/28/2024)** |
| 11/27/2024 | 130 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Jeffrey D Isaacs. Appeal of Order on Motion to Reopen Case, 129 (Appeal fee of $605 receipt number BCANDC-20095952 paid.) (Attachments: # 1 Supplement Form)(Isaacs, Jeffrey) (Filed on 11/27/2024) (Entered: 11/27/2024) |
| 12/03/2024 | 131 | USCA Case Number 24-7280 United States Court of Appeals for the Ninth Circuit. (kmg, COURT STAFF) (Filed on 12/3/2024) (Entered: 12/04/2024) |
| 12/05/2024 | 132 | MOTION to Relate Case filed by Apple Inc.. (Attachments: # 1 Declaration of Julian W. Kleinbrodt, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Proposed Order)(Kleinbrodt, Julian) (Filed on 12/5/2024) (Entered: 12/05/2024) |

| 12/09/2024 | 133 | OPPOSITION/RESPONSE (re 132 MOTION to Relate Case ) filed byCoronavirus Reporter Corporation. (Attachments: # 1 Exhibit A - Apple declaration that "Coronavirus Reporter" is a legal non-entity, # 2 Exhibit B - FAC Comparison to DOJ case, CRC case)(Mathews, Keith) (Filed on 12/9/2024) (Entered: 12/09/2024) |
|---|---|---|
| 01/09/2025 | 134 | **Order by Judge Edward M Chen GRANTING 132 Motion to Relate Case.(vla, COURT STAFF) (Filed on 1/9/2025)**<br><br>Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF)<br><br>**(Entered: 01/09/2025)** |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 03/11/2025 22:26:26 | | |
| **PACER Login:** | jeffreydi | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:21-cv-05567-EMC |
| **Billable Pages:** | 17 | **Cost:** | 1.70 |