No. 24-7280

---

# In the United States Court of Appeals for the Ninth Circuit

—————————————

DR JEFFREY ISAACS,

*Plaintiff-Appellant,*

v.

APPLE INC.

*Defendant-Appellee.*

—————————————

On Appeal from the United States District Court
for the Northern District of California
No. 3:21-cv-05567-EMC
Hon. Edward M. Chen

—————————————

## OBJECTION TO APPLE'S MOTION FOR SUMMARY AFFIRMANCE

—————————————

JEFFREY ISAACS
11482 KEY DEER CIRCLE
Wellington, FL 33449

# TABLE OF CONTENTS

**INTRODUCTION** .................................................................................................1

**LEGAL STANDARD** ...........................................................................................3

   I.    The Law of the Case Regarding Notary Stamps Is Thin to Nonexistent ............4

   II.   There is No "Law of the Case" Regarding Plaintiffs' Tying Allegation............8

   III.  Apple's Strategic Misuse of the Summary Affirmance Procedure....................11

   IV.  Two-Sided Market Theory does not Address Notarization ...............................16

   V.   The District Court's Judgment Has Prospective Effect Under Rule 60(b)(5)...18

   VI.  Page Count Dismissal Reflects a Misuse of Discretion by the District Court 20

**CONCLUSION** ...................................................................................................22

## INTRODUCTION

Apple's Motion for Summary Affirmance attempts to short-circuit this appeal by painting it as "manifestly without merit," yet the facts, law, and equities overwhelmingly show otherwise. This is an antitrust case which affects almost every American. It asks a deceptively simple but profoundly significant question: If you purchase an iPhone, do you truly own it, or does Apple maintain perpetual control over the software that can run on your device?

In this appeal, the Opening Brief challenges Apple's use of a digital "Notary Stamp" mechanism as an unlawful tie between Apple's iPhone and a separately monetized signature required to run any software on iOS. This "stamp" was initially dismissed by the District Court as an "integrated, inseparable part of the iPhone operating system," neither a separate product nor a relevant market. But subsequent new developments—particularly Apple's introduction of a "Core Technology Fee" (CTF) in the European Union and evidence of malicious compliance with the *Epic* anti-steering UCL injunction in the U.S.—have shown beyond dispute that Apple now openly unbundles and monetizes the notary stamp. Those developments expose Apple's original stance as inaccurate or incomplete, justify revisiting the prior judgment under Rule 60(b), and present substantial issues ripe for full appellate review.

By contrast, Apple's Motion for Summary Affirmance rests on a distorted reading of the record. Defendant-Appellee cites the "law of the case" doctrine as though the District Court or this Court had ever meaningfully analyzed, let alone definitively decided, the "Notary Stamp" tying claim. But that never happened. The District Court dismissed the complaint at the pleading stage under Rule 12(b)(6), faulting Plaintiffs' market definitions and purported lack of antitrust injury—never substantively reaching whether Apple's stamp requirement could constitute a separate, illegally tied product. Since then, Apple's introduction of a separate CTF line item internationally, as well as continuing domestic fees discovered through the *Epic* litigation, have changed the factual landscape. Thus, the key notary-stamp-based tying allegations remain unresolved and, if anything, are now more blatant than ever.

Apple's Motion for Summary Affirmance is inappropriate under Ninth Circuit standards, which allow such expedited rulings only if the appeal presents no substantial question or is manifestly controlled by binding precedent. Here, numerous significant questions remain, including whether the District Court misapplied "law of the case" to foreclose claims never actually decided regarding single-brand markets for iOS notarization. Review is further necessary to determine if Apple's notarization fees are a continuing antitrust violation that warrants reopening under *Lawlor* and *Hanover Shoe* principles. Appellate intervention is

likewise necessary to determine if a denied injunction – filed to halt the tying of notary stamps to a smartphone – represents a ruling of a prospective nature. Lastly, the Court is requested to assess whether the District Court's procedural rejections on page limits suppressed a factually grounded, newly supported antitrust theory in the smartphone economy.

For these reasons and more detailed in the Appellant's Opening Brief, Appellant respectfully requests that this Court deny Apple's motion and permit the appeal to proceed on its merits.

## LEGAL STANDARD

A motion for summary affirmance "will be granted only if it is manifest that the questions on which the decision of the cause depends are so unsubstantial as not to need further argument." See *In re Thomas*, 508 F.3d 1225, 1227 (9th Cir. 2007). Under Ninth Circuit precedent, summary affirmance is disfavored unless the appellant "can present no substantial question." *Id*. Indeed, the Court's approach is "cautious," ensuring that summary affirmance "does not become a substitute for the normal appellate process." *United States v. Hooton*, 693 F.2d 857, 858 (9th Cir. 1982).

Apple has not come close to meeting this high standard.

## ARGUMENT

## I.    THE LAW OF THE CASE REGARDING NOTARY STAMPS IS THIN TO NONEXISTENT

Apple heavily relies on the "law of the case" doctrine, asserting that Plaintiffs' claims regarding the single-brand market for Notary Stamps were fully adjudicated and conclusively rejected. ***What exactly does law of the case say about notary stamps? The law of the case, on this matter, is thin to non-existent***. Careful review reveals precisely how limited—and in 20/20 hindsight, incorrect—the "law of the case" actually is concerning the alleged conduct.

To establish a single-brand market under controlling antitrust precedent, Plaintiffs typically must allege three elements. First, Plaintiffs must allege facts showing that consumers perceive no adequate substitutes for the single-brand product. *Eastman Kodak Co. v. Image Tech. Servs., 504 U.S. 451, 481–82 (1992)*. Second, Plaintiffs must demonstrate consumers face substantial switching costs or other economic barriers creating a "lock-in," making substitution economically infeasible. *Newcal Indus., Inc. v. Ikon Office Solution, 513 F.3d 1038, 1048–49 (9th Cir. 2008)*. And third, Plaintiffs must plead facts reflecting actual consumer behavior or market realities consistent with single-brand constraints. *Kodak, 504 U.S. at 482–83; Newcal, 513 F.3d at 1045–46*.

Remarkably, the entirety of the District Court's prior analysis of the Notary Stamp market was confined to **just one conclusory sentence**:

4

"[T]he alleged notary stamp market is entirely artificial; there are no allegations suggesting that Apple actually charges developers any separate, identifiable fee for such a 'stamp.'" *(ECF 85 at 15)*

Notably, the court below never addressed Element #1: whether the Notary Stamp is a distinct product with no substitutes. It provided no analysis regarding interchangeability or substitutability of the Notary Stamp—Plaintiffs argued (and reiterate here) that by definition, Apple's Notary Stamp is a mandatory, non-substitutable approval process imposed exclusively by Apple. The lower court's discussion of two-sided *Amex* platforms pertained (incorrectly) to the App Store markets and alleged monopsonies – not to the notary stamp. The court likewise never addressed Element #2: the reality of consumer lock-in. Plaintiffs explicitly pleaded that consumers (and thus app developers) are completely locked into Apple's iOS ecosystem, facing prohibitive switching costs—a textbook case under *Newcal* and *Kodak*. The court's single-sentence dismissal was limited to Element #3: "economic reality," solely asserting—incorrectly, as new evidence now plainly shows—that the market was "artificial" because Apple "didn't charge a separate identifiable fee." Thus, contrary to Apple's framing, the law of the case regarding Notary Stamps is exceptionally thin, limited solely to a single erroneous assertion about fees.

This Rule 60 motion addresses precisely that single conclusory point by highlighting three major developments: Apple's new "Core Technology Fee (CTF)" in Europe explicitly establishes precisely the type of "separate, identifiable fee" that

the District Court said did not exist. Second, the *Epic v. Apple* anti-steering injunction demonstrated Apple's ability to separately charge for notarization in the United States. See, generally, *Opening Brief* on recent Phil Schiller testimony. Third, the *Epic v. Google* jury verdict illustrates judicial recognition and validation of single-brand markets in digital app practices, making it clear that such a market construct is not only plausible but increasingly accepted by courts and juries.

Even one of these new developments alone justifies reconsideration under Rule 60(b). Appellant has presented three such developments, creating a compelling basis to revisit the lower court's cursory and now demonstrably incorrect assumption.

Apple's reliance on the doctrine of law of the case attempts to exaggerate the scope and depth of prior rulings on Notary Stamps. In reality, the District Court's prior holding on this point is minimal, unsupported by analysis on two of the three critical elements, and directly contradicted by new, powerful evidence now before this Court. Apple's attempt to dismiss the Notary Stamp market as already decided is clearly overstated, and the case for revisiting it under Rule 60 is not merely plausible—it is compelling. Apple claims the "failure to adequately allege the prerequisites to a single-brand market was only one of many failures with the Complaint," but as demonstrated above, these items were there in plain daylight, and

it is now clear they were erroneously dismissed. If there existed any doubt in this matter, it warrants conducting an evidentiary hearing.

Apple purports that no "clear and authoritative change in governing law" exists since the Ninth Circuit's decision. (*Motion* at 9). This position ignores reality. Controlling legal principles have shifted, including both factual items and antitrust regulatory enforcement law. As the Opening Brief extensively demonstrates, the three aforementioned, substantial regulatory developments have altered the governing legal landscape concerning Apple's app-distribution practices. (*Opening Br*. at 7–8, 11). Both the DMA's mandated unbundling and the *Epic* injunction constitute significant, concrete shifts in antitrust regulation—developments absent and unforeseeable at the time of the initial dismissal. *Epic v. Google* also represents a change in controlling law and facts: single-brand app distribution tactics exist. (*Opening Br*. at 29–30). Apple's motion entirely fails to rebut the central fact that these regulatory actions represent material shifts in the "controlling legal principles" governing Apple's app distribution and tying practices, directly undermining the original rationale for dismissal. In *Agostini v. Felton*, 521 U.S. 203, 215 (1997), the Supreme Court affirmed that Rule 60(b)(5) relief is appropriate when a significant change in controlling law renders continued application of a judgment inequitable, reaffirming *Rufo's* principle that a judgment may be reopened based upon substantial changes *either* in **factual conditions** or *governing law*.

7

The Ninth Circuit has repeatedly emphasized that law of the case is a discretionary doctrine, not an "ironclad rule," and courts should deviate from it when substantially different evidence emerges after an initial ruling. See *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997) ("[T]he law of the case doctrine is discretionary, not mandatory," and courts may revisit issues when "substantially different evidence" arises).

## II.    THERE IS NO "LAW OF THE CASE" REGARDING PLAINTIFFS' TYING ALLEGATION

A simple word search confirms that the term "tying" appears nowhere—not even once[1] —in either the District Court's original 34-page dismissal order or the Ninth Circuit's published opinion affirming dismissal. With respect to the tied product – the Notary Stamp[2] – as shown above, the entirety of the judicial analysis is limited to a single, conclusory sentence that the market alleged is "not reality." This cursory dismissal cannot, under any reasonable standard, constitute meaningful or binding "law of the case." A close examination of both the District Court's dismissal order and the Ninth Circuit's opinion confirms no judicial analysis whatsoever was undertaken regarding Plaintiffs' tying allegations. While the law of

---

[1] An introductory block quote enumerates the FAC claims, but never proceeds to analysis of the tying cause of action.

the case on the subject of Notary Stamps is minimal at best, the record is unequivocal that the law of the case regarding the overall tying conduct is nonexistent.

Plaintiffs' tying allegations were clear, specific, and entirely consistent with controlling Supreme Court precedent. The gravamen of Plaintiffs' claim is that Apple leveraged monopoly power over the iPhone device (the "tying" product) to force developers and consumers to purchase a separate, unwanted product—Apple's digital Notary Stamp[3] (the "tied" product)—as a mandatory condition for launching software.

This arrangement constitutes a textbook example of a *per se* unlawful tying arrangement as condemned by the Supreme Court in seminal antitrust cases, including *Northern Pacific Railway Co. v. United States, 356 U.S. 1, 5–6 (1958)* and *Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 462–63 (1992)*. In *Northern Pacific*, the Supreme Court explicitly held:

> "[Tying agreements] deny competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or lower price but because of his power or leverage in another market." (*Northern Pacific, 356 U.S. at 6*).

---

[3] Plaintiffs' operative complaint likewise alleged that the App Store (in addition to notary stamps) is tied to the iPhone device. The bulk of the prior opinions concerns the nature of the App Store platform itself with respect to *Amex* platform interchangeability. Nevertheless, tying of the App Store was never mentioned in either of the USDC or USCA opinions.

This rationale perfectly describes Plaintiffs' allegations: Apple forces developers into purchasing its Notary Stamp not by offering superior quality or price, but purely by exploiting its leverage and market power in the tying product (the iPhone). No other computing platform in history has done this.

By way of background, Plaintiffs had clearly plead a *per se* tying violation. Plaintiffs explicitly alleged two separate products: (1) the iPhone itself (a smartphone device), and (2) the mandatory Notary Stamp, a separate, artificially imposed digital signature for which Apple charges mandatory fees. *(See FAC ¶¶ 24–26, 49–51.)* Plaintiffs explicitly alleged Apple's undisputed market dominance over the iPhone device, including market shares, lock-in effects, and consumer dependency on the iPhone ecosystem. *(FAC ¶¶ 74–78.)* Plaintiffs explicitly alleged coercion, showing developers have absolutely no practical choice but to purchase Apple's Notary Stamp in order to distribute apps to the billions of iPhone users. *(FAC ¶¶ 26, 50–52.)* Plaintiffs explicitly alleged that billions of dollars in supra-competitive fees have been collected through the coerced sale of Notary Stamps. *(FAC ¶¶ 50–52.)*

What exactly did the courts previously say about tying? Critically, the answer is: nothing. The District Court never addressed tying. The dismissal order never analyzed any of the required tying elements (separate products, coercion, market power, anticompetitive effect). The Ninth Circuit never addressed tying either. Its

opinion (ER 110-126) contained no reference to tying and no analysis of the anticompetitive harm from bundling.

It is therefore curious why Apple's opposition wrongly asserts that the District Court "fully addressed and rejected Plaintiffs' tying allegations." (*Apple Opp*. at 5.). Notably, Apple fails to cite a single passage in either court's opinion that substantively addresses or even mentions tying. Apple instead directs the Court only to general discussions about market definitions. (*Id*. at 5–6.) As stated above, those generalities resulted in a conclusory dismissal of notary stamp tying allegations.

In short, Apple's Motion attempts to rewrite history: neither the District Court nor the Ninth Circuit ever addressed or decided the controlling elements of tying— separate products, coercion, market power, and anticompetitive harm. Plaintiffs' tying claim and the notarization digital product definition, rooted in well-established Supreme Court *Northern Pacific* precedent, thus remains entirely undecided, unaddressed, and unmentioned in the prior opinions.

## III.   APPLE'S STRATEGIC MISUSE OF THE SUMMARY AFFIRMANCE PROCEDURE

This Court should consider the possibility that Apple is using the affirmance procedure under Ninth Circuit Rule 3-6 strategically to short-circuit legitimate

11

antitrust inquiry of national—and indeed global—importance. Immediately upon filing of the opening brief in this appeal, MLex covered this Rule 60 appeal:

> **"App developer asks US appeals court to reopen antitrust case against Apple [March 12, 2025, 23:31 GMT | Official Statement]**
>
> **MLex Summary:** Counsel for Dr. Jeffrey D. Isaacs asked a US appeals court to reopen an antitrust case accusing Apple of abusing its monopoly over the App Store by denying Isaacs' coronavirus app access to its store, saying that a recent change to Apple's policy in the EU proves that iOS notarization is not inseparable from the phone's hardware or operating system. "If Apple truly had no separate 'notary stamp' here in the US, it wouldn't be able to unbundle and monetize it in the EU. The new CTF vindicates the entire premise of the initial lawsuit," they said.

MLex immediately grasped the subject of this appeal, something Apple seeks to obscure by summary disposition: Apple's own recent unbundling of its notarization function in Europe unequivocally demonstrates that iOS notarization is indeed separable from the iPhone device and its operating system. Apple now asks this Court to repeat the exact mistake made by the District Court years ago, and despite five years of material developments, pronounce notarization is "not reality."

To grant Apple's request here would be profound injustice. It would perpetuate precisely the unchecked monopoly conduct that antitrust laws were designed to prevent, allowing Apple's carefully disguised anticompetitive practices to continue for potentially decades longer.

12

Indeed, the opening brief specifically raised Apple's repeated pattern of responding to antitrust litigation by launching *ad hominem* attacks against those who advocate reform. The brief even challenged Apple to compile and produce evidence of all such remarks. Such scrutiny[4] of Apple's litigation tactics might alone have motivated the filing of this strategic motion. Indeed, this motion is more of the same, characterizing Plaintiffs' legitimate antitrust inquiry as "vexatious." A comparison to *Optional Capital*[5] borders on the frivolous, given that the issues here are indisputably newsworthy and timely.

The notary stamp, as described in this and related filings, can be analogized to a toll booth, subway turnstile, or padlock—each a clear barrier to free access. The fact that Apple's gatekeeping mechanism has been hidden in plain sight for two decades, intertwined with most people's everyday internet access, renders it less obvious to courts and the public. Consider an alternative historical scenario: imagine if, in the era when American automotive innovators first mass-produced cars, they

---

[4] Opposing Counsel misrepresents a statement by The Honorable Scott Skavdahl (USDC Wyoming District). Judge Skavdahl wrote "The Court acknowledges Plaintiffs' alleged claims of injustice delivered by the hands of Apple."

[5] Apple leans heavily on the Ninth Circuit's *Optional Capital, Inc. v. DAS Corp.*, 66 F.4th 1188 (9th Cir. 2023) to argue the Rule 60(b) motion reasserts issues conclusively decided. This comparison fails. Nothing in Optional Capital comes close to Apple's breathtaking efforts to subvert global antitrust regulation, vis-à-vis the recent exposure of notary stamp charges. *Optional Capital* involved a repetitive attempt to relitigate a straightforward contract-payment dispute, where the litigant presented no new material facts. Global news coverage about Apple's escalating fees conduct is too extensive to list in this motion; *Optional* had no such events transpire.

13

had also privately controlled every toll booth on the interstate highway system. Coincidentally, both of these infrastructures—the internet today, and the interstate highway system historically—were developed by federal government initiative. But Apple appropriated control of most people's primary gateway to the internet through its notarization scheme. Apple now effectively dictates who accesses what on the internet, constructing digital toll booths at will and deciding passage based on profit maximization, corporate self-preferencing, or even political preference.

There would be justified public outrage if one private company had monopolized all interstate toll booths, controlling who travels where based on one monopoly's interests. Unfortunately, our nation has never witnessed such liberty with the smartphone as it did with the automobile. While public outrage over Apple's conduct is increasing—with bipartisan legislation enjoying 70% support in the U.S. and many countries actively challenging Apple's market power—the comparative silence historically is a puzzle for future inquiry.

Nonetheless, this Court must recognize and address this conduct now. The notarization stamp, toll booth, or whatever metaphor captures its true digital reality undeniably exists—and Plaintiffs' original insights into this subtle yet pervasive antitrust violation five years ago have proven prescient. Apple's current litigation strategy is transparently designed to suppress this illuminating theory once again.

14

The Court should reject Apple's attempt to bury this crucial antitrust issue and finally allow Plaintiffs' claims to be heard on the merits.

## IV. DISCOVERY AND EVIDENTIARY HEARING ARE APPROPRIATE

Apple seeks Summary Affirmance on the supposed basis there is no new evidence. But the District Court denied an evidentiary hearing, following Apple's claims that no discovery or evidentiary hearing was justified because the original dismissal was based on the pleadings, and "no amount of testimony can change that." (*Apple Opp*. at 22.) This position fundamentally misstates the standard for evidentiary hearings in the context of Rule 60(b).

The Ninth Circuit has consistently held that an evidentiary hearing is appropriate where significant new factual developments or allegations emerge after judgment—especially where these developments bear directly on the substantive adequacy of a complaint initially dismissed on the pleadings. See *Latshaw v. Trainer Wortham & Co.*, 452 F.3d 1097, 1103 (9th Cir. 2006) (holding that district courts abuse their discretion when foreclosing essential fact-finding related to newly emergent allegations under Rule 60(b)). Moreover, the Supreme Court has expressly directed district courts to remain flexible in permitting limited discovery or hearings under Rule 60(b) motions, particularly when changed factual circumstances

undermine the basis for the initial judgment. *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 380–81 (1992).

The Opening Brief specifically invoked these standards, noting the appropriateness of at least minimal discovery or an evidentiary hearing given Apple's recent conduct:

> "The District Court had a duty to inquire whether 'single-brand' or 'stamp-based' market definitions had become viable. In ignoring these post-judgment developments and failing to entertain a limited hearing or discovery, the District Court effectively foreclosed legitimate avenues of factual and legal exploration…Permitting an evidentiary hearing would illuminate these critical issues and prevent judicial finality from shielding ongoing antitrust violations. Without a hearing, the District Court mistakenly concluded, largely upon Apple's word, that 'nothing has changed.'" (*Opening Br*. at 35-37.)

Thus, summary affirmance is particularly inappropriate when legitimate factual developments could be scrutinized at evidentiary hearing. Apple plainly seeks to close off judicial examination of precisely the developments Rule 60(b) is designed to address, and close the doors to necessary fact adjudication through a hasty affirmance.

## IV. TWO-SIDED MARKET THEORY DOES NOT ADDRESS NOTARIZATION

Apple's Motion states "Plaintiffs 'fail[ed] to properly allege a relevant [two-sided] market.'" (Motion at 4). Apple thereby concedes that Plaintiffs' complaint failed because it purportedly did not adequately account for the economic realities

16

of a "two-sided" symmetric market. However, a two-sided *Amex* platform is non-sensical when applied to the concept of notarization. Hence, Apple's characterization fundamentally misconstrues the nature of rulings, and moreover, only proves that the law of the case references the App Store two-sided platform, and is wholly inapplicable to Notary Stamps. Summary affirmance is an inappropriate means to adjudicate complexities and controlling facts surrounding this unique single-brand market.

The economic harm alleged from Apple's notary stamp requirement does not hinge upon the traditional (a)symmetric market dynamics of the App Store platform. Rather, the underlying Complaint alleged that Apple imposed a discrete, economically unnecessary cost—the notarization stamp—that artificially restricted software distribution, regardless of marketplace structure:

> "Under this notarization model, Apple can (and does) censor COVID-19 apps, hamper cross-platform video solutions, and impose Core Technology Fees on developers… Whether it exists as a distinct CTF, or a hidden bundled fee, the net effect is the same stranglehold on iOS software distribution—a 'stamp tax' that punishes free app developers and stifles user freedom." (*Opening Br.* at 2.)

Thus, Apple's invocation of the two-sided market theory—regardless of its prior correctness or error—does not address, nor could it possibly negate, the separate and independently viable antitrust claim relating specifically to notarization fees. The law of the case as articulated by the Ninth Circuit and District Court

certainly never applied *Amex* two-sided market theory to notary stamps, and Apple's attempt to suggest it did is unsupported.

## V.    THE DISTRICT COURT'S JUDGMENT HAS PROSPECTIVE EFFECT UNDER RULE 60(B)(5)

Apple wrongly claims the Appellant invokes only the prospective inequity prong of Rule 60(b)(5). On the contrary, Isaacs explicitly argued that the District Court's dismissal was also based on legal premises—that single-brand markets are inherently implausible or legally disfavored—that have since been effectively reversed or vacated in relevant part by precedent established in *Epic v. Google*. The jury verdict in *Epic* explicitly affirmed the viability of single-brand markets as relevant antitrust markets in digital app distribution, directly undermining the legal assumptions on which the District Court relied. Accordingly, Isaacs' Rule 60(b)(5) argument does not rest solely on prospective inequity, but directly invokes the alternate basis in Rule 60(b)(5): that the prior judgment was based on earlier assumptions that have now been reversed or vacated.

Apple erroneously dismisses any possibility of relief under Rule 60(b)(5), contending that the prior judgment had no prospective effect. Apple provides exactly zero citations supporting its claim that a denied injunction categorically lacks prospective effect. Apple concedes it filed its own Rule 60 motion concerning a

18

continuing UCL injunction, and then declares "there is no such injunction here." But there was a denied continuing injunction against tying iPhone use to iOS notarization products. While not every denied injunction may have prospective implications, this particular denial effectively immunizes ongoing anti-competitive conduct of the largest possible scale, warranting reconsideration.

While the dismissal itself was facially retrospective insofar as it addressed an app rejection of the first Coronavirus App in late February of 2020, the causes of action to enjoin conduct pursuant to Sherman Act of 1890 were clearly of a prospective nature, and hence the underlying ruling and denied prospective injunction had a broader practical consequence: it insulated Apple's ongoing notarization practices from future antitrust scrutiny by cementing the erroneous factual conclusion that notarization was inseparable from the iPhone. Subsequent factual developments—i.e. CTF and UCL conduct—have fundamentally undermined the basis for the dismissal. Under these unique circumstances, courts have recognized that when changed factual circumstances reveal an ongoing antitrust violation, continued application of a prior judgment may become inequitable and justify reopening under Rule 60(b)(5). See *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 380–81 (1992). Appellant respectfully submits that the dramatically changed factual landscape at least warrants judicial consideration as to

whether continued enforcement of the prior dismissal is inequitable or unjust, and therefore properly revisited under Rule 60(b)(5).

As to the catch-all FRCP 60(b)(6) provision, Apple declares "nothing of that sort occurred here, and Isaacs does not suggest otherwise." Motion at 11. Apple conveniently argues that "all litigation must come to an end," yet Apple itself subverted a definitive federal determination meant precisely to curb notarization. In 2010, the U.S. Copyright Office explicitly recognized consumers' right to bypass Apple's notarization restrictions—then known as "jailbreaking"—because notarization unlawfully restricted consumers' control over their purchased iPhones. Instead of complying, Apple doubled down, strengthening its notarization system, circumventing federal intent, and ensuring that this very problem persists fifteen years later. Dr. Isaacs is the first plaintiff to identify notarization itself as a distinct Sherman Act market. If Apple's deliberate defiance of federal policy and sustained restriction of consumer freedoms do not constitute "exceptional circumstances," it is difficult to conceive what would.

## VI.  PAGE COUNT DISMISSAL REFLECTS A MISUSE OF DISCRETION BY THE DISTRICT COURT

The District Court's dismissal of the Rule 60 motion on a purported page-length procedural ground alone represented an abuse of discretion, as the underlying

motion was not, in fact, overlength. Apple asserts summary affirmance is warranted because the Rule 60 motion was purportedly overlength – and undisputedly so, according to Appellee's motion. But that is simply untrue. The Rule 60 motion was originally filed without left-sided line numbering, and with excess space between section headers. Judge Chen issued an order requiring the Plaintiff format the Rule 60 motion with line numbering. The correctly re-formatted motion, which the Court itself ordered, was twenty-five pages in total length. No content was changed during repagination formatting. Hence, the Rule 60 motion was page-length compliant, and dismissing an antitrust case concerning the largest monopoly in history on this basis is nothing less than unreasonable.[6]

The Rule 60 motion explicitly demonstrated compliance with Local Rule 7-2(b), and Apple has offered no evidence to the contrary. The District Court's order (Dkt. 123) rejected the motion based solely on page count. This was clear legal error and an abuse of discretion, particularly given the substantial, timely antitrust issues raised. Courts must exercise procedural dismissals judiciously—not to evade adjudication of critical issues. See *Foman v. Davis*, 371 U.S. 178, 181–82 (1962)

---

[6] Apple cites decade-old *Whitepages* litigation as somehow supporting a dismissal for a page count violation. It is unclear how that case is relevant. Without belaboring the matter, *Whitepages* initiated litigation to invalidate Dr. Isaacs' patent, which provided free Caller-ID allowing 300 million users to safely screen calls and text messages. Isaacs retained Winston & Strawn to litigate the matter; the Federal Circuit selected it as a teaching case tried at Columbia Law School. Ultimately, the patent was re-issued by the USPTO and remains in effect.

(policy favors merits-based decisions, not technicalities). Apple's reliance on this procedural error as justification for summary affirmance is misplaced.

## CONCLUSION

Apple's practice of claiming absolute control over iOS app distribution—and therefore, every iPhone owner (80% of the US population)—raises fundamental questions about whether a user truly owns a smartphone they purchased. The public interest requires thorough antitrust scrutiny, not an abrupt terminus via summary affirmance.

Apple's motion for summary affirmance fails to satisfy the Ninth Circuit's stringent criteria. Far from presenting an "obviously meritless" appeal, the Opening Brief challenges Apple's newly revealed notary fees and raises legitimate, unresolved antitrust questions unaddressed by prior rulings. The record demonstrates evolving facts and evolving market conditions—precisely when a final judgment may no longer be equitable under Rule 60(b). In line with the Supreme Court's directive to avoid immunizing continuing anticompetitive conduct, the Court should deny Apple's motion and allow the appeal to proceed to full briefing, argument, and an on-the-merits decision.

Date: March 31, 2025                    Respectfully submitted,

/s/ Jeffrey Isaacs
JEFFREY D. ISAACS, MD
11482 KEY DEER CIRCLE
Wellington, FL 33449

## CERTIFICATE OF COMPLIANCE

I certify that this motion contains 4,798 words, excluding the parts of the motion exempted by Federal Rule of Appellate Procedure 32(f). I certify that this motion complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this motion has been prepared in a proportionately spaced 14 point Times New Roman typeface using Microsoft Word.

**Certified by:**
/s/ Jeffrey D. Isaacs, MD          **Date** March 31, 2025


## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Motion for Summary Affirmance with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on March 31, 2025. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


**Certified by:**
/s/ Jeffrey D. Isaacs, MD          **Date** March 31, 2025